**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SHOLEM WEISNER,

        Plaintiff,

    v.

GOOGLE LLC and SHMUEL NEMANOV

        Defendant and Involuntary Party.

Case No.: 20-cv-02862-AKH

**GOOGLE'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS FIRST AMENDED COMPLAINT UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)**

**TABLE OF CONTENTS**

|  |  |  | Page |
|---|---|---|---|
| I. | INTRODUCTION | | 1 |
| II. | THE PATENTS-IN-SUIT | | 2 |
| | A. | Overview of the '202 Patent (Bilateral Physical Encounters) | 2 |
| | B. | Overview of the '910 Patent (Unilateral Physical Encounters) | 10 |
| | C. | Overview of the '911 Patent (Return Visit Prioritization) | 11 |
| | D. | Overview of the '905 Patent (Common Experience Prioritization) | 12 |
| III. | THE PATENTS ARE INVALID UNDER 35 U.S.C. § 101 | | 14 |
| | A. | Legal Standard Regarding Patent Eligibility | 14 |
| | B. | Keeping Travel Logs Is an Abstract Idea | 17 |
| | | 1. Humans Have Long Recorded Information About Their Travels | 18 |
| | | 2. Courts Have Found Claims Reciting Similar Subject Matter Abstract | 20 |
| | | 3. The Claims Do Not Address A Problem Rooted in Technology | 22 |
| | C. | The Patent Claims Lack an Inventive Concept | 24 |
| | | 1. The Undisputed Facts Show the Asserted Claims Recite Only Conventional Components Arranged in A Conventional Manner to Perform the Recited Functions | 24 |
| | | a. The Stationary Components Are Not Inventive: "processing system," "telecommunications network," and "database" | 26 |
| | | b. The Mobile Components Are Not Inventive: "application," "mobile communication device," and "positioning system" | 27 |
| | | c. The Additional Extra-Solution Features Are Not Inventive | 29 |
| | | d. The Sequence of Steps Is Not Inventive | 31 |
| | | 2. The Remaining Claims Also Lack an Inventive Concept | 32 |

IV.     THE AMENDED COMPLAINT FAILS TO STATE A PLAUSIBLE CLAIM ..............33

    A.     Legal Standard for Motion to Dismiss Based on Failure to State a
        Claim           33

    B.     The Amended Complaint Fails Plead Any Factual Allegations to
        Support a Plausible Claim for Direct Infringement    34

    C.     The Complaint Does Not Allege Any Facts to Support Joint
        Infringement    38

        1.     The Complaint Fails to Address How Any of the Steps of the
            Method Claims Are Met or Who Performs Them and Fails to
            Provide Factual Allegations that Would Support a Joint
            Infringement Theory    39

            a.     The Language of Claim 1 of the '202 Shows that No
                Single Actor Performs the Steps of the Asserted Claim
                and There Are No Allegations in the Complaint to
                Support Joint Infringement    40

                (1)     The Physical Encounter Limitation    41

                (2)     The Location Determining Limitation    42

                (3)     The Acceptance Limitation    42

                (4)     The Complaint Fails to Make Sufficient
                    Allegations of Fact to Support a Plausible Claim
                    for Infringement of Method Claim 1 of the '202
                    Patent    43

            b.     The Physical Encounter Limitations Recited in Claims
                1 and 14 of the '905 Patent, and in Claims 1 and 23 of
                the '910 Patent Require Multiple Actors    44

            c.     The Location Determining Limitations Recited in
                Claims 1 and 14 of the '905, Claims 1 and 23 of the
                '910 Patent, and Claim 1 of the '911 Patent Require
                Multiple Actors    45

            d.     The Searching Limitations Recited in Claims 1 and 14
                of the '905 Patent Require Multiple Actors    47

            e.     All Method and Computer-Readable Medium Claims of
                the '202, '905, '910, and '911 Require Multiple Actors
                and the Complaint is Devoid of Allegations to Support
                Joint Infringement    48

2.     The Complaint Fails to Address Any Limitations of Asserted System Claims of the Asserted Patents, And There Are No Allegations to Support Infringement     48

    a.    Claim 14 of the '202 Patent, Claim 11 of the '905 Patent, Claim 12 of the '910 Patent, and Claim 12 of the '911 Patent Repeat Limitations Recited in the Method Claims of the Asserted Patents     48

    b.    The Complaint Fails to Address Any Limitations of Asserted System Claims of the Asserted Patents or Allege How Any Party "Makes" the Asserted System Claims     49

    c.    The Complaint Fails to Address Any Limitations of Asserted System Claims of the Asserted Patents or Allege How Any Party "Uses" the Asserted System Claims     50

    d.    The Complaint Fails to State a Plausible Claim for Direct Infringement of the System Claims in Any of the Four Patents-In-Suit     51

D.    The Complaint's Allegations of Indirect Infringement Fail to Set Forth a Plausible Claim and Should Be Dismissed     51

    1.    Without Direct Infringement, There Can Be No Indirect Infringement     51

    2.    The Complaint Fails to Allege the Requisite Specific Intent and Action to Support a Plausible Claim for Induced Infringement     52

    3.    The Complaint Fails to Allege Facts to Support a Plausible Claim for Contributory Infringement     54

V.    CONCLUSION ................................................................................................ 56

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alice Corp. v. CLS Bank Int'l*,
573 U.S. 208 (2014)...................................................................................... *passim*

*Apple, Inc. v. Ameranth, Inc.*,
842 F.3d 1229 (Fed. Cir. 2016)....................................................................32, 33

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...............................................................................33, 34, 52

*Atrip v. Ball Corp.*
735 Fed. Appx. 708 (Fed Cir. 2018) ..........................................................34, 55

*Automated Tracking Sols., LLC v. Coca-Cola Co.*,
723 F. App'x 989 (Fed. Cir. 2018) .....................................................................25

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..........................................................................33, 34, 52, 54

*Berkheimer v. HP Inc.*,
881 F.3d 1360 (Fed. Cir. 2018)................................................................. *passim*

*In re Bill of Lading*,
681 F.3d 1323 (Fed. Cir. 2012)...................................................................52, 54

*Bilski v. Kappos*,
561 U.S. 593 (2010)............................................................................................16

*Centillion Data Sys., LLC v. Qwest Commc'ns. Int'l, Inc.*,
631 F.3d 1279 (Fed. Cir. 2011).....................................................................50, 51

*Charles v. Orange County*,
925 F.3d 73 (2d Cir. 2019)................................................................................34

*Cleveland Clinic Found. v. True Health Diagnostics LLC*,
859 F.3d 1352 (Fed. Cir. 2017).........................................................................53

*Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*,
776 F.3d 1343 (Fed. Cir. 2014)....................................................................17, 32

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2014).........................................................................23

*Digital-Vending Services International, LLC v. University of Phoenix*,
672 F.3d 1270 (Fed. Cir. 2012)............................................................................44

*Dynacore Holdings Corp. v. U.S. Philips Corp.*,
363 F.3d 1263 (Fed. Cir. 2004)............................................................................52

*Elec. Power Group, LLC v. Alstom S.A.*,
830 F.3d 1350 (Fed. Cir. 2016).................................................................22, 26, 30

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016)............................................................................23

*Grecia v. McDonald's Corp.*,
724 Fed. Appx. 942 (Fed. Cir. 2018)...............................................................50, 51

*Holotouch, Inc. v. Microsoft Corp.*,
No. 17 CIV. 8717 (AKH), 2018 WL 2290701 (S.D.N.Y. May 18, 2018), *rev'd
in part sub nom Hall v. Bed, Bath & Beyond, Inc.*, 705 F.3d 1357 (Fed. Cir.
2019) ...............................................................................................................34, 38

*Intellectual Ventures I LLC v. Erie Indemnity Co.*,
850 F.3d 1315 (Fed. Cir. 2017)................................................................... *passim*

*Intellectual Ventures I LLC v. Symantec Corp.*,
838 F.3d 1307 (Fed. Cir. 2016)............................................................................25

*Island Intellectual Property, LLC v. Stonecastle Asset Mgmt. LLC*,
No. 19-cv-4792 (JPO), 2020 WL 2793000 (S.D.N.Y. May 29, 2020)........... *passim*

*Lumen View Tech. v. Findthebest.com, Inc.*,
984 F. Supp. 2d 189 (S.D.N.Y. 2013)..................................................................16

*Lyda v. CBS Corp.*,
838 F.3d 1331 (Fed. Cir. 2017)................................................................... *passim*

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
566 U.S. 66 (2012)......................................................................................15, 29

*Mortgage Grader, Inc. v. First Choice Loan Servs. Inc.*,
811 F.3d 1314 (Fed. Cir. 2016)............................................................................17

*Nalco Co. v. Chem-Mod, LLC*,
883 F.3d 1337 (Fed. Cir. 2018)............................................................................34

*OIP Techs., Inc. v. Amazon.com, Inc.*,
788 F.3d 1359 (Fed. Cir. 2015).....................................................................28, 34

*OpenTV, Inc. v. Netflix Inc.*,
    76 F. Supp. 3d 886 (N.D. Cal. 2014) .....................................................................22

*Quantum Stream Inc. v. Charter Commc'ns, Inc.*,
    309 F. Supp. 3d 171 (S.D.N.Y. 2018).....................................................................16

*Rovi Guides, Inc. v. Comcast Corp.*,
    No. 16-CV-9278 (JPO), 2017 WL 3447989 (S.D.N.Y. Aug. 10, 2017) ................44

*SAP Am., Inc. v. Investpic, LLC*,
    898 F.3d 1161 (Fed. Cir. 2018).............................................................................16

*Search and Social Media Partners v. Facebook, Inc.*,
    C.A. No. 18-1424-LPS-CJB, 2019 WL 581616 (D. Del. Feb. 13, 2019)...............22

*Secured Mail Sols. LLC v. Universal Wilde, Inc.*,
    873 F.3d 905 (Fed. Cir. 2017)...............................................................................14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)...............................................................................................14

*In re TLI Commc'ns LLC*,
    823 F.3d 607 (Fed. Cir. 2016)...................................................................... *passim*

*Ultramercial, Inc. v. Hulu, LLC*,
    772 F.3d 709 (Fed. Cir. 2014), *cert. denied sub nom.*, *Ultramercial, LLC v.*
    *WildTangent, Inc.*, 135 S. Ct. 2907 (2015) .............................................17, 30, 33

**Statutes**

35 U.S.C. § 101 ...........................................................................................1, 14, 15, 17

35 U.S.C. § 271(b) .................................................................................................53

35 U.S.C. § 271(c) ............................................................................................54, 55

**Other Authorities**

Federal Rule of Civil Procedure 8(a)(2) ....................................................................33

Federal Rule of Civil Procedure 19(a) ......................................................................35

## I.      INTRODUCTION

The claims of the asserted patents are directed to the abstract idea of creating a record of where a person has been, which the patent calls a "physical location history," for later review. This is analogous to the common practice of humans recording their travels in logs and journals, or creating travel guides, merely applied in an online context.  The same kinds of information people would ordinarily record—when, where, and who they met—are the same kinds included in the claimed location histories.  The claimed ways of using these logs are also akin to the ways people use traditional travel logs and guides: searching through them to find people or places visited; looking for places previously visited in an area; and looking for recommendations from others who have been to the same places.

The asserted claims are not directed to a technological problem and provide no technological improvement over the prior art.  Instead, the claims recite using generic computer components and processes for organizing, transmitting, storing, and reviewing information to automate the creation of the claimed "physical location histories" using existing mobile devices and the web.  As such, the asserted claims are invalid for being directed to an abstract idea reflecting longstanding human behavior with no inventive concept.  *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208 (2014).  Thus, dismissal with prejudice is proper because the asserted patent claims are invalid as claiming non-patent-eligible subject matter under 35 U.S.C. § 101.

Dismissal is also appropriate because the Complaint fails to plead factual allegations to support plausible claims of direct or indirect infringement, and instead includes only threadbare recitals of a cause of action and conclusions insufficient under *Twombly/Iqbal*.  This is particularly problematic in this case because, on their face, the claims require the acts of multiple (as yet unidentified) parties and the Complaint fails to provide any factual allegations relating to direction or control that would support a plausible claim for joint infringement.

1

## II.    THE PATENTS-IN-SUIT

Plaintiff asserts claims 1-7 and 14-18 of U.S. Patent No. 10,380,202 (the "'202 patent"); claims 1-10, 12-21, and 23-28 of U.S. Patent No. 10,642,910 (the "'910 patent"); claims 1-21 of U.S. Patent No. 10,642,911 (the "'911 patent"); and claims 1-14 of U.S. Patent No. 10,394,905 (the "'905 patent").  All four patents stem from a common parent application and share virtually identical specifications.[1]

### A.    Overview of the '202 Patent (Bilateral Physical Encounters)

The '202 patent claims the common abstract idea of creating a travel log in a mobile web environment.  At their core, the '202 patent claims are directed to accumulating "a digital record of a person's physical presence across time" or, in other words, creating a log of their travels and encounters.  '202 patent at 1:6-7.  Among the purported advantages of these logs, or "physical location histories," is that they provide a person "reviewing their own history with the satisfaction, nostalgia, and practical value associated with a digital leg history that meaningfully characterizes that person's life and past physical activities." *Id.* at 1:33-37.  The patent asserts that these logs are "appealing to review" and enable people to review their "life history in a novel and interesting way." *Id.* at 2:3-6, 2:41-43.  And, because the logs arise "out of natural activities that people enjoy[] doing," they purportedly sidestep the expectation that people would ordinarily be "severely reluctant to voluntarily submit to" location and activity monitoring. *Id.* at 1:64-2:3.  People creating travel logs or guides in the traditional pen-and-paper format also selectively record log entries of activities they enjoyed, or that they found interesting, such that reviewing them later would offer a sense of satisfaction and nostalgia.

The log entries of the patent claims are not tailored in any way that differs from

---

[1] For clarity in this brief, Google cites to the '202 patent specification for the same disclosures found in all four asserted patents.

traditional human practice to achieve the purported advantages above.  They merely capture the
typical kinds of information that people record in traditional travel logs:

> The entries represent various kinds of data that a person obtained
> at different points in time.  The types of data can be data about the
> place he is in.  It can be data concerning the person he met.  It can
> be data concerning a business he visited.  It can be data that
> another person he met thought was interesting.

*Id.* at 3:3-8.

According to the '202 patent, the problem facing the named inventors was not how to
program a communication device, how to transmit information between communication devices,
how to improve existing positioning systems, how to send data over a network and store it in a
database, or how to search a database.  The named inventors simply sought to log a person's
activities.  The patent focuses on this aspect of the purported invention and minimizes the import
of the technology, stating "*[a]lthough accumulated electronically*, the present invention is a
viewable and updateable digital leg history conveying various kinds of information about where
a person has physically been."  '202 patent at 2:66-3:2.[2]  Indeed, the specification only describes
using existing technologies: searchable histories (*id.* at 1:15-16), many kinds of portable devices
(8:45-57), sharing data between portable devices (*id.* at 1:41-43), transmitting data from a mobile
device to a database over the world wide web (*id.* at 8:32-42), and GPS or other navigational
systems (15:44-47).

The problems purportedly addressed by the patent further confirm its non-technological
nature.  For instance, the patent claims that web search histories fail to provide a person with
"satisfaction, nostalgia and practical value."  '202 patent at 1:33-35.   The patent notes there is a
"need to have data on the location and activities, past and present, of individuals."  '202 patent at

---

[2] All emphasis added unless otherwise specified.

1:64-65.  It asserts that the logging process addresses the problem that people may be "severely

reluctant to voluntarily submit to" activity tracking unless based on "natural activities that people

enjoyed doing." *Id.* at 2:1-3.  The process purportedly results in a log "that people can use to sit

back and review their life history." '202 patent at 2:5-6.  It claims an unmet "need to have a

digital record of a person's past . . . that they consider significant enough to record for later use."

*Id.* at 2:33-36.  In this way, the problems the patent purports to solve and the solution—a log of a

person's activities they can review or search later—are no different from travel logs people have

created and maintained for centuries.  At best the patent purports to automate this age-old

process using generic and well-known computing technology, precisely what the Supreme Court

explained was ineligible for a patent in its *Alice* decision.  *Alice*, 573 U.S. at 212.  Any

automation in the patent only addresses the purported concern that if "the generation of such a

log were not time-consuming on the part of the person generating it, it would be particularly

useful." '202 patent at  2:29-32.  Finally, the patent states there is a "need to have a digital leg

history that is appealing to review, including but not limited to reasons of nostalgia." *Id.* at 2:41-

43.  All of these are simply observations of people's preferences regarding activity logs; they are

not technological problems.

The '202 patent claims result-oriented functions in a generic system.  As Plaintiff admits,

the '202 patent simply takes in-person interactions and applies them to "mobile web identifiers":

> One of the ways this is accomplished is by combining physical
> encounters between individual members and stationary vendor
> members of a network at the physical premises of the stationary
> vendor member in the 'brick and mortar' world with mobile web
> identifiers of the cyber world.

Dkt. No. 15, First Amended Complaint ("Complaint") at ¶ 18.  This says no more than make

activity logs and "do it using mobile devices."  The "mobile web identifiers" simply serve as

names or addresses that identify people ("individual members") and establishments they visit

("stationary vendor members") online, just as names and addresses identify people and businesses in the "brick and mortar" context.

Indeed, independent claim 1 of the '202 patent simply recites high-level functional features for creating log entries from a mobile device, as illustrated in Figure 3 below for a person visiting a store.



'202 patent at Fig. 3.

Claim 1 recites the basic premise of "maintaining a processing system" connected to a "network" and "providing an application" for a mobile device. The device "transmit[s]" information to the system upon a member's acceptance of a proposal from a vendor during a "physical encounter" with the vendor, "thereby generating" a log entry with a "determined" location of the visit. The application "maintain[s]" a viewable and searchable log. Claim 1 thus claims no more than the basic organization, transmission, and storage of data in a mobile web environment for later review that is no different from a traditional travel log or guide.

Conventional components perform these basic functions of creating and using the travel

log, beginning with a generic "processing system" connected to a network:

> 1. A **method of creating and/or using physical location histories**, comprising:
>
> maintaining a **processing system** that is connected to a telecommunications network and configured to provide an account to an individual member and to a stationary vendor member of a member network;

'202 patent at 21:13-18.  The patent discloses no specifics about the claimed "processing system," instead *depicting* it as the generic "system website" 121 shown in Fig. 3 above connected to a generic "database."  The website manages user accounts, receives data, and stores data in a conventional way.  *Id.* at 8:61-64, 11:4-6.

The next element of claim 1 (excerpted below) recites a generic software "application" on a "mobile communication device," which the specification makes clear is generic and conventional: its "content is known to those skilled in the art of computer science" and the device manufacturer "has to have agreed to install" the application.  *Id.* at 8:32-38.

> providing an **application** that configures a handheld **mobile communication device** of each individual member of a member network to, upon instances of a **physical encounter** between the individual member and the stationary vendor member of a plurality of stationary vendor members of the member network at a physical premises [*sic*] of the stationary vendor member,

*Id.* at 21:19-25.  The communication device may be anything ranging from cell phones to PDAs, laptops, and others.  *Id.* at 8:43-57.  The specification suggests that the alleged invention would even cover things not known to the patentee.  *Id.* at 12:53-55 ("Applicant is not aware of whether such a digital camera exists presently on the market at present.").  The generic software on the device performs certain operations when the individual has a "physical encounter" with a vendor, with a location determined by a generic "positioning system":

> a location of the physical encounter determined by a **positioning system** in communication with either the handheld mobile

> communication device or a communication device of the stationary
> vendor member, and

*Id.* at 21:25-29.  This positioning system may be a standard GPS.  *Id.* at 13:30-34.

As a proxy for people knowing when they have physically encountered a vendor in the "brick and mortar" world, the communication device detects an encounter when it accepts a communication from another device using known short-range wireless communications methods or over a network.  *Id.* at 1:38-46, 8:36-40.  Claim 1 refers to the member accepting a proposal from a stationary vendor:

> upon **acceptance** by the handheld mobile communication device of
> the individual member of an **automatic proposal** from the
> stationary vendor member,

*Id.* at 21:29-32.  The patent fails to provide any specifics about the proposal and, as noted above, relies on well-known and conventional components for generating, transmitting, and receiving communications.  Upon accepting the proposal, the software causes the device to send URLs to the processing system identifying the individual and the vendor (the "mobile web identifiers" described by Plaintiff, Complaint at ¶ 18):

> **transmit** a URL of the stationary vendor member and a URL of
> the individual member to the processing system automatically,

'202 patent at 21:32-35.  The data transmission results in the creation of a log entry with ordinary information about the "who," "where," and "when" of the physical encounter based on the URLs, the position data, and time and date information generated by functionally and generically claimed steps using ordinary means (*id.* at 13:59-63 ("using global positioning systems to trigger a recordation of time and place based on a person's having performed a data transfer or a data entry")):

> thereby **generating a location history entry**, in at least the
> account of the individual member, that includes (i) the URL of,
> and a location of, the stationary vendor member, (ii) a time and

> date of the physical encounter, and (iii) an identity or the account
> of the individual member and of the stationary vendor member,

*Id.* at 21:35-41.  Though it changes nothing about the conventional operation of the claimed

method, the claim requires that the individual already have an existing URL:

> the URL of the individual member associated with the individual
> member before the physical encounter between the individual
> member and the stationary vendor member;

*Id.* at 21:42-45.  This is no different from saying people in the longstanding practice of making

travel logs have unique names, addresses, or locations before they meet each other.

The user can use the generic software to review and search the log on the communication

device (*id.* at 8:32-38, 14:26-29) by conventional means, based on the stored "who," "where,"

and "when" information:

> the application maintaining a viewable physical encounter history
> on the handheld mobile communication device that includes URLs
> from multiple stationary vendor members and is **searchable** from
> the handheld mobile communication device (i) by URL of the
> individual member and of the stationary vendor member, (ii) by
> geographic location, and (iii) by time of the physical encounter,

*Id.* at 21:46-53.

The claim further recites a generic database at the processing system to store member

logs, again without deviating from the conventional way of using a database:

> maintaining, using the processing system, a **database** of physical
> encounter histories of members of the member network whose
> accounts received the location history entry that was generated
> during the physical encounters,

*Id.* at 21:54-58.  The individual may generate log entries from other devices too (like having

more than one travel journal):

> the individual member's account having data transfer privileges
> that allow the physical encounter history to be accumulated
> through transmission of location history entries from multiple

> handheld mobile communication devices of the individual member
> over time; and

*Id.* at 21:58-63.  Finally, the user's log includes a "visual timeline" (akin to a travel log perhaps

with pictures or sketches of the traveler's stops).  Again, the specification provides no specifics

about the visual timeline:

> wherein the physical encounter history of a particular individual
> member includes at least one **visual timeline** of physical
> encounters of the particular individual member.

*Id.* at 21:64-67.  Every component recited in claim 1 functions in the conventional way, resulting

in the creation of a travel log based on a person's physical encounters with vendors.

The other asserted independent claim of the '202 patent, claim 14, recites a system for

performing substantially the same steps of the method recited in claim 1, but is even less specific

regarding how location is determined.  For example, claim 14 allows for location to be

determined by a generic positioning system or from data about the stationary vendor, called "key

data," that a member wants to share (*see, e.g.*, '202 patent at 8:64-9:16):

> a location of the individual member at the physical premises
> determined by a positioning system **or by the key data of the
> stationary vendor member**;

'202 patent at 24:14-17.  Claim 14 also rephrases the "acceptance . . . of an automatic proposal"

limitation of claim 1 as "receiving a short range communication," and recites that the URL

transmission of claim 1 occurs "as a result of the physical encounter":

> the physical encounter recognized by the handheld mobile
> communication device **upon receiving a short range
> communication** from a transmitting device of the stationary
> member,
>
> **transmit** a URL of the stationary vendor member and a URL of
> the individual member to the processing system automatically **as a
> result of the physical encounter** at the physical premises,

'202 patent at 23:52-24:4.  Again, these limitations simply call for the recited components to

operate in a conventional manner, providing a generic technological environment in which to perform the abstract idea of creating a travel log that records physical encounters.

## B.    Overview of the '910 Patent (Unilateral Physical Encounters)

People record information about their travels in various ways.  For example, a person may take photos or write down their thoughts based upon their own observations without a bilateral exchange of information.  Claim 1 of the '910 patent recites a method for adding this kind of entry, which the '910 patent calls a "digital member entry," to a travel log.  '910 patent at 21:28-30 ("upon instances of a capture by the particular individual member of **a digital member entry**"); Complaint at ¶ 36 (characterizing the '910 patent as "a particular individual member capturing digital member entries").  A "digital member entry" is an entry the user decides to make in the log.  '202 patent at 12:31-35 ("digital member entries . . . are made unilaterally at any point in time by the person whose digital leg history it is").  The entry may be of a vendor or another individual physically encountered.  '910 patent at 21:57-61 ("at least some of the digital member entries captured are of a vendor member or a second individual member, . . . during a physical encounter"); Complaint at ¶ 36.  The unilateral nature of the "digital member entries" differentiates claim 1 of the '910 patent slightly from the claims of the '202 patent, which call for either the "acceptance" of an "automatic proposal" or "receiving a short range communication" from a vendor during a physical encounter.  '202 patent at 21:29-32, 23:52-24:3.  Otherwise the claims recite largely the same steps and features in the same way.  *See* '202 patent at 21:15-29 (reciting a processing system, application on a mobile device, and positioning system), 21:32-67 (generating entry in a searchable log stored in a database); '910 patent at 21:20-28 (reciting a processing system and application on a mobile device), 21:36-56 (reciting a positioning system and generating entry in a searchable log stored in a database).

There is nothing technologically unique about "digital member entries" that mandates

specific handling.  For example, the entries may be digital photographs or textual notes, which are both conventional ways of recording information.  '202 patent at 12:48-50, 12:60-65.  And the recited method steps, claimed only by their results, are performed on the same conventional components as in the '202 patent.  Accordingly, '910 patent claim 1 does not deviate from the travel log example: it is simply the traveler making a unilateral entry of a photo or notes in their log without requiring the traveler to accept a proposal from a vendor.

The other two asserted independent claims of the '910 patent, claims 12 and 23, recite a system and a non-transitory computer-readable medium storing an application for performing substantially the same steps of the method recited in claim 1.  Both claims further recite that the log entries are accumulated "into a calendar format" without reciting any specific method or specialized component for doing so.  '910 patent at 23:2, 24:26.  But again, organizing travel photos by date, in a calendar, is something that people have long done.

### C.    Overview of the '911 Patent (Return Visit Prioritization)

When looking at travel logs or guides, people often focus on ones for a specific geographic area.  And, return visitors to an area will often look for the restaurants or shops they have previously visited.  The claims of the '911 patent seek to claim this abstract idea in the same generic mobile web environment recited in claim 1 of the '202 patent, focusing on searching the logs stored by the processing system rather than operation of the mobile communication device.  Claim 1 of the '911 patent, for example, simply describes "the mobile communication device being set to enter instances of a physical encounter" and does not separately recite functions for data transmission or review on the device.  '911 patent at 21:31-32.  Instead, the claim recites that a person may search the database of the processing system for vendors in a target geographic area without any explanation or restriction on how such a search is performed.  Claim 1 of the '911 patent then simply recites the result—prioritizing search

11

results using the criteria of "an appearance of one of the stationary vendor member URLs in the location history of the individual member." *Id.* at 21:48-51.  This is no different from a return visitor looking for places to eat and consulting their travel log of a prior visit to identify restaurants they noted during a prior visit.  Nothing about the claim describes a specific way to determine the priority value or how the search engine should use the priorities when ranking results; it merely recites "assigning a priority, by the at least one processing system, in a search result ranking based on" the criteria.  *Id.* at 21:47-48.

The other asserted independent claim of the '911 patent, claim 12, recites a system for performing substantially the same steps of the method recited in claim 1.  Again, claims 1 and 12 both recite searching a conventional database using a conventional search engine and simply seek to claim the result of prioritizing places the member has previously visited.

### D.      Overview of the '905 Patent (Common Experience Prioritization)

People have long used each other's experiences as suggestions of where to go, tending to trust the guidance of those with whom they share common experiences (*e.g.* Bob and I both liked restaurant 2, so if Bob likes restaurant 1, I will try it too).  The '905 patent tries to claim this long-standing practice.  Like the '911 patent, the '905 patent also operates in the same generic mobile web environment claimed in the '202 patent, and similarly focuses on searching the logs stored by the processing system.  Here, claim 1 of the '905 patent even acknowledges the real-world human activity analog, stating in the preamble that the search "use[s] humans as physical encounter links" to prioritize search results.  '905 patent at 21:16-17.  Claim 1 identifies a "physical location relationship" between four entities: (1) "a searching person," (2) "a reference individual member," (3) "a first stationary vendor member," and (4) "a second stationary vendor member."  '905 patent at 21:38-43, 21:54-56.  The relationship limitation, though lengthy (spanning 25 lines in the '905 patent at 21:38-63), describes two simple concepts regarding the

relationships between these entities, as illustrated in the diagram below.



The first concept is that the "reference individual member" and the "searching person" each have a relationship to the second vendor.  '905 patent at 21:52-56 (reference member and searching person's physical location histories "each include key data of a second stationary vendor").  The second concept is that the "reference individual member" has a relationship to the first vendor.  *Id.* at 21:50-52 ("the reference individual member's physical location history includes key data of the first stationary vendor").

Claim 1 recites that, when these relationships exist, the system responds to a searching person's request by "generating a computerized search result that increases a ranking of the first stationary vendor."  *Id.* at 21:46-49.  In short, the patent purports to claim using two individuals' common relationship with a second vendor (restaurant 2, which Bob and I both like) as a link to promote the search ranking of a first vendor (restaurant 1 in our example) with which one individual has a relationship.  Again, as with the '911 patent, the claim recites no specific technique for the prioritization itself; it merely describes the relationships and recites a result.  In other words, these criteria simply reflect the human concept that somebody who has visited the same places as another person may have similar preferences and can be relied upon for recommendations.  This is no different from understanding that a traveler reading a travel guide authored by a person who has been to the same places is more likely to trust that person's other

recommendations.

The second asserted independent claim of the '905 patent, claim 11, recites a system for performing substantially the same steps of the method recited in claim 1. '905 patent at 22:39-23:20. The third, claim 14, is also substantially similar to claim 1, but omits that the physical encounter with the "stationary vendor member" occurs at "physical premises of the stationary vendor member" and recites that the positioning system determine the location of the "individual member" rather than "each individual member's device" (but the positioning system does so by communicating with the device). '905 patent at 24:1-8. These variations do not meaningfully differentiate the main thrust of claim 14 from claim 1. As with the claims of the '911 patent, claims 1, 11, and 14 each recite searching a conventional database using a conventional search engine.

## III.     THE PATENTS ARE INVALID UNDER 35 U.S.C. § 101

### A.     Legal Standard Regarding Patent Eligibility

"Patent eligibility, a question of law often involving subsidiary factual questions, can be decided on a motion to dismiss 'when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law.'" *Island Intellectual Property, LLC v. Stonecastle Asset Mgmt. LLC*, No. 19-cv-4792 (JPO), 2020 WL 2793000, at *2 (S.D.N.Y. May 29, 2020) (quoting *Pers. Beasties Grp. LLC v. Nike, Inc.*, 341 F. Supp. 3d 382, 386 (S.D.N.Y. 2018) (quoting *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125, 1128 (Fed. Cir. 2018)), *aff'd*, 792 F. App'x 949 (Fed. Cir. 2020) (per curiam). Although a court must construe the facts in the light most favorable to the non-moving party, it should not accept as true allegations that contradict matters subject to judicial notice, such as the patent claims, specification, and prosecution history. *See, e.g.*, *Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 913 (Fed. Cir. 2017); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,

14

551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.").

Section 101 sets forth four statutory classes of patent-eligible subject matter:  processes, machines, manufactures, and compositions of matter.  35 U.S.C. § 101.  Patents may not, however, claim abstract ideas, laws of nature, or natural phenomena because these are the basic building blocks of science, the monopolization of which "might tend to impede innovation more than it would tend to promote it."  *Mayo Collaborative Servs. v. Prometheus Labs., Inc*., 566 U.S. 66, 71 (2012).  In *Alice*, the Supreme Court reiterated a two-step test for determining whether claims are directed to patent-ineligible subject matter.  573 U.S. at 217-18.  The first step asks whether the claims as a whole are directed to a patent-ineligible concept, such as an abstract idea.  *Id.* at 217-18; *Mayo*, 566 U.S. at 77-79.  If so, the second step is a "search for an 'inventive concept,'—i.e., an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'"  *Alice*, 573 U.S. at 217-18, 221, 224-26 (quoting *Mayo*, 566 U.S. at 72-73) (brackets in original).

Although the step two analysis may sometimes raise a question of fact, "not every § 101 determination contains genuine disputes over the underlying facts material to the § 101 inquiry."  *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018).   In *Berkheimer*, the Federal Circuit noted that "[p]atent eligibility has in many cases been resolved on motions to dismiss or summary judgment.  Nothing in this decision should be viewed as casting doubt on the propriety of those cases."  *Id*.  Both before and after *Berkheimer*, dismissal or judgment on the pleadings is

proper where, as here, the claims recite the use of purely conventional components to implement the abstract idea. *See, e.g.*, *SAP Am., Inc. v. Investpic, LLC*, 898 F.3d 1161, 1169-70 (Fed. Cir. 2018) (affirming judgment on pleadings where claims reciting databases and processors merely required "just already available computers, with their already available basic functions"); *In re TLI Commc'ns LLC*, 823 F.3d 607, 609, 612 (Fed. Cir. 2016) (affirming dismissal where the claims were "directed to the use of conventional or generic technology" in a "well-known environment"); *Island Intellectual Property*, 2020 WL 2793000 at *4, *6 (granting motion to dismiss where the "do it on a computer" claims failed to embody an "unconventional technological solution"); *Lumen View Tech. v. Findthebest.com, Inc.*, 984 F. Supp. 2d 189, 191 (S.D.N.Y. 2013) (granting motion for judgment on the pleadings where claim implemented abstract idea of matchmaking using a computer).

The "prohibition against patenting abstract ideas 'cannot be circumvented by attempting to limit the use of the formula to a particular technological environment' or adding 'insignificant postsolution activity.'" *Bilski v. Kappos*, 561 U.S. 593, 610-11 (2010). "Wholly generic computer implementation is not generally the sort of 'additional featur[e]' that provides any 'practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself.'" *Alice*, 573 U.S. at 217-18 (brackets in original). "[I]t is not enough that a patent invoke a computer 'merely as a tool' to execute an otherwise unpatentable idea." *Island Intellectual Property*, 2020 WL 2793000 at *2.

"[A]lbeit through seemingly differing arrangements of types of generic devices," all the asserted claims are directed to the same abstract idea of recording human travel/interaction. *See Quantum Stream Inc. v. Charter Commc'ns, Inc.*, 309 F. Supp. 3d 171, 179 (S.D.N.Y. 2018). The discussion below highlights the asserted independent claims of each asserted patent, which

Plaintiff acknowledges are "exemplary" and thus suitable for evaluation as representative claims. Complaint at ¶¶ 16 ('202 claims 1, 14), 22 ('905 claims 1, 11),[3] 28 ('911 claims 1, 12), ('910 claims 1, 12, 23)); *Island Intellectual Property*, 2020 WL 2793000 at *3 (courts may "evaluate representative claims" to decide patent viability under § 101) (citing *Automated Tracking Sols., LLC v. Coca-Cola Co.*, 723 F. App'x 989, 991 (Fed. Cir. 2018)).   None of the claims, including the dependent claims, present any difference "in a manner that is material to the patent-eligibility inquiry."  *Mortgage Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1324 n.6 (Fed. Cir. 2016).    Thus, the claims may appropriately be evaluated together.  *See Alice*, 573 U.S. at 226 ("[T]he system claims are no different from the method claims in substance.  The method claims recite the abstract idea implemented on a generic computer; the system claims recite a handful of generic computer components configured to implement the same idea.");  *Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1348 (Fed. Cir. 2014) (approving "representative" claim analysis for § 101).

## B.    Keeping Travel Logs Is an Abstract Idea

The first step of *Alice* is to determine the "abstract idea at the heart" of the patent claims. *See Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 714 (Fed. Cir. 2014), *cert. denied sub nom.*, *Ultramercial, LLC v. WildTangent, Inc.*, 135 S. Ct. 2907 (2015).  As described above in Section II, the asserted claims are all directed to the abstract idea of recording human travel/interaction, with the following variations between the four patents:

---

[3] Independent claim 14 of the '905 patent, which Plaintiff did not identify as "exemplary," does not meaningfully differ from claims 1 and 11.  *See* Section II.D.

| '202 patent claims 1 and 14 | '910 patent claims 1, 12, and 23 | '911 patent claims 1 and 12 | '905 patent claims 1, 11, and 14 |
|---|---|---|---|
| A person can search/review their own travels; record includes "visual timeline"; records are created based upon communications between the person and a vendor. | A person can search/review their own travels; record includes "visual timeline"; the person unilaterally makes records of encounters with vendors or other people. | A person searches through travel records for a geographic area; the search prioritizes places in the travel record from the person's prior visits to the same area. | A person searches through travel records; the search prioritizes places visited by others who have been to the same places as the searcher. |

The claims all recite result-oriented functions to implement the abstract idea in a computer system using conventional components. These components operate as a conduit to practice the abstract idea of recording human travel in the physical world, and thus the analysis should proceed to the second *Alice* step. *See Island Intellectual Property* 2020 WL 2793000 at *5 ("Because the patents simply seek to monopolize a long-understood concept by masking it through the medium of technology, . . . the Court must proceed to the second step of the *Mayo/Alice* analysis.") (internal citation and quotation omitted).

### 1.   Humans Have Long Recorded Information About Their Travels

Humans have long used logs like diaries, journals, and calendars to organize and record their travels. Entries in these logs ordinarily include time and place information and can be reviewed and searched. The asserted patents claim nothing more than this longstanding practice of organizing human activity, implemented using well-known technologies in a conventional manner as confirmed by the generic result-oriented claims and the specification. *TLI*, 823 F.3d

at 612-613 (claims directed to uses of "conventional or generic technology" described by the specification in "purely functional terms" are abstract).  The claims do not present any specific improvement to technology to address a technological problem.

People have recorded their travels for centuries.  For example, during the age of exploration, ships traveled the seas searching for new trade routes and trading partners. Travelers on these ships would record their travels in paper logbooks, including where they made landfall and who they met.  One example was Ferdinand Magellan, who hired a navigator, Antonio Pigafetta, to keep records of his expedition to circumnavigate the world, completed in 1522.[4]  Robert Juet, shipmate of the English explorer Henry Hudson, kept journals of his travels including for a 1609 voyage on the Dutch East India Company's boat, the "Half Moon."[5] Google references these materials as additional background.

A traveler would have created a new log entry upon arriving at a new location, determining where they are on a map or by asking local people, using other information obtained from the locals or from their own observations, akin to both bilateral physical encounters ('202 patent) and unilateral physical encounters ('910 patent).  Their entries would have contained basic identifying information about each such encounter: where they went, who they met, and when, and information exchanged with or learned from the people they met.  Logbooks could also contain maps or illustrations of their travels.

Travelers had various ways to store, organize, and review these travel records.  For example, upon returning to home port, travelers would keep their logs in a repository, for

[4] A manuscript version of the journal is available online.  *Journal of Magellan's Voyage*, World Digital Library, *available at* https://www.wdl.org/en/item/3082/.
[5] An extract of this journal is available online.  *Extract from the journal of the voyage of the Half-Moon, Henry Hudson, master, from the Netherlands to the Cost of North America, in the year 1609*, Library of Congress, *available at* https://www.loc.gov/item/11022268/.

19

instance at a library, guild, or government office.  Travelers could search through their own logs or those of others, using indices, tables of contents, or other means of organization.  The logs could be classified in various ways, including by geographic region and/or author.  A traveler reviewing or searching these prior logs could then prioritize what to visit based on their own prior experience as a return visitor ('911 patent) or on a common experience shared with someone else ('905 patent).

### 2.    Courts Have Found Claims Reciting Similar Subject Matter Abstract

Courts have found subject matter directed to similar abstract ideas of organizing data patent ineligible.  For example, in *TLI* the Federal Circuit invalidated a patent claiming recording digital images, classifying them with "a date or timestamp," transmitting them to a server, and storing them in a database "taking into consideration the classification information."  *TLI*, 823 F.3d at 610, 612.  Though the *TLI* claim recited tangible components such as a "telephone unit" and "server," the Federal Circuit held that these "merely provide[d] a generic environment in which to carry out the abstract idea of classifying and storing digital images in an organized manner."  *TLI*, 823 F.3d at *611.  Additionally, the focus of the claimed invention in *TLI* was not technical: "the problem facing the inventor was not how to combine a camera with a cellular telephone, how to transmit images via a cellular network, or even how to append classification information to that data."  *Id.* at *612.  Instead, the inventor in *TLI* sought to "provid[e] for recording, administration and archiving of digital images simply, fast and in such a way that the information therefore may be easily tracked."  *Id.*  The specification of the patent in *TLI* noted that the various transmission and annotation functions of cellular telephones were known, as were server capabilities for "storing, receiving, and extracting data."  *Id.*  For these reasons, the Federal Circuit held that "collecting data" and "attaching classification data, such as dates and times" to store the collected data "in an organized manner is a well-established 'basic concept'

20

sufficient to fall under *Alice* step 1." *Id.* at 613.

These characteristics of the patent in *TLI* parallel those of the asserted patents here, which also identify a non-technical goal: to accumulate a "viewable and updateable digital leg history" by using data entries "captured," "transmitted," and "stored" in a "hand-held electronic device" and "sent to an online database." '202 patent at 2:66-3:22.  In fact, the "digital member entry" in the claims of the '910 patent may be a digital image. *Id.* at 12:48-50.  And the common specification of the asserted patents similarly acknowledges that the functionalities of the claimed mobile communication devices, databases, and other conventional components were known. *Id.* at 8:31-42, 14:41-67.  Accordingly, these components, like those of *TLI*, "merely provide a generic environment" in which to carry out the abstract idea of creating a travel log that can be searched.  *See TLI*, 823 F.3d at *611.

In another case, the Federal Circuit invalidated two patents respectively directed to the abstract ideas of "creating an index and using that index to search for and retrieve data" and "remotely accessing user specific information." *Intellectual Ventures I LLC v. Erie Indemnity Co.*, 850 F.3d 1315, 1329-30 (Fed. Cir. 2017) [hereinafter "*IV/Erie*"].  The Federal Circuit noted both concepts are old ones: "organizing and accessing records through the creation of an index-searchable database, includes longstanding conduct that existed well before the advent of computers and the Internet" and "[r]emotely accessing and retrieving user-specified information is an age-old practice that existed well before the advent of computers and the Internet." *Id.* at 1327, 1330.  The patent regarding indexing and searching conceded that the claims recited a previously known way of categorizing data ("XML tags"). *Id.* at 1328.  Further, the claims did not explain "*how*" using these tags "alter[ed] the database in a way that" improved the technology of computer databases. *Id.* (emphasis in original).  And the remote mobile interface

21

patent claims failed to "recite any particularly unique delivery of information." *Id.* at 1330.

Similarly, the abstract idea of collecting information and creating chronologies of human activity is a longstanding one. Organizing, searching, and accessing the collected information, as the asserted patents claim, are exactly the kinds of activities the Federal Circuit deemed abstract in *IV/Erie*. Again, the common specification does not explain *how* any of the recited functions alters the conventional components recited leading to a technological improvement, or any unique method in which they function to implement this abstract idea.

Other district courts have found similar claims based on longstanding practices for collecting, organizing, and using information to be directed to abstract ideas. *See, e.g.*, *Search and Social Media Partners v. Facebook, Inc.*, C.A. No. 18-1424-LPS-CJB, 2019 WL 581616 at *5 (D. Del. Feb. 13, 2019) (claim "likened to pinning pictures on a map or keeping them in a chronological photo album" with a "location and/or time on the back of a photograph" is merely "collection, organization, manipulation, and display of data, and does not rise above the realm of abstraction"); *OpenTV, Inc. v. Netflix Inc.*, 76 F. Supp. 3d 886, 893 (N.D. Cal. 2014) (finding that "gathering information about one's intended market and attempting to customize the information then provided is as old as the saying, 'know your audience'" and doing so on "generic computer processors, databases, and internet technology" is not patentable).

### 3.     The Claims Do Not Address A Problem Rooted in Technology

Often considered as part of *Alice* step two, as recognized by the Federal Circuit in *TLI*, some cases have analyzed whether the patent claims address a problem rooted in technology in step one. *See, e.g.*, *TLI*, 823 F.3d at 612-13 (discussing cases and distinguishing claims found patent eligible for being directed to improvement in technology or solution to a technological problem). Courts making this assessment have considered whether the focus of the claims is "on such an improvement in computers as tools" (patent eligible) or "on certain independently

abstract ideas that use computers as tools" (patent ineligible).  *Elec. Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016).

The asserted claims, which use computers as tools to implement the abstract idea of recording human travel/interaction, fall in the patent ineligible category.  As described in Section II.A-D, *supra*, the asserted patents do not identify a technology problem associated with creating travel logs.  For instance, the patents assert there is a need to have time and place information on "data transmissions or transfers," and a "need to have such a log whose entries would automatically be transmitted to a database on the Internet."  '202 patent at 2:12-13, 2:39-41.  But the classification of data transmissions, and the convenience of automatic transmission, do not solve problems rooted in technology; these are design considerations for using existing technology as a tool to accomplish the goal of creating log entries.  *See TLI*, 823 F.3d at 612 (not a solution to a technological problem where the inventor merely "sought to 'provid[e] for recording, administration and archiving of digital images simply, fast and in such way that the information therefore may be easily tracked'") (alteration in original).  The claimed system and method of using existing capabilities of mobile devices and other computer components to record human travel/interaction does not improve technology.  *See Berkheimer*, 881 F.3d at 1367 (technological "parsing" limitation did not improve computer functionality as "parsers had existed for years prior" to the patent).

Unlike the types of claims that courts have found patent eligible for reciting improvements to technology, the claims of the asserted patents merely call for using known technologies in conventional ways to perform a long-standing human practice.  *See, e.g.*, *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1338 (Fed. Cir. 2016) (claimed self-referential database table was an improvement in computer functionality, not just the performance of conventional

steps); *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257-58 (Fed. Cir. 2014)

(claims address a problem with the function of Internet hyperlink protocol and did not merely

"perform an abstract business practice (with insignificant added activity)").  In contrast, because

the asserted claims do not provide a technological improvement or solution to a technological

problem, they are all directed to an abstract idea under *Alice* step one—recording human

travel/interaction that can be searched.

### C.      The Patent Claims Lack an Inventive Concept

The asserted patent claims fail *Alice* step two as the limitations do not contain an

"inventive concept."  *Alice*, 573 U.S. at 217.  They do not "involve more than performance of

'well-understood, routine, [and] conventional activities previously known to the industry,'"

which is required to find an inventive concept.  *Berkheimer*, 881 F.3d at 1367 (citing *Content*

*Extraction*, 776 F.3d at 1347-48) (alteration in original).  Instead, they recite generic computer

components and attempt to limit the abstract idea of recording human travel/interaction to the

"particular technological environment" of mobile devices, which cannot make them patent

eligible.  *See, e.g.*, *Alice*, 573 U.S. at 223-224 ("mere recitation of a generic computer" or

"limiting the use of an abstract idea to a particular technological environment . . . cannot impart

patent eligibility").  *Id.* at 223-224 (internal quotations and citations omitted).  Simply reciting

"concrete, tangible components is insufficient to confer patent eligibility to an otherwise abstract

idea."  *TLI*, 823 F.3d at 613.

### 1.      The Undisputed Facts Show the Asserted Claims Recite Only Conventional Components Arranged in A Conventional Manner to Perform the Recited Functions

The asserted patents broadly refer to using existing technology and the abilities of one of

ordinary skill in the art to implement the claimed functions.  *See* Section II, *supra*.  Nothing in

the asserted claims identifies any unconventional computing technology.  Thus, there can be no

dispute of fact preventing the Court from determining invalidity at the pleading stage. *See TLI*, 823 F.3d at 609 (affirming dismissal of complaint based on patent ineligibility); *Island Intellectual Property*, 2020 WL 2793000 at *6 (granting motion to dismiss where the claims, specifications, patentee's briefing, and cited sources lacked a "'technological problem' or any 'unconventional technological solution' to said problem"); *cf. Berkheimer*, 881 F.3d at 1360 (only where claims contain limitations directed to an "unconventional inventive concept described in the specification" might there be a question of fact).

The asserted independent claims recite the following conventional components:

- "processing system" (all independent claims),

- "telecommunications network" ('905 patent claims 1, 11, 14; '202 patent claims 1, 14; '910 patent claims 1, 12);

- "database" (all independent claims);

- "application" ('905 patent claims 1, 11, 14; '202 patent claims 1, 14; '910 patent claims 1, 12),

- "mobile communication device" (all independent claims), and

- "positioning system" (all independent claims).

As explained above (*see* Section II.A-D, *supra*), the specification describes all of these components only generically and admits they were well-known. *See Automated Tracking Sols., LLC v. Coca-Cola Co.*, 723 F. App'x 989, 995 (Fed. Cir. 2018) (no support for patentee's "contention that there is a factual dispute" where "specification indicates that the components of the claimed invention are conventional"). The common specification of the asserted patents confirms there is nothing unconventional about any of these components. *See Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1317 (Fed. Cir. 2016) ("The written

description is particularly useful in determining what is well-known or conventional.").  Rather,

each component performs routine, well-understood functions as described in the following

groups of stationary components, mobile components, and extra-solution features.

> **a.     The Stationary Components Are Not Inventive: "processing system," "telecommunications network," and "database"**

All three of these components are standard.  The specification provides little detail about

the "processing system."  *See* '202 patent at Figs. 1-4, 6, 9 (depicting a "system website" as a

generic element connected to a generic database).  The patents broadly describe the

"telecommunications network," to which the processing system is connected, as "a global

network such as the world wide web, although it does not have to be."  *Id.* at 11:44-46.  A

standard "database" "run" by the processing system is also "located on [the] telecommunications

network."  *Id.* at Abstract.

The claims recite generic uses of these components to perform their conventional

functions.  The "telecommunications network" simply connects users to the processing system

and database.  *See, e.g.*, *id.* at 14:41-44 (users access their activity logs via the network).  The

processing system, in turn, provides user accounts and "run[s]" the "database."  *See id.* at 8:61-

65 (members go through the typical process of signing up at a web site to get an account), 16:62-

63 (system is one "running database 100").  The user accounts serve two non-inventive purposes

in the claims: (1) identifying people and vendors for whom the system generates visit entries in

an activity log, and (2) permitting people to add log entries from multiple mobile devices.  These

are ways to select or classify known data sources—a conventional activity the Federal Circuit

has held does not make an abstract idea patent eligible.  *See TLI*, 823 F.3d at 614 (receiving and

storing data based on classification information not an inventive concept); *Elec. Power*, 830 F.3d

at 1355 (no transformation of abstract process for information collection and analysis where

claims "do not even require a new source or type of information, or new techniques for analyzing it").

The database stores activity log information and users may search it using a generic algorithm about which the specification offers no details.  *See* '202 patent at 14:28-33 ("searching feature" provided by generic software "accessible by the computer that houses the database"), 14:55-57 ("a search engine . . . will perform the searching in accordance with an algorithm provided to it").  The database performs searches, in the ordinary way that computers provide access to data, by finding entries based on their contents or characteristics.  *Id.* at 14:52-55 (searching based on a date and place "might retrieve any entry that was entered . . . on that date and at that place").  The "ranking" or prioritization of search results claimed by the '911 and '905 patents is also done generically by a known "algorithm."  *Id.* at 17:46-49 ("The algorithm of the search considers a plurality of factors in ranking search results of URLs *known to those skilled in the art of search engine algorithms*.").  Because everything claimed was already known, there is no claimed improvement to database technology and the recited "database" cannot serve as an inventive concept.  *TLI*, 823 F.3d at 614 (holding "arbitrary data bank system" for storing digital images did not add inventive concept, citing prior Federal Circuit cases holding the same for generic "database" components).

> **b.     The Mobile Components Are Not Inventive: "application," "mobile communication device," and "positioning system"**

The "mobile communication device" and its associated components are also conventional.  The mobile communication devices themselves may be any generic off-the-shelf device.  '202 patent at 8:43-60 (other than "cell phones," the device may be "any other handheld electronic device that is typically carried around"); *IV/Erie*, 850 F.3d at 1331 (no inventive solution where patent "recites that the abstract idea will be implemented using the conventional

components and functions generic to electronic mobile devices"). Manufacturers of the devices install an "application" on them, which the specification vaguely describes as "software 89, whose content is known to those skilled in the art of computer science." '202 patent at 8:32-35. The devices receive place data from a "global positioning system" that uses "a satellite or any other appropriate means known to those skilled in the art." *Id.* at 13:31-36.

As with the stationary components, these mobile components also perform conventional operations. The admittedly well-known and generic software on the mobile device permits it to "receive and transmit wirelessly to other such devices, for example known short range wireless communications methods such as Bluetooth®." *Id.* at 8:38-40. The claims use this well-known wireless communication technology to receive a communication from the vendor device. The patents identify no improvement in wireless communications; to the contrary, the specification states broadly that the "exact transmission mechanism can occur in a number of ways, and the present invention is not limited to one particular method." *Id.* at 10:60-63; *see TLI*, 823 F.3d at 615 ("abstract functional descriptions devoid of technical explanation" in the specification "are insufficient to transform the abstract idea into a patent-eligible invention.). The person's device next automatically transmits URLs of the person and vendor to the system to create a log entry for the encounter. This transmission step is also generic and not inventive. *See TLI*, 823 F.3d at 613-614 (no inventive concept where specification "describes the telephone unit and server as either performing basic computer functions such as sending and receiving data, or performing functions 'known' in the art"). Automating the transmission is not inventive either. *See OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363 (Fed. Cir. 2015) ("automation" and "relying on a computer to perform routine tasks more quickly" does not make a claim patent-eligible). Based on the automatic data transfer (or unilateral data entry, when the person creates

their own digital member entry as claimed in the '910 patent), the system uses the "global positioning systems to trigger a recordation of time and place based on a person's having performed a data transfer or a data entry."  '910 patent at 13:59-67.

The '202 and '910 patent claims recite that the "application" may be used to maintain and search the activity log using the mobile device.  This software is again the same admittedly well-known and generic software installed by the manufacturer.  *Id.* at 8:39-43 (content of software 89 "known to those skilled in the art"); 14:29-37 ("searching feature" provided by software "located in the network device 22 (and forming a part of software 89)").  Searching—"e.g., receiving a request for information and delivering records"—is "no more than the performance of well-understood, routine, and conventional activities previously known," and is not inventive. *IV/Erie*, 850 F.3d at 1329 (internal quotes and citation omitted).

### c.    The Additional Extra-Solution Features Are Not Inventive

The asserted claims also recite additional features ancillary to recording human travel/interaction in searchable activity logs.  These extra-solution features, all of which constitute "well-understood, routine, conventional activity" impose no meaningful limit on the claims.  *Mayo*, 566 U.S. at 79.

For example, the asserted independent claims of all four patents recite using URLs of people and vendors as conventional identifiers in the activity log.  As described in the specification, the patentees "believe[] that in the not too distant future . . . everyone will have a URL."  '202 patent at 1:57-59.  Reciting these URLs for their known purpose fails to transform the claims into patent-eligible ones.  *See IV/Erie*, 850 F.3d at 1328-29 (limiting index to well-known XML tags was "akin to limiting an abstract idea to one field of use or adding token post solution components" and did not lead to "an improvement in computer database technology").

Claim recitations about including typical who, where, and when data in the log entry are

directed to standard "electronic recordkeeping—one of the most basic functions of a computer," and cannot serve as an inventive concept. *Alice*, 573 U.S. at 225; *see also Ultramercial*, 772 F.3d at 716 (holding that "consulting and updating an activity log represent insignificant 'data-gathering steps,'" where the log tracked ad-related activity) (quoting *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1370 (Fed. Cir. 2011)); *Elec. Power Grp.*, 830 F.3d at 1355 (limitations directed to selecting types of information "for collection, analysis, and display" do not save claims directed to abstract ideas).

Nothing about obtaining the information stored in each entry is inventive either. The *who* information comes from the URLs or affiliated data of the person and vendor. *See, e.g.*, '202 patent at 8:66-9:2. The *where* information comes from conventional position determination systems or other generic location data provided by the vendor. '202 patent at 11:24-29 (store device may transmit generic "key data . . . previously provided to an account at database 100"); 15:44-47 (log entries "have a geographical place stamp because the system makes use of a GPS or other navigational system"). And the *when* information is based on the known capability of computers to track time. *Id.* at 4:19-20 (log entries are "time and place stamped"); 15:45 ("all entries have a time stamp"). These were all known, conventional sources for each type of information. *Elec. Power Grp.*, 830 F.3d at 1355 (the mere "selection and manipulation of information," without any "new source or type of information, or new techniques for analyzing it," "does not transform the otherwise-abstract processes of information collection and analysis").

The asserted claims of the '202 and '910 patents (bilateral/unilateral encounters) further recite that the activity log includes a "visual timeline of physical encounters." This is, again, incidental extra-solution activity ancillary to the claimed abstract idea of recording human

travel/interaction.  The specification contains no description of a non-generic way to construct a "visual timeline"; it only suggests the presentation of activity data in a typical calendar format. *See* '202 patent at 13:37-41 (digital history may be presented "as a monthly calendar"); *IV/Erie*, 850 F.3d at 1331 ("displaying [data] to a user merely implicates purely conventional activities that are the 'most basic functions of a computer'") (quoting *Alice*, 573 U.S. at 225).

### d.    The Sequence of Steps Is Not Inventive

As confirmed by the description of the claims above in Section II, the components are arranged in a conventional way to perform the abstract idea of recording human travel/interaction in an activity log for later review.  The asserted claims apply this abstract idea on generic mobile communication devices communicating over a telecommunications network. Thus, they are not patent-eligible.  *See, e.g.*, *TLI*, 823 F.3d at 615 ("steps that generically spell out what it means to 'apply it on a telephone network' also cannot confer patent eligibility"); *Berkheimer*, 881 F.3d at 1370 (holding claims lacked inventive concept as they only performed "the abstract idea of parsing and comparing data with conventional computer components").

Evaluating the limitations of the asserted claims as ordered combinations also fails to provide an inventive concept beyond the abstract idea.  Indeed, the claims do not deviate from the ordinary usage of each conventional component.  *See IV/Erie*, 850 F.3d at 1329 (invalidating claims that "recite no more than routine steps involving generic computer components and conventional computer data processing activities to accomplish the well-known concept of creating an index and using that index to search for and retrieve data").  The claims merely recite performing the traditional computing functions of each component in a conventional order. First, a data transmission from the mobile device is triggered either by a "physical encounter" between a person and a vendor, which may be based on a wireless communication ('911, '905, and '202 patents), or by the person's unilateral capture of a "digital member entry" ('910 patent).

31

The mobile device receives location information from a positioning system which it includes in the transmission to the database.  The transmission results in creating an entry in the database. The entries may be searched later.  There is no unconventional use of technology or non-generic arrangement of these steps; the "recited physical components behave exactly as expected according to their ordinary use."  *TLI*, 823 F.3d at 615.

2.     <strong>The Remaining Claims Also Lack an Inventive Concept</strong>

The asserted dependent claims of the four patents are all directed to the same abstract idea as the independent claims and fail to provide an inventive concept for the same reasons. *Content Extraction*, 776 F.3d at 1348 (claims need not be individually addressed where representative claim is identified and "all the claims are substantially similar and linked to the same abstract idea") (citations omitted).  They do not circumvent the prohibition against patenting abstract ideas, as they only add routine extra-solution activity or recite additional known functions of the generic conventional technology recited in the independent claims.  *See Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1244-45 (Fed. Cir. 2016) (appending "preexisting practice[s]" or "preexisting technologies onto [unpatentable] independent claims does not make them patentable").  The conventional elements of the dependent claims include:

- types of stored or transmitted data ('202 claims 4-6, 15-18; '910 claims 4-5, 8, 15-16, 19, 24-25, 27; '911 claims 7-8, 18; '905 claims 7-9);

- characteristics of the vendor or individual ('910 claims 2-3, 13-14; '911 claims 9-10; '905 claims 2-4, 12);

- types of parameters used for searching or ranking results ('202 claims 2-3; '910 claims 9-10, 20-21, 28; '911 claims 2-6, 11-17, 21; '905 claim 5);

- wireless communications of the processing system or positioning system ('911 claims 19-

32

20);

- automatic transmissions from vendor devices ('905 claims 6, 13);

- account setting enabling automatic transmission from user devices ('910 claims 6, 17, 26); and

- user sign-in to access search ('202 claim 7; '910 claims 7, 18; '905 claim 10).

The named inventors did not invent any of these routine elements, as illustrated by the lack of any technical explanation in the common specification of the asserted patents regarding *how* the conventional components should be designed or configured to achieve the claimed results. *See TLI*, 823 F.3d at 614-15 (dependent claims reciting functions devoid of technical explanation in the specification "are insufficient to transform the abstract idea into a patent-eligible invention"); *Ameranth*, 842 F.3d at 1242 (affirming finding of abstract claims where specifications described "hardware elements of the invention as 'typical' and the software programming needed as 'commonly known.'"). None of the dependent claims adds anything of "practical significance to the underlying abstract idea" of recording human travel/interaction for later review and search. *See Ultramercial*, 772 F.3d at 716.

## IV.    THE AMENDED COMPLAINT FAILS TO STATE A PLAUSIBLE CLAIM

### A.    Legal Standard for Motion to Dismiss Based on Failure to State a Claim

"To survive a motion to dismiss, a complaint must contain sufficient ***factual*** matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (hereafter *Iqbal*) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (hereafter *Twombly*). Federal Rule of Civil Procedure 8(a)(2) requires that a complaint provide a defendant fair notice of the plaintiff's claim and the grounds relied upon. This obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . ." *Twombly*, 550 U.S. at 555 (citations omitted). "On a

motion to dismiss, courts are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* (citation omitted); *see also Iqbal*, 556 U.S. at 678-79.  Regional circuit law applies when reviewing a Rule 12 motion to dismiss.  *OIP Techs.*, 788 F.3d at 1362.  In the Second Circuit, courts apply the *Twombly/Iqbal* plausibility standard.  *Charles v. Orange County,* 925 F.3d 73, 74-75, 79 (2d Cir. 2019); *see also Holotouch, Inc. v. Microsoft Corp.*, No. 17 CIV. 8717 (AKH), 2018 WL 2290701, at *3 (S.D.N.Y. May 18, 2018), *rev'd in part sub nom Hall v. Bed, Bath & Beyond, Inc.*, 705 F.3d 1357 (Fed. Cir. 2019).

**B.      The Amended Complaint Fails Plead Any Factual Allegations to Support a Plausible Claim for Direct Infringement**

Plaintiff's Complaint should be dismissed because it fails to plead factual allegations sufficient to support a plausible claim for direct infringement of the asserted patents.

The *Iqbal/Twombly* plausibility standard applies to claims of direct infringement of a patent, and this Court has stated the same.  *See Atrip v. Ball Corp.* 735 Fed. Appx. 708, 714 n.4 (Fed Cir. 2018); *Holotouch, Inc.*, 2018 WL 2290701 at *3 (the "familiar pleading standard outlined in *Twombly* and *Iqbal* applies to" patent cases).  The Second Circuit has applied *Twombly/Iqbal* and held that "[a] claim has facial plausibility when the plaintiff pleads ***factual content*** that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *See Charles,* 925 F.3d at 81.  Although a plaintiff need not prove its case at the pleading stage, it must place the alleged infringer "on notice of what activity is being accused of infringement."  *See Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1350 (Fed. Cir. 2018).   Plaintiff has not done so, and the Complaint fails to allege any facts to support a plausible claim for direct infringement in *any* of its paragraphs.

In summary, the Complaint makes the following allegations:

- paragraphs 1-4: address the parties;

- paragraphs 5-6: address subject matter jurisdiction and venue;

- paragraph 7: addresses personal jurisdiction over Google, and merely provides conclusory statements of Google's alleged infringement ("Google . . . has infringed or induced infringement or contributorily infringed, and continues to do so, in this District");

- paragraph 8-14: address defendant Nemanov's dealings with Plaintiff Weisner, including a separate State Court proceeding *Weisner v. Nemanov, et al.* (Kings County Index #502269/2020), and reasons for joining Nemanov as an involuntary party under Federal Rule of Civil Procedure 19(a).

- paragraphs 15-20, 21-26, 27-32, and 33-38: although under the header "Google's Patent Infringement," these paragraphs simply recite claim language (*see* ¶¶ 16-17, 22-23, 28-29, 34-35), and describe the issuance (*see* ¶¶ 15, 19, 21, 25, 27, 31, 33, 37), subject matter (*see* ¶¶ 18, 24, 30, 36), alleged ownership (*see* ¶¶ 19, 25, 31, 37), and status (*see* ¶¶ 20, 26, 32, 38) of the asserted patents;

- paragraphs 39-47: provide conclusory allegations that Google Maps, which contains "Your Timeline," "Your Places," and "Your Photos" ("Accused Instrumentality"), infringe the asserted patents;

- paragraphs 48-49: address Plaintiff's purported notice to Google without any facts that support an infringement claim;

- paragraphs 50-65: state alleged harm to Plaintiff and possible remedies for Google's alleged infringement without reciting any facts relating to Google's alleged infringement;

- paragraphs 66-72, 74-80, 82-88, and 90-96: address alleged notice and make passing

references to the Accused Instrumentality without any factual allegations to support a

plausible claim for infringement;

- paragraphs 73, 81, 89, and 97: recite a bare conclusion of willful infringement

    without any facts to support a plausible claim for infringement or willful

    infringement;

- paragraphs 98-100, 109-111, 120-122, and 131-133: recite bare conclusions of

    infringement without even mentioning the Accused Instrumentality;

- paragraphs 101-104, 112-115, 123-126, and 134-138: address induced infringement

    with bare conclusions of direct infringement without any factual allegations to

    support either direct or indirect infringement, much less satisfy the heightened

    pleading requirements for indirect infringement;

- paragraphs 105-108, 116-119, 127-130, 139-143: address contributory infringement

    with bare conclusions of direct infringement and is insufficient for the same reasons

    as paragraphs 101-104, 112-115, 123-126, and 134-138.

None of these paragraphs provide anything more than threadbare recitals of a cause of

action with only conclusory statements as support, which fails to satisfy the *Twombly/Iqbal*

standard.  *Lyda v. CBS Corp.*, 838 F.3d 1331, 1337 (Fed. Cir. 2017) ("[t]hreadbare recitals of the

elements of a cause of action supported by mere conclusory statements, do not suffice.").

The only parts of the Complaint pertinent to evaluating the claims of direct infringement

are paragraphs 39-47, and none of them allege sufficient facts to support a plausible claim of

direct infringement.  Of those, paragraphs 39, 41, 44, and 46 are quite similar in simply reciting

that Google allegedly is "making, using and/or selling a copycat method and/or system . . . as

claimed in the ['202/'905/'911/'910] Patent," without reciting any facts.  Paragraph 40 alleges

that Google infringes the '202 patent by making a passing reference to the "Your Timeline" and "Your Places" features of Google Maps.  Yet, paragraph 40 is devoid of any facts explaining why or how the features of Google Maps could plausibly support a finding of direct infringement.  *See* Complaint at ¶ 40 ("Google literally infringes at least claims 1-7 and 14-18 of the '202 Patent. Google's infringement of the '202 Patent occurs through its Google Maps feature. Google Maps contains a "Your Timeline" and "Your Places" feature(s) that infringe the '202 Patent.").

Paragraphs 42, 43, 45, and 47 of the Complaint likewise fail to allege sufficient facts to support a plausible claim for infringement.  For example, paragraphs 42 and 45 make a passing reference to the "Your Timeline" and "Your Places," and allege that Google infringes the '905 and '911 patent when "Google's search engine provides [enhanced digital] search results to a mobile device or to a non-mobile device, and in doing so utilizes location history data obtained in connection with the Google Maps feature(s)."  *See* Complaint at ¶¶ 42, 45.  Paragraph 47 also makes passing reference to "Your Timeline" and "Your Photos" and alleges that Google infringes the '910 patent when "captures of a digital member entry are made and accumulated over time into the particular individual member's physical location history, including at least one visual timeline of digital member entries."  *Id.* at ¶ 47.  The allegations in these paragraphs lack any detail describing *how* Google's alleged actions satisfy any of the limitations of the '905, '910, and '911 patents.

Similarly, paragraph 43 attempts to provide factual support for a claim of infringement of the '905 patent by including a passing reference to the following article: https://searchengineland.com/googlemaps-explore-adds-curated-recommendations-new-features-229711.  Mere reference to this article as support of alleged infringement is insufficient to satisfy

the *Twombly/Iqbal* requirements because it fails to allege any facts plausibly supporting how Google satisfies any limitation of the asserted claims of the '905 patent. *See* Complaint at ¶ 43.

These threadbare allegations of paragraphs 39-47 are insufficient to satisfy *Twombly/Iqbal*. Neither these paragraphs nor any others in the Complaint even go so far as to parrot the claim language of the asserted patents with a perfunctory attribution to Google, which this Court has observed would be insufficient to satisfy the *Twombly/Iqbal* requirements. *See Holotouch*, 2018 WL 2290701, at \*6-\*7. Thus, the Complaint here, which does less than what this Court has already observed is insufficient to satisfy *Twombly/Iqbal*, cannot possibly satisfy the *Twombly/Iqbal* requirements for a claim of direct infringement of any of the four patents. This alone provides a basis to dismiss Plaintiff's Complaint.

## C.     The Complaint Does Not Allege Any Facts to Support Joint Infringement

The plain language of the claims of the asserted patents require the actions of multiple actors. For example, each of the asserted independent claims of the '202, '905, and '910 patents recite a "physical encounter" limitation, which requires elements to occur upon or during a physical encounter between an individual member and a stationary vendor member (both entities other than Google). *See* '202 patent at 21:21-25, 23:48-52; '905 patent at 21:23-27, 22:53-57, 24:1-4; '910 patent at 21:28-31, 21:57-61, 22:57-58, 23:17-21, 24:14-16, 24:43-47. Additionally, each of the asserted claims of the asserted patents recite a "location determining" limitation, wherein a positioning system, that is distinct from any product or functionality provided by Google, determines the location of an individual member's device or a physical encounter. *See* '202 patent at 21:25-29, 24:14-17; '905 patent at 21:30-32, 22:60-62, 24:7-8; '910 patent at 21:36-37, 22:65-66, 24:22-23; '911 patent at 21:35-37; 22:44-46. The '202 patent also recites an "acceptance limitation," wherein limitations of the asserted independent claims occur upon acceptance by an individual member of a proposal by a stationary vendor member

(both entities other than Google).  *See* '202 patent at 21:30-32.  Lastly, '905 patent recites a

"searching" limitation, wherein recited limitations occur upon "a searching person," an entity

other than Google, making a search query on a search engine.  *See* '905 patent at 21:38-45, 23:1-

8, 24:16-22.  The Complaint does not allege any facts to support a plausible claim that any single

actor performs any of these limitations recited in the asserted claims, much less identify *any* of

the actors required to perform them.  *See* Complaint at ¶¶ 39-47, 98-100, 103, 107, 109-11, 114,

118, 120-22, 125, 129, 131-33, 136-37, 141-42.  For at least this reason, the Complaint should be

dismissed.

**1.      The Complaint Fails to Address How Any of the Steps of the Method
Claims Are Met or Who Performs Them and Fails to Provide Factual
Allegations that Would Support a Joint Infringement Theory**

To meet the *Twombly/Iqbal* pleading standard for joint infringement by the combined

acts of multiple parties, the Complaint must plead "facts sufficient to allow a reasonable

inference that all steps of the claimed method are performed and either (1) one party exercises

the requisite 'direction and control' over the other's performance or (2) the actors form a joint

enterprise such that performance of every step is attributable to the controlling party."  *Lyda*, 838

F.3d at 1339 (applying *Akamai* to affirm 12(b)(6) dismissal).  In *Lyda*, the Federal Circuit

dismissed a complaint that failed to set forth ***factual allegations*** to support assertions in the

complaint that one entity directed or controlled others.  *Id.*  Dismissal was proper because there

were no allegations that could "form the basis of a reasonable inference that each claim step was

performed by or attributable to Defendants."  *Id.*  The Complaint here is even more deficient than

in *Lyda* because it fails to make even conclusory allegations of direction, control, or joint

enterprise, much less set forth any factual allegations of the same.  Thus, this case presents an

even more compelling basis to dismiss claims than in *Lyda*.

39

a.   **The Language of Claim 1 of the '202 Shows that No Single Actor Performs the Steps of the Asserted Claim and There Are No Allegations in the Complaint to Support Joint Infringement**

Plaintiff's Complaint fails to include any factual allegations that a single actor performs the steps of claim 1 of the '202 patent or that would meet the requirements in *Lyda*.  For example, the language of claim 1 of the '202 patent plainly requires multiple actors for certain steps to occur, including at least: (1) the application provider, (2) an individual member, (3) a global positioning system provider, and (4) a stationary vendor member of a plurality of stationary vendor members.  Plaintiff tacitly acknowledges the actions of multiple actors are required by its conclusory statement—"where all the steps of method claims 1-7 are performed by either Google, its customers, purchasers, users, and developers, or some combination thereof."  *See* Complaint at ¶ 103.  The need for multiple actors is apparent because claim 1 of the '202 patent requires at least:

- steps to occur "upon instances of a physical encounter between the individual member and the stationary vendor member of a plurality of stationary vendor members of the member network at a physical premises of the stationary vendor member" ('202 patent at 21:21-25, the "Physical Encounter Limitation");

- "a location of the physical encounter determined by a positioning system in communication with either the handheld mobile communication device or a communication device of the stationary vendor member" (*id.* at 21:25-29, the Location Determining Limitation");

- "upon acceptance by the handheld mobile communication device of the individual member of an automatic proposal from the stationary vendor member" (*id.* at 21:30-32, the "Acceptance Limitation").

The Physical Encounter, Location Determining, and Acceptance Limitations each require multiple actors.

<h3 style="text-align:center">(1) The Physical Encounter Limitation</h3>

The Physical Encounter Limitation requires parties other than Google because, even if Google provided the claimed "application" and "processing system" the steps in the claim do not occur except "upon instances of a physical encounter" (*see* '202 patent at 21:21-25). The specification supports the same, stating that a physical encounter occurs when a person (i.e., individual member) enters a store (i.e., stationary vendor member). *Id.* at 11:16-19 ("So if you encounter a store or other business and the store is part of the network, one way it can transmit to you is by placing transmitting devices near each store entrance."). The specification further describes and illustrates in Figure 3 a physical encounter as between a person and a store. *Id.* at 7:46-52 ("FIG. 3 is a simplified schematic diagram showing an individual member of the network entering the premises of a vendor member of the network").



'202 patent at Fig. 3 (illustrating a physical encounter between an individual member and vendor member "Macy's"). As such, none of the steps recited in claim 1 of the '202 can be performed as alleged without the actions of one or more entities other than Google, such as an individual

member and a stationary vendor member.

The Complaint neither identifies an entity as the individual member or stationary vendor member, nor addresses how either member type is under the direction or control of Google.  *See* Complaint at ¶¶ 39-40, 98-100.  Thus, the allegations regarding claim 1 of the '202 patent require actors other than Google, and the Complaint is devoid of any factual allegations identifying the individual member, the stationary vendor member, the plurality of stationary vendor members, or how Google or anyone else directs or controls the actions of others to satisfy the Physical Encounter Limitation along with all the remaining limitations as required by *Lyda*, 838 F.3d at 1339-40.  *See* Complaint at ¶¶ 39-40, 98-103.

### (2)      The Location Determining Limitation

The Location Determining Limitation of the '202 patent also requires an actor other than Google because its plain language requires that the positioning system determines the location of a physical encounter and communicates the location to the generic "application" on the handheld device.  *See* '202 patent at 21:25-29.  The specification further supports that the positioning system that determines locations is distinct from the claimed application and the accused Google Maps service because it explains that the handheld device "communicat[es] with and receiv[es] place data from the global positioning system."  *Id.* at 13:32-33.  The Complaint contains no factual allegation regarding how the location determination is done, by whom, or that any single actor controls the performance of this step as required by *Lyda*, 838 F.3d at 1339-40.  *See* Complaint at ¶¶ 39-40, 98-103.

### (3)      The Acceptance Limitation

Similarly, the plain language of the Acceptance Limitation of the '202 patent requires multiple actors because the limitation requires that an individual member (i.e., a first actor) accept an automatic proposal from a stationary vendor (i.e., a second actor).  *See* '202 patent at

21:30-32.  The specification supports the same when describing the recording of digital network

entries, stating that an individual member must push a button to ***accept*** a proposal from a

stationary vendor.  *Id.* at 3:57-60.  For example, when an individual member enters a store, the

individual member's cell phone receives a message from the store's pre-positioned cell phone or

transmitting device proposing to transmit the store's electronic business card.  *Id.* at 11:20-27.

The specification further describes that "if the member who receives a signal from the vendor

member or the store then hits the button on his cell phone to accept and store the information, the

data is transmitted, stored, and automatically sent to the database 100 on the system …."  *Id.* at

11:20-37 (emphasis added).  Thus, performance of the Acceptance Limitation requires the

actions of two individuals: (1) a vendor member sending an automatic proposal to an individual

member, and (2) an individual member hitting a button on its cell phone to "accept" the vendor

member's proposal to record the electronic business card.  *Id.* at 7:46-52 ("FIG. 3 is a simplified

schematic diagram showing an individual member of the network … accepting a transmission

from the vendor's pre-positioned device that generates a digital network entry in the digital leg

history of the member in accordance with the method and apparatus of the present invention.").

The Complaint, however, fails to include any factual allegations identifying the individual

member, the stationary vendor member, or how any party performs the steps required by the

Acceptance Limitation, and there are no allegations that would satisfy a joint infringement theory

under *Lyda*, 838 F.3d at 1339-40.  *See* Complaint at ¶¶ 39-40, 98-100.

> **(4)     The Complaint Fails to Make Sufficient Allegations of
> Fact to Support a Plausible Claim for Infringement of
> Method Claim 1 of the '202 Patent**

Dismissal of '202 patent claim 1 is proper because the plain language of claim 1 requires

multiple actors, and the Complaint fails to allege any facts regarding how Google, or any party,

satisfies these limitations or the remaining limitations, much less allegations of fact that would

support joint infringement as set forth in *Lyda*, 838 F.3d at 1339-40.

> **b.     The Physical Encounter Limitations Recited in Claims 1 and 14 of the '905 Patent, and in Claims 1 and 23 of the '910 Patent Require Multiple Actors**

The Complaint similarly fails to provide any allegations to support a plausible claim for joint infringement of the method claims of the '905 or '910 patent under *Lyda*. Like claim 1 of the '202 patent, claims 1 and 14 of the '905 patent and claims 1 and 23 of the '910 patent recite the Physical Encounter Limitation requiring multiple actors other than Google (to trigger other steps) as alleged, and the Complaint does not identify who performs this limitation, or any single party that controls performance of this step.

For example, claims 1 and 14 of the '905 patent each repeat the Physical Encounter Limitation recited in claim 1 of the '202 patent. *Compare* '202 patent at 21:21-25 *with* '905 patent at 21:23-27 and 24:1-4. As previously discussed, the plain claim language indicates that Physical Encounter Limitation requires multiple actors other than Google, such as an individual member and a stationary vendor member. *See* Section IV.C.1.a, *supra*.

The Physical Encounter Limitation of method claim 1 and computer-readable medium claim 23[6] of the '910 patent also require multiple actors other than Google, as alleged. Specifically, claims 1 and 23 state that "upon instances of a capture by the particular individual member of a digital member entry," the handheld mobile communication device "transmit[s] the

---

[6] Claim 23 of the '910 patent is what is known as a *Beauregard* claim and should be treated as a method claim here. *See Rovi Guides, Inc. v. Comcast Corp.*, No. 16-CV-9278 (JPO), 2017 WL 3447989, at *23 (S.D.N.Y. Aug. 10, 2017) ("A Beauregard claim … is a claim to a computer readable medium … containing program instructions for a computer to perform a particular process" and the "Federal Circuit has instructed that Beauregard claims … are treated as method claims.") (citing *CyberSource v. Retail Decisions, Inc.*, 653 F.3d 1366, 1373-74 (Fed. Cir. 2011)) and *Digital-Vending Services International, LLC v. University of Phoenix*, 672 F.3d 1270, 1275 n.1 (Fed. Cir. 2012)). Nevertheless, classifying claim 23 as a system claim would still result in dismissal of the Complaint because it fails to allege how Google "makes" or "uses" the limitations of claim 23 if it were treated as a system claim. *See* Section IV.C.2.

digital member entry to the processing system." *See* '910 patent at 21:28-31, 24:14-16.  Claims

1 and 23 further state that "at least some of the digital member entries captured" occur "during a

physical encounter between the individual member and the vendor member or the second

individual member." *See* '910 patent at 21:57-61, 24:43-47.  Thus, claims 1 and 23 require

multiple actors because, based on the plain claim language, at least some of the instances of

capturing digital member entries must occur during a physical encounter between multiple actors

other than Google (i.e., individual member and vendor member or second individual member) to

trigger other steps in the claim including transmitting the digital member entries to the

processing system.  *See* '910 patent at 21:57-61, 24:43-47; *see also* Section IV.C.1.a, *supra*.

Claims 1 and 23 of the '910 patent also require that an individual member perform the "capture"

of a digital member entry.  *See* '910 patent at 21:28-31; 24:14-16.

Similar to the Complaint's treatment of the '202 patent, the Complaint does not provide

any factual allegations identifying the individual member and stationary vendor members, or

how Google or any single actor performs or controls the performance of the Physical Encounter

Limitation as recited in claims 1 and 14 of the '905 patent and claims 1 and 23 of the '910 patent

(or the unilateral capture in '910 patent claims 1 and 23).  *See* Complaint at ¶¶ 39-43, 46-47, 98-

100, 109-11, 131-33.  Thus, the allegations of infringement relating to claims 1 and 14 of the

'905 patent and claims 1 and 23 of the '910 patent do not satisfy *Lyda*'s requirements for

pleading joint infringement.  *Lyda*, 838 F.3d at 1339-40.

      **c.**     **The Location Determining Limitations Recited in Claims 1 and
14 of the '905, Claims 1 and 23 of the '910 Patent, and Claim 1
of the '911 Patent Require Multiple Actors**

The Complaint also fails to provide any allegations to support a plausible claims for joint

infringement under *Lyda*; like claim 1 of the '202 patent, claims 1 and 14 of the '905 patent,

claims 1 and 23 of the '910 patent, and claim 1 of the '911 patent each recites a substantially

similar version of the Location Determining Limitation (as illustrated in the table below) that requires multiple actors; the Complaint does not allege who performs this limitation, or allege any facts to support that a single actor that controls performance of this step.

| Patent | Claim | Location determining limitation |
|---|---|---|
| '202 | 1 | "a location of the physical encounter determined by a positioning system," *see* '202 patent at 21:25-27. |
| '905 | 1 | "a location of each individual member's device determined by the positioning system," *see* '905 patent at 21:30-32. |
| '905 | 14 | "a location of the individual member determined by the positioning system," *see* '905 patent at 24:7-8. |
| '910 | 1 | "a location of each particular individual member determined by a positioning system," *see* '910 patent at 21:36-37. |
| '910 | 23 | "a location of each particular individual member determined by a positioning system," *see* '910 patent at 24:22-23. |
| '911 | 1 | "the positioning system determining a location of the individual member at the physical premises," *see* '911 patent at 21:35-37. |

As with the '202 patent, each of the Location Determining Limitations requires a positioning system that determines a location of the individual member or physical encounter. As discussed in Section IV.C.1.a, the positioning system is not part of the claimed "application" or the accused Google Maps because the mobile communication device "communicat[es] with and receiv[es] place data from the global positioning system." *See* '202 patent at 13:32-34; *see also* '905 patent at 21:22-23, 30-32. The Complaint fails to satisfy the *Lyda* joint infringement pleading requirements because it contains no factual allegations regarding how this is done, by

whom, or that any single actor controls the performance of this step, along with the other steps of the claim.  *See* Complaint at ¶¶ 39-47, 98-100, 109-11, 120-22, and 131-33.

> **d.     The Searching Limitations Recited in Claims 1 and 14 of the '905 Patent Require Multiple Actors**

The Complaint also fails to provide any allegations that a single actor performs the searching limitation as recited in claims 1 and 14 of the '905 patent, which states: "determining, by the processing system, a physical location relationship… upon the searching person making a search query on a search engine having access to the processing system" (*see* '905 patent at 21:38-45, 24:16-22, "Searching Limitation").   The plain language of the "Searching Limitation" of claims 1 and 14 of the '905 patent requires actions by multiple actors because the step of determining a physical location relationship occurs only "upon the searching person making a search query on a search engine."  *Id.*  Thus, the claimed "searching person" is a first actor that uses the search engine provided by the second actor, and the specification of the '905 patent supports the same.  For example, in describing a method of using digital histories to perform a web search, the specification describes that a "searching person" who is "conducting a search on the search engine" can use the search engine's algorithm to "identify one or more persons (called "useful persons")" having common digital history entries to the "searching person."  *Id*. at 17-18:64-12.  Thus, as plainly required by the claim language, the performance of the Searching Limitation requires the actions of more than one actor.

The Complaint fails to provide any plausible allegations identifying all the actors performing the Searching Limitation and is devoid of any allegations satisfying the *Lyda* pleading requirements for joint infringement.  *See* Complaint at ¶¶ 41-43, 109-11.

Case 1:20-cv-02862-AKH   Document 35   Filed 08/24/20   Page 55 of 64

e.   **All Method and Computer-Readable Medium Claims of the '202, '905, '910, and '911 Require Multiple Actors and the Complaint is Devoid of Allegations to Support Joint Infringement**

As explained above, claim 1 of the '202 and '911 patents, claims 1 and 14 of the '905 patent, and claims 1 and 23 of the '910 patent require the actions of more than one actor. Plaintiff tacitly admits as much: "all of the steps of the method claims 1-7 are performed by either Google, its customers, purchasers, users, and developers, or some combination thereof." *See* Complaint at ¶ 103.  Plaintiff repeats the same for each of the claims in the '905, '910, and '911 patents.  *See* Complaint at ¶¶ 114, 125, and 136.  Dismissal of the claims for infringement of the method and computer-readable medium claims of all four patents is proper because the method and computer-readable medium claims, on their face, require the actions of multiple actors and the Complaint alleges no facts to support a claim for joint infringement.

2.   **The Complaint Fails to Address Any Limitations of Asserted System Claims of the Asserted Patents, And There Are No Allegations to Support Infringement**

Because the system claims of the asserted patents repeat at least one of the Physical Encounter, Location Determining, or Searching Limitations recited in the method claims of the respective asserted patents, the system claims also require multiple actors.  The Complaint fails to allege how Google, or any single party, could "make" the system claims by combining all of the claim elements or "use" the system claims by controlling the system as a whole and obtaining benefit from it.  For at least this reason, the Complaint should be dismissed.

a.   **Claim 14 of the '202 Patent, Claim 11 of the '905 Patent, Claim 12 of the '910 Patent, and Claim 12 of the '911 Patent Repeat Limitations Recited in the Method Claims of the Asserted Patents**

As discussed above, the Physical Encounter and Location Determining Limitations recited in system claim 14 of the '202 patent, claim 11 of the '905 patent, claim 12 of the '910

48

patent, and claim 12 of the '911 patent are repeated or substantially similar to the Physical

Encounter and Location Determining Limitations recited in the method claims of their respective

patents.  For example, system claim 14 of the '202 patent repeats the Physical Encounter

Limitation of claim 1 (*compare* '202 patent at 21:21-25 *with* 23:48-52) and recites a limitation

substantially similar to the Location Determining Limitation as recited claim 1 of the '202 patent

(*compare* '202 patent at 21:25-29 *with* 24:14-17).

　　　　Similarly, system claim 11 of the '905 patent repeats the Physical Encounter and

Location Determining Limitations recited in method claim 1 of the '905 patent.  *Compare* '905

patent at 21:23-27 (claim 1), 24:1-4 (claim 14) *with* 22:53-57 (claim 11) (Physical Encounter

Limitation); *compare id.* at 21:30-32 (claim 1), 24:7-8 (claim 14) *with* 22:60-62 (claim 11)

(Location Determining Limitation).  System claim 11 of the '905 patent also recites a limitation

substantially similar to the Searching Limitation recited in claims 1 and 14 of the '905 patent.

*Compare* '905 patent at 21:38-45 (claim 1), 24:16-22 (claim 14) *with* 23:1-8 (claim 11).

　　　　Additionally, system claim 12 of the '910 patent repeats the Physical Encounter and

Location Determining Limitations recited in method claim 1 and computer-readable medium

claim 23 of the '910 patent.  *Compare* '910 patent at 21:28-31, 21:57-61 (claim 1), 24:14-16,

24:43-47 (claim 23) *with* 22:57-58, 23:17-21 (claim 12) (Physical Encounter Limitation);

*compare id.* at 21:36-37 (claim 1), 24:22-23 (claim 23) *with* 22:65-66 (claim 12) (Location

Determining Limitation).  Further, system claim 12 of the '911 patent repeats the Location

Determining Limitation as recited in method claim 1 of the '911 patent.  *Compare* '911 patent at

21:35-37 *with* 22:44-46.

> **b.     The Complaint Fails to Address Any Limitations of Asserted
> System Claims of the Asserted Patents or Allege How Any
> Party "Makes" the Asserted System Claims**

The Complaint should be dismissed because it fails to address if or how a single party

"makes" the accused system claims.  "In order to 'make' a system under § 271(a), [a party] would need to combine all of the claim elements." *Centillion Data Sys., LLC v. Qwest Commc'ns. Int'l, Inc.*, 631 F.3d 1279, 1288 (Fed. Cir. 2011).  For example, system claim 14 of the '202 patent, system claim 11 of the '905 patent, system claim 12 of the '910 patent, and system claim 12 of the '911 patent each recite at least one of the Physical Encounter, Location Determining, and Searching Limitations, which as discussed above, require the actions of multiple actors.  *See* Sections IV.C.1 and IV.C.2.a, *supra*.

None of the Complaint's paragraphs referencing purported infringement of these claims even alleges facts identifying actors, much less who is combining all the limitations.  *See* Complaint at ¶¶ 39-47, 98-100, 109-11, 120-22, and 131-133; *see also* Section IV.C.1.  Thus, the Complaint does not plead facts sufficient to plausibly support an inference that any single entity or person "makes" the accused system.

        **c.**        **The Complaint Fails to Address Any Limitations of Asserted System Claims of the Asserted Patents or Allege How Any Party "Uses" the Asserted System Claims**

Dismissal is also proper because the Complaint fails to address if or how a single party "uses" the alleged system.  To "use" a system, like claim 14 of the '202 patent, claim 11 of the '905 patent, claim 12 of the '910 patent, and claim 12 of the '911 patent, a party must "put the claimed invention into service, i.e., control the system and obtain benefit from it." *Centillion*, 631 F.3d at 1286.  For a first party to be vicariously liable based on the "use" of the system by a second party, the second party must be acting at the direction of the first party or as an agent of the first party.  *Id.* at 1287.  A complaint must also plausibly allege facts that the accused infringer "benefits from each element of the claimed system necessary to allege 'use' under § 271," not just some general benefit from the use as a whole.  *Grecia v. McDonald's Corp.*, 724 Fed. Appx. 942, 946 (Fed. Cir. 2018) (applying *Intellectual Ventures I LLC v. Motorola Mobility*

*LLC*, 870 F.3d 1302, 1329 (Fed. Cir. 2017) to affirm 12(b)(6) dismissal) ("*IV/Motorola*").

The Complaint meets neither of these requirements. It neither alleges any facts regarding who controls or puts the system into use, nor who benefits from each element of the claimed system. *See* Complaint at ¶¶ 39-47, 98-100, 109-11, 120-22, and 131-33; *see also* Section IV.B, *supra* (classifying portions of the Complaint). Thus, the Complaint fails to plead allegations of fact that Google, or any single party, "uses" claim 14 of the '202 patent, claim 11 of the '905 patent, claim 12 of the '910 patent, or claim 12 of the '911 patent.

> **d.** **The Complaint Fails to State a Plausible Claim for Direct Infringement of the System Claims in Any of the Four Patents-In-Suit**

The Complaint fails to set forth any factual allegations to support a plausible conclusion that any single party combines all the limitations of the system claims of the asserted patents or controls and obtains the benefit of all the limitations of these claims to support the conclusion that any entity "makes" or "uses" the system claims under the controlling authority. *Centillion*, 631 F.3d at 1288; *Grecia*, 724 Fed. Appx. at 946 (applying *IV/Motorola*, 870 F.3d at 1329). Moreover, the Complaint provides no basis to even infer that users of the Accused Instrumentality are directed by, controlled by, in a joint enterprise with, or agents of Google. Thus, the Complaint fails to state a plausible claim for direct infringement of the system claims in the asserted patents.

> **D.** **The Complaint's Allegations of Indirect Infringement Fail to Set Forth a Plausible Claim and Should Be Dismissed**

> **1.** **Without Direct Infringement, There Can Be No Indirect Infringement**

The Complaint cannot set forth a plausible claim for indirect infringement because it fails to set forth a plausible claim for direct infringement. To support a claim for indirect infringement, a plaintiff needs to plead "facts sufficient to allow an inference that at least one

direct infringer exists." *In re Bill of Lading*, 681 F.3d 1323, 1336 (Fed. Cir. 2012); *see also Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1272 (Fed. Cir. 2004) ("Indirect infringement, whether inducement to infringe or contributory infringement, can only arise in the presence of direct infringement . . .").

The Complaint's unsupported claims that Google directly infringes the claims are legal conclusions that need not be accepted as true in the face of a motion to dismiss. *See Twombly*, 550 U.S. at 555 (citation omitted); *see also Iqbal*, 556 U.S. at 678-79. As shown above, the Complaint provides no basis to even infer that a single user directly infringes or that there is a basis for a claim for joint infringement. *See* Sections IV.B and IV.C, *supra*. For that reason alone, Plaintiff cannot state a claim for indirect infringement.

> **2.      The Complaint Fails to Allege the Requisite Specific Intent and Action to Support a Plausible Claim for Induced Infringement**

The Complaint also fails to set forth a plausible claim for induced infringement because it does not allege facts to support an inference of the intent required for induced infringement. For claims of induced infringement, a complaint must plead facts that plausibly show the defendant had specific intent to cause another to directly infringe and knew the other's act(s) constituted infringement. *In re Bill of Lading*, 681 F.3d at 1339.

The Complaint also fails to plausibly plead induced infringement of the asserted claims. For example, Count II of the Complaint (related to induced infringement of claims 1-7 of the '202 patent) fails to plausibly plead induced infringement; paragraphs 101-104 of Count II recite bare legal conclusions and lack any factual allegations regarding how Google acted with specific intent to actually induce and encourage users to use the Accused Instrumentality in an infringing manner. *See, e.g.*, Complaint at ¶ 101 ("Weisner repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth

above."); Complaint at ¶ 102 ("Upon information and belief, Google has induced infringement and continues to induce infringement of at least claims 1-7 of the '202 Patent in violation of 35 U.S.C. § 271(b)."); Complaint at ¶ 104 ("Google's inducement to infringe is based upon literal infringement or infringement under the doctrine of equivalents, or both.").

The allegations of induced infringement in paragraph 103 related to Count II are similarly conclusory and unsupported. Paragraph 103 alleges that Google "instruct[s], direct[s], and/or require[s] others including customers, purchasers, users and developers, to perform the one or more of the steps of claims 1-7," and that Google "knew or was willfully blind to the fact that they were inducing others, including customers, purchasers, users, and developers, to infringe by practicing . . . one or more of" claims 1-7. *See* Complaint at ¶ 103. Paragraph 103 fails to identify *who* (e.g., which of a "customer, purchaser, user, and developer") Google allegedly induces "to perform the one or more of the steps of claims 1-7." *Id.* Paragraph 103 also lacks any details regarding *how* Google induces these actors to allegedly infringe claims 1-7 of the'202 patent. Thus, the Complaint fails to allege any facts illustrating a connection between Google and any other party to perform the steps of claims 1-7 and "falls short of showing 'specific intent and action' on behalf" of Google to induce anonymous third-party infringement of the '202 patent. *See Cleveland Clinic Found. v. True Health Diagnostics LLC,* 859 F.3d 1352, 1364 (Fed. Cir. 2017) ("Cleveland Clinic alleges no facts that suggest any connection between True Health and doctors that may prescribe lipid lowering drugs. Cleveland Clinic thus falls short of showing 'specific intent and action' on behalf of True Health to induce infringement . . .").

The Complaint's sections relating to alleged induced infringement of claims 1-10 and 14 of the '905 patent (¶¶ 112-15, Count V), claims 1-11 of the '911 patent (¶¶ 123-26, Count VIII), and claims 1-10 and 23-28 of the '910 patent (¶¶ 134-38, Count XI) do no more than parrot the

inadequate allegations of Count II, and simply change patent numbers and claims.  Thus, for the same reasons discussed above relating to Count II, the allegations of induced infringement recited in Counts V, VIII, and XI also recite bare legal conclusions that are properly disregarded. *Twombly*, 550 U.S. at 555.

   3.   **The Complaint Fails to Allege Facts to Support a Plausible Claim for Contributory Infringement**

   The Complaint does not allege any facts supporting a plausible inference of contributory infringement because it does not identify with any specificity a component having no substantial noninfringing uses.  Instead, the paragraphs of the Complaint directed to contributory infringement recite unsupported legal conclusions that are properly disregarded.  *See, e.g.*, Complaint at ¶¶ 105-08, 116-19, 127-30, 139-43.

   Contributory infringement requires that a defendant sell, offer to sell or import "a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use."  35 U.S.C. § 271(c).  Thus, to properly plead a claim for contributory infringement, the Complaint must allege facts sufficient to infer that any "components" alleged to provide the basis for contributory infringement have no substantial noninfringing use.  *In re Bill of Lading*, 681 F.3d at 1337.

   Count III of the Complaint (related to contributory infringement of claims 14-18 of the '202 patent) does not plead *any* facts sufficient to infer that a component has no substantial non-infringing uses, and instead recites broad, unsupported legal conclusions that need not be accepted as true.  *See, e.g.*, Complaint at ¶ 105 ("Weisner repeats, realleges, and incorporates by

54

reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth

above."); Complaint at ¶ 106 ("Upon information and belief, Google has contributorily infringed

and continues to contributorily infringe at least claims 14-18 of the '202 Patent in violation of 35

U.S.C. § 271(c)."); Complaint at ¶ 108 ("Upon information and belief, Google's contributory

infringement is based upon literal infringement or infringement under the doctrine of

equivalents, or both.").

The allegations of contributory infringement in paragraph 107 are also unsupported and

merely state legal conclusions.  *See* Complaint at ¶ 107.  Paragraph 107 identifies "their

applications and/or products" as the "component" for the basis of a contributory infringement

claim.  However, neither paragraph 107, nor paragraphs 105-06 and 108, identify which Google

"application and/or product" is the alleged component, much less that the alleged component is

"not a staple article or commodity of commerce suitable for substantial noninfringing uses."

Thus, paragraph 107 asserts contributory infringement, but fails to allege any supporting facts to

support this bare conclusion.

As such, paragraphs 105-108 amount to threadbare recitals of the elements of

contributory infringement, and should be dismissed as the Federal Circuit did in *Artrip v. Ball

Corp.*  735 Fed. Appx. 708, 713 (Fed. Cir. 2018).  In *Artrip*, the Federal Circuit affirmed

dismissal the claims of contributory infringement, holding that the complaints' allegations were

mere threadbare recitals of the elements of contributory infringement supported by mere

conclusory statements.  *Id.* ("While the complaint recited . . . that the aluminum is a material part

of the claimed invention that is not a staple article and is not suitable for substantial

noninfringing use . . . the second amended complaint did not plausibly assert facts to . . . suggest

that the aluminum it supplied had no substantial noninfringing use.") (citing *Iqbal*, 556 U.S. at

678) (internal citations and quotations omitted).  Thus, any claim for contributory infringement of the '202 patent is properly dismissed.

The Complaint's sections relating to alleged contributory infringement of claims 11-13 of the '905 patent (¶¶ 116-19, Count VI), claims 12-21 of the '911 patent (¶¶ 127-30, Count IX), claims 12-21 and 23-28 of the '910 patent (¶¶ 139-43, Count XII) do no more than parrot the inadequate allegations of Count III, and simply modify the patent numbers and claims. Thus, for the same reasons discussed above relating to Count III, the contributory infringement claims in Counts VI, IX, and XII should be dismissed as insufficient to plausibly plead a claim for contributory infringement.

## V.      CONCLUSION

For the reasons above, Google respectfully requests that the Court dismiss Plaintiff's Complaint with prejudice because (1) the asserted claims of the '202, '910, '911, and '905 patents are invalid as directed to a patent-ineligible abstract idea, and (2) the complaint fails to state a plausible claim of infringement.

Dated:  August 21, 2020

Respectfully submitted,

FENWICK & WEST LLP

By:   */s/ Kevin X. McGann*

Kevin X. McGann (NY Bar #2842425)
Email: kmcgann@fenwick.com
Scott D. Baker (NY Bar #5690292)
Email: sbaker@fenwick.com
**FENWICK & WEST LLP**
902 Broadway, Suite 14
New York, NY  10010-6035
Telephone:     212.430.2600

Allen Wang (Calif. State Bar #278953)
*Pro hac vice* to be filed
Email: allen.wang@fenwick.com
**FENWICK & WEST LLP**
801 California Street
Mountain View, CA  94041
Telephone:     650.988.8500

*Attorneys for Google LLC*