**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X

SHOLEM WEISNER and SHMUEL NEMANOV,

                **Plaintiff and Involuntary Plaintiff,**

               **-against-**

GOOGLE LLC,

                   **Defendant.**
-----------------------------------------------------------------X

            20-CV-2862 (AKH) (VF)

            23-CV-8186 (AKH) (VF)

            **REPORT AND**
            **RECOMMENDATION**

**VALERIE FIGUEREDO, United States Magistrate Judge.**

**To: THE HONORABLE ALVIN K. HELLERSTEIN, United States District Judge**

       Plaintiff Sholem Weisner ("Weisner") commenced one action on April 6, 2020 (Sholem Weisner and Shmuel Nemanov v. Google LLC, No. 20-CV-2862 (S.D.N.Y.) ("Weisner I")) and a related action on September 15, 2023 (Sholem Weisner and Shmuel Nemanov v. Google LLC, No. 23-CV-8186 (S.D.N.Y.) ("Weisner II")), asserting claims for patent infringement by Defendant Google LLC ("Google"). The cases were consolidated on July 29, 2025. ECF No. 337.[1] Both parties moved for summary judgment on the affirmative defenses of inequitable conduct and prosecution laches (see ECF Nos. 339, 342), and on August 26, 2025, the Honorable Alvin K. Hellerstein referred the matter to the undersigned for a report and recommendation on the cross motions and "any bench trial that may be appropriate" (ECF No. 392). On October 21, 2025, Google and Weisner's attorney appeared for a bench trial, in which Weisner refused to participate. See ECF No. 448 ("Tr.").

---

[1] Citations to documents on the electronic docket ("ECF") are to the electronic docket in Weisner I unless otherwise noted.

This Report & Recommendation has three parts. Part I addresses the pending cross-motions for summary judgment. See infra pp. 3-45. For the reasons stated in Part I, I respectfully recommend that Weisner's motion for summary judgment be **GRANTED in part**, as to the affirmative defense of prosecution laches, and **DENIED in part**, as to the affirmative defense of inequitable conduct. I also respectfully recommend that Google's motion for summary judgment be **DENIED**. Because Google's affirmative defense of inequitable conduct raised an issue of fact, a bench trial was conducted on October 21, 2025. Part II includes recommended factual findings and conclusions of law concerning the defense of inequitable conduct. See infra pp. 45-84. For the reasons stated in Part II, I respectfully recommend that the Court conclude that Weisner's conduct in reviving the '165 patent constituted inequitable conduct. And Part III addresses Google's motion pursuant to Federal Rule of Civil Procedure 41(b), seeking dismissal of Weisner's suit as a sanction for his nonappearance on October 21.[2] See infra pp. 85-102. For the reasons stated in Part III, I respectfully recommend that Google's Rule 41 motion be **GRANTED**, and that Weisner's suit be dismissed with prejudice.

---

[2] Because Weisner refused to participate in the bench trial that occurred on October 21, Google orally moved for sanctions pursuant to Rule 41. ECF No. 448 at 5-9.

I.    <u>**Cross Motions for Summary Judgment**</u>[3]

<u>**BACKGROUND**</u>[4]

A.  <u>**Factual Background**</u>

Before 2007, when a person searched the Internet, the user's Internet browser maintained

a "surf history," which was a "list[ ] of previously visited web sites." ECF No. 344-8 at 9.[5] But

---

[3] The page numbers referenced in Part I for citations to ECF are to the electronically generated pagination in those documents, including for any deposition transcripts cited.

[4] Unless otherwise noted, the facts recounted herein reflect admissible evidence in the record and the undisputed, material facts contained in the parties' Local Civil Rule 56.1 Statements of Facts. <u>See</u> ECF No. 351-1 (Weisner's R. 56.1); ECF No. 348 (Google's R. 56.1); ECF No. 372-2 (Google's Counter R. 56.1); ECF No. 373-1 (Weisner's Counter R. 56.1). In considering the cross motions for summary judgment, any fact that was contested or challenged by pointing to admissible evidence in the record was considered to be disputed and is not included in the facts recounted herein. Where a party provides only a conclusory denial and/or fails to include any record citation to admissible evidence, those facts were deemed admitted. <u>See</u> <u>Giannullo v. City of New York</u>, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted."); <u>see also</u> <u>N.Y. State Teamsters Conf. Pension & Ret. Fund v. Express Servs., Inc.</u>, 426 F.3d 640, 648 (2d Cir. 2005) (finding it within the district court's discretion to deem the moving party's statement of material facts admitted as to a particular claim where the opposing party "offered mostly conclusory denials" and "failed to include any record citations"). Additionally, where a party denies a fact because it "simply seeks to add its own 'spin' on the fact or otherwise dispute the inferences from the stated fact" but does not otherwise cite to admissible evidence refuting the fact (<u>see, e.g.</u>, ECF No. 372-2 at ¶ 11), those facts have been deemed admitted. <u>See</u> <u>Johnson v. L'Oreal USA</u>, No. 18-CV-9786 (JPC), 2021 WL 4482167, at *1 n.1 (S.D.N.Y. Sept. 30, 2021), <u>aff'd by</u>, No. 21-CV-2914, 2023 WL 2637456 (2d Cir. Mar. 27, 2023).

[5] There are various facts in the record which are not disputed, but which neither party has included in their respective Rule 56.1 statement of undisputed facts. These facts have been included here, because the Court may rely on any admissible "evidence in the record" on a motion for summary judgment. <u>See</u> <u>In re Fosamax Prods. Liab. Litig.</u>, 707 F.3d 189, 193 (2d Cir. 2013) (quoting <u>Lyons v. Lancer Ins. Co.</u>, 681 F.3d 50, 57 (2d Cir. 2012)) ("In ruling on a motion for summary judgment, a district court 'may rely on any material that would be admissible at a trial.'"); <u>see also</u> Fed. R. Civ. P. 56(c)(3); 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure: Civil § 2721 at 361 (3d ed. 1998) ("[A]lthough the court is required only to consider the materials cited by the parties, it has discretion to consider other materials in the record when making its determination.").

the surf histories did not account for a person's "physical presence," also known as a "digital leg history." Id. 9-10. Weisner created a system where a person's digital leg history is "viewable and updateable . . . conveying various kinds of information about where a person has physically been stretching back a day, a month, a year[,] o[r] many years." Id. at 13.

Weisner patented his invention, including, as is relevant here, U.S. Patent Nos. 10,394,905 (the "'905 Patent"), 10,642,911 (the "'911 Patent"), 10,685,068 (the "'068 Patent"), 10,860,667 (the "'667 Patent"), and 11,163,839 (the "'839 Patent") (collectively, the "Claimed Patents"). ECF No. 373-1 at ¶ 1; ECF No. 72 at 28-29. Each of the Claimed Patents is included in U.S. Patent Application No. 11/811,165 (the "'165 Application"). ECF No. 373-1 at ¶ 2; ECF No. 72-3; ECF No. 72-4; Weisner II at ECF No. 10-2; Weisner II at ECF No. 10-4.

On June 7, 2007, Steven Horowitz ("Horowitz"), the prosecuting attorney, filed the '165 Application with the Patent and Trademark Office ("PTO"). ECF No. 373-1 at ¶ 4; ECF No. 372-2 at ¶ 2. Weisner and Involuntary Plaintiff Shmuel Nemanov ("Nemanov")[6] are named as the coinventors on the '165 Application. ECF No. 373-1 at ¶ 3; ECF No. 372-2 at ¶ 3.

Around 2007 or 2008, Weisner was prescribed drugs, including OxyContin and Xanax. ECF No. 372-2 at ¶ 6; ECF No. 350-11 at 4; ECF No. 350-12 at 4. The strength of Weisner's OxyContin and Xanax prescriptions increased rapidly.[7] ECF No. 351-2 at 11-12. Sometime between late 2008 and 2010, Weisner "r[a]n out of medications" and substituted heroin for

---

[6] Weisner and Nemanov were involved in a separate dispute in state court regarding ownership of the Claimed Patents, but a stipulation of discontinuance was filed on April 11, 2024. See Weisner v. Nemanov et al., No. 502269/2020 at Doc. No. 128 (N.Y. Sup. Ct. Apr, 11, 2024).

[7] See supra n.5.

OxyContin.[8] ECF No. 351-2 at 12-13. Around the same time, Weisner began using other non-prescribed drugs, such as morphine, crack cocaine, and crystal meth. ECF No. 373-1 at ¶ 5; ECF No. 351-2 at 13-14.

On July 29, 2008, the PTO issued a non-final rejection of the '165 Application, to which Horowitz, on behalf of Weisner and Nemanov, filed a response on October 29, 2008. ECF No. 373-1 at ¶ 9; ECF No. 344-8 at 103-25. On October 10, 2008, the PTO issued a notice of publication of the '165 Application. ECF No. 372-2 at ¶ 4. On February 13, 2009, the PTO issued a final rejection (id. at ¶ 5; ECF No. 373-1 at ¶ 9; ECF No. 344-8 at 127-57), and on August 13, 2009, Horowitz, on behalf of Weisner and Nemanov, filed a request for continued examination and another response (ECF No. 373-1 at ¶ 9; ECF No. 344-8 at 158-73). Horowitz believed he would have spoken to Weisner to file this response.[9] ECF No. 344-6 at 3-4.

Weisner paid Horowitz's legal bills for the prosecution of the '165 Application.[10] ECF No. 373-1 at ¶ 35; ECF No. 350-3 at 6.

In August 2009, Horowitz joined the law firm of Dr. Mark Friedman ("Dr. Friedman").[11] ECF No. 372-2 at ¶ 29; ECF No. 351-4 at 3.

On August 31, 2009, Weisner pled *nolo contendere* in person in the Superior Court of Connecticut to two misdemeanor charges of criminal trespass and larceny. ECF No. 373-1 at ¶ 11; ECF No. 350-4 at 5-6. Weisner signed the plea document in the presence of his lawyer.

---

[8] See supra n.5.

[9] See supra n.5.

[10] See supra n.5.

[11] See supra n.5.

ECF No. 373-1 at ¶ 11; ECF No. 350-4 at 6, 9. The conviction was "in connection with an incident that occurred in November 2007, when [Weisner] was arrested on felony charges." ECF No. 373-1 at ¶ 11; ECF No. 344-29 at 2-3.

On September 30, 2009, the PTO issued a non-final action rejecting all pending claims in the '165 Application (the "Non-Final Action"). ECF No. 372-2 at ¶ 7. The PTO allowed the parties to respond to the Non-Final Action until March 30, 2010. ECF No. 373-1 at ¶ 17; ECF No. 344-8 at 174-75. From September 30, 2009, through April 13, 2010, Horowitz sent Weisner and Nemanov three e-mails to inform them that the PTO required a response to the '165 Application. ECF No. 373-1 at ¶ 18; ECF No. 372-2 at ¶ 8. In one of those e-mails, Horowitz wrote "[a]s previously advised numerous times the application will go abandoned on March 29, 2010 if we do not file a response by then." ECF No. 373-1 at ¶ 23 (emphasis removed). Weisner never saw the e-mails.[12] ECF No. 372-2 at ¶ 9. Horowitz did not speak to Weisner to warn him about the abandonment. ECF No. 373-1 at ¶ 19. Horowitz spoke with Nemanov on the phone around March 2010 about the abandonment. ECF No. 373-1 at ¶ 25; ECF No. 344-6 at 12. Nemanov was aware that the patent would become abandoned if he did not respond to the Non-

---

[12] In its Rule 56.1 statement, Google disputes this fact, but the evidence it cites does not contradict Weisner's testimony that he never *read* Horowitz's e-mails. ECF No. 351-2 at 22-26. Instead, Google cites to evidence that indicates that Weisner *received* Horowitz's e-mails. ECF No. 348 at ¶¶ 19-23, 26-27. Google claims that Weisner was "informed" that the '165 Application would become abandoned. See ECF No. 373-1 at ¶ 19. But there is no evidence in the record that Weisner was "informed" that the '165 Application would become abandoned, because Weisner testified that he did not read his e-mails (ECF No. 351-2 at 23-26; ECF No. 350-2 at 8), and Horowitz did not speak to Weisner about the Non-Final Action after September 30, 2009 and before April 2010 (ECF No. 351-4 at 118).

Final Action. ECF No. 373-1 at ¶ 28. Weisner did not pay Horowitz to respond to the Non-Final

Action. Id. at ¶ 39.

By April 13, 2010, no response was filed by Weisner, Nemanov, or Horowitz to the Non-

Final Action. ECF No. 372-2 at ¶ 16. On April 13, 2010, the PTO issued a notice of

abandonment of the '165 Application. Id. at ¶ 17. Horowitz "knew about the abandonment." ECF

No. 373-1 at ¶ 32 (internal quotation marks omitted). Nemanov was aware that the '165

Application was abandoned in 2010, and he was informed by Weisner or Horowitz "that [his]

patent couldn't be revived in 2010."[13] Id. at ¶¶ 40-41; ECF No. 350-3 at 4-5. Nemanov did not

act to revive the '165 Application in 2010. ECF No. 373-1 at ¶ 42. Horowitz believed that the

'165 Application was abandoned because Weisner was "seriously incapacitated," and Nemanov

"felt strongly" that Weisner needed to be involved in any response to the PTO. ECF No. 372-2 at

¶¶ 11, 15.

Weisner testified that he was doing "very, very bad" by "maybe late 2009" and was

"nonfunctional" from 2010, if not earlier. ECF No. 372-2 at ¶ 12; ECF No. 350-1 at 4-5. From at

least 2009 to 2015, Weisner testified that "there was never a day when he was not on very heavy

drugs." ECF No. 372-2 at ¶¶ 18-19; ECF No. 351-2 at 16-17. Horowitz testified that between

September 30, 2009, and March 29, 2010, Weisner was "out of commission," "it wasn't possible

to work with [Weisner]," and "[Weisner] couldn't function to work with me like he had been."[14]

ECF No. 372-2 at ¶ 11; ECF No. 344-6 at 6, 9. Nemanov testified that Weisner was "quite a bit

---

[13] See supra n.5.

[14] See supra n.5.

out of his mind" around 2009 to 2010 and "wasn't in a condition to do anything."[15] ECF No. 373-1 at ¶ 36; ECF No. 344-4 at 5-6.

In June 2010, Weisner provided a sworn affidavit to the Brooklyn District Attorney's office, related to an individual who was working to bring a criminal case against Baruch Lebovits. ECF No. 373-1 at ¶ 45; ECF No. 344-11 at 3-5. In the affidavit, which was signed by Weisner on June 22, 2010, Weisner stated that he had met the individual in the summer of 2009, that the individual had a "guilty conscience" about making a case against Lebovits, and that Weisner and the individual were arrested in Brooklyn at the end of 2009 for marijuana possession.[16] ECF No. 344-11 at 3-5.

On January 10, 2014, Weisner entered a rehabilitation facility for the first time. ECF No. 373-1 at ¶ 66. He was in rehab for 30 days.[17] ECF No. 350-12 at 7. On December 2, 2014, Weisner entered rehab again. ECF No. 373-1 at ¶ 69. Weisner left rehab on February 20, 2015, and he did not use "hard drugs" again. Id. at ¶¶ 72-73. While in rehab, Weisner played "50, 60" games of online chess.[18] ECF No. 350-1 at 18. In February 2015 and September 2015, Weisner also played online chess.[19] ECF No. 344-23.

"After leaving the rehabilitation facility in February 2015," Weisner "spent time in upstate New York where he hiked, meditated, and learned about Jewish mysticism." ECF No.

---

[15] See supra n.5.

[16] See supra n.5.

[17] See supra n.5.

[18] See supra n.5.

[19] See supra n.5.

373-1 at ¶ 74. In 2016, Weisner obtained a car and used it to occasionally drive back and forth from upstate New York to New York City.[20] ECF No. 350-1 at 3.

On July 21, 2015, Google released a feature of Google Maps called Timeline. ECF No. 373-1 at ¶ 76; ECF No. 344-25 at 2. Timeline was advertised as "a useful way to remember and view the places" a person had visited "on a given day, month or year" and allowed users to "visualize" their "real-world routines" and "easily see the trips" taken.[21] ECF No. 344-25 at 2.

Sometime in the beginning of 2017, Weisner discussed the '165 Application with a patent attorney while at a spa. ECF No. 373-1 at ¶ 79; ECF No. 372-2 at ¶ 27; ECF No. 351-2 at 33-34. On May 17, 2017, Weisner sent an e-mail to Horowitz, who was a law partner of Dr. Friedman, asking about reviving the '165 Application. ECF No. 373-1 at ¶ 85; ECF No. 372-2 at ¶ 31. Horowitz had not spoken with Weisner since 2009. ECF No. 372-2 at ¶ 45. On May 20, 2017, Horowitz sent an e-mail to Weisner, stating in part:

> One other thing I want you to be aware of . . . is 'Intervening Rights'. This means: Even if you end up with a patent, since your patent was abandoned for a number of years and people thought you have [sic] up on it, if someone (like Google) saw that you apparently abandoned your patent and then after that started developing a product based on your published invention a court would be reluctant to force them to stop selling the product even after you get the patent since they relied on your having given up on it when they started developing it.

Id. at ¶ 30.

Horowitz conducted an investigation in connection with the petition to revive the '165 Application (the "Revival Petition"). Id. at ¶ 41. Horowitz spoke with Weisner as part of his investigation. Id. at ¶ 44. Horowitz did not request Weisner's medical records or any other

---

[20] See supra n.5.

[21] See supra n.5.

"documentation establishing [Weisner's] incapacity." Id. at ¶ 49; ECF No. 344-6 at 16-17. Horowitz did not speak with Weisner's medical providers or individuals at the rehab facility Weisner attended. ECF No. 372-2 at ¶ 44; ECF No. 344-6 at 18. Horowitz did not speak to Nemanov.[22] ECF No. 372-2 at ¶ 44; ECF No. 344-6 at 16.

Horowitz was "sensitive to what the Patent Office considered an appropriate basis" for filing a revival application for a patent that was abandoned unintentionally. ECF No. 372-2 at ¶ 46. Horowitz ultimately determined that he "could represent to the PTO that the entire period of abandonment of the '165 Application was unintentional." Id. at ¶ 47.

On June 1, 2017, Dr. Friedman, Horowitz's law partner, filed the Revival Petition. Id. at ¶ 31. The PTO's form for the Revival Petition was prepopulated with a required statement that "[t]he entire delay in filing the required reply from the due date for the required reply until the filing of a grantable petition under 37 CFR 1.137(a) was unintentional." Id. at ¶ 34. Per Title 37, Section 1.137(a) of the Code of Federal Regulations, Dr. Friedman certified that that the entire delay in filing the Revival Petition was "unintentional." Id. at ¶ 31; ECF No. 373-1 at ¶ 92. Dr. Friedman did not do "any substantive work" on the prosecution prior to filing the Revival Petition. ECF No. 373-1 at ¶ 94. Dr. Friedman had "zero knowledge of the facts surrounding" the Revival Petition. ECF No. 372-2 at ¶ 39.

On June 6, 2017, Dr. Friedman filed a power of attorney request with the PTO to replace Horowitz as the prosecuting attorney on the '165 Application. ECF No. 373-1 at ¶ 96. The power of attorney request was signed by Weisner but not Nemanov. Id. at ¶¶ 96-97. The PTO denied

---

[22] Weisner claims that Horowitz spoke with both Weisner and Nemanov as part of his investigation, but as Horowitz's deposition testimony makes clear, Horowitz only spoke with Nemanov in 2010, and not in connection with his subsequent investigation in 2017. ECF No. 344-6 at 16; ECF No. 351-4 at 24.

the power of attorney request "because it did not include [Nemanov], who needed to sign as coinventor." Id. at ¶ 98. On July 3, 2017, Dr. Friedman filed a new power of attorney request, now with a signature for Nemanov. Id. at ¶ 103. The signature for Nemanov on this request "could be" Nemanov's signature, but Nemanov was not "absolutely for certain" it was his signature on the power of attorney. Id. at ¶ 108. On July 12, 2017, the PTO accepted the power of attorney request, accepting Dr. Friedman's power of attorney and revoking Horowitz's power of attorney. Id. at ¶¶ 118-120.

On September 14, 2017, the PTO granted the petition to revive the '165 Application. ECF No. 373-1 at ¶ 121. In doing so, the PTO noted that it was "relying on petitioner's duty of candor and good faith in accepting the statement that the entire delay in filing the required reply from the due date for the reply until the filing of a grantable petition pursuant to 37 CFR 1.137 was unintentional." Id. (internal quotation marks omitted); ECF No. 372-2 at ¶ 55. Dr. Friedman understood that the PTO was relying on his statement that the entire period of delay was unintentional when it revived the '165 Application.[23] ECF No. 344-7 at 4. Horowitz understood that without making the certification that the entire delay was unintentional under 37 CFR 1.137, the PTO would not have revived the '165 Application.[24] ECF No. 344-6 at 19.

On October 12, 2018, Weisner and two investors, Martin and Malka Mittelman, entered into an investor agreement for the '165 Application. ECF No. 344-10 at 3. The agreement stated that "Sholem is selling to Martin and Malka, for $10 and other valuable consideration, herby [sic] acknowledged received by Shoelm Weisner, an undiluted 3% interest in [the '165 Application]." Id. The agreement "overrides any prior agreements between Sholem and Martin

---

[23] See supra n.5.

[24] See supra n.5.

11

and Malka." <u>Id.</u> On October 26, 2018, Weisner sent an e-mail to Horowitz asking him to look at a link. ECF No. 372-2 at ¶ 58. The link was to a new "Explore Tab" in Google Maps. <u>Id.</u> at ¶ 59.

### B. Procedural Background

On July 31, 2025, Google and Weisner filed cross motions for summary judgment on the affirmative defenses of inequitable conduct and prosecution laches. ECF Nos. 339, 342. On August 14, 2025, Google and Weisner filed their respective opposition briefs. ECF Nos. 372, 373. On August 19, 2025, Google and Weisner filed their respective reply briefs. ECF Nos. 381, 384. On August 26, 2025, Judge Hellerstein referred the motions for summary judgment on the affirmative defenses, stating "I hereby refer these motions, and any bench trial that may be appropriate, to U.S. Magistrate Judge Valerie Figueredo, for a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B)-(C)." ECF No. 392. As indicated, a bench trial on the disputed issues of material fact related to the defense of inequitable conduct was held on October 21, 2025. ECF No. 448.

## DISCUSSION

"[A] court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); <u>see</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986). The Court's task is not to resolve contested issues of fact but rather to determine whether there exists any disputed issue of material fact. <u>Donahue v. Windsor Locks Board of Fire Comm'rs</u>, 834 F.2d 54, 58 (2d Cir. 1987); <u>Knight v. U.S. Fire Ins. Co.</u>, 804 F.2d 9, 11 (2d Cir. 1986). "A fact is material when it might affect the outcome of the suit under governing law." <u>McCarthy v. Dun & Bradstreet Corp.</u>, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks and citation omitted). A dispute "is 'genuine' . . . if the evidence

12

is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248.

"The moving party bears the initial burden of demonstrating 'the absence of a genuine issue of material fact.'" <u>Fed. Deposit Ins. Corp. v. Great Am. Ins. Co.</u>, 607 F.3d 288, 292 (2d Cir. 2010) (quoting <u>Celotex</u>, 477 U.S. at 323). Once that burden is met, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." <u>Id.</u> (citing <u>Anderson</u>, 477 U.S. at 249).

"All evidence submitted on the motion is to be construed in the manner most favorable to the nonmoving party." <u>Okin v. Vill. of Cornwall-On-Hudson Police Dep't</u>, 577 F.3d 415, 427 (2d Cir. 2009) (quoting <u>Horvath v. Westport Library Ass'n</u>, 362 F.3d 147, 151 (2d Cir. 2004)). However, "[t]o defeat a summary judgment motion, the non-moving party 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and 'may not rely on conclusory allegations or unsubstantiated speculation.'" <u>Fed. Deposit Ins. Corp.</u>, 607 F.3d at 292 (first quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586, then quoting <u>Scotto v. Almenas</u>, 143 F.3d 105, 114 (2d Cir. 1998)). While "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[,] [f]actual disputes that are irrelevant or unnecessary will not be counted." <u>Anderson</u>, 477 U.S. at 248; <u>see also</u> <u>Knight</u>, 804 F.2d at 11-12 (quoting <u>Quarles v. Gen. Motors Corp.</u>, 758 F.2d 839, 840 (2d Cir. 1985) (per curiam)) (noting that "the mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment") (alteration omitted).

The same standards apply on cross-motions for summary judgment. "[E]ach moving party has the burden of presenting evidence to support its motion that would allow the district

court, if appropriate, to direct a verdict in its favor." City of New York v. Tavern on the Green Int'l LLC, 351 F. Supp. 3d 680, 688 (S.D.N.Y. 2018) (internal quotation marks and citation omitted). "[W]hen both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party. Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Morales v. Quintel Ent., Inc., 249 F.3d 115, 121 (2d Cir. 2001) (citations omitted).

### A. Inequitable Conduct

#### 1. *Legal Standard*

"Inequitable conduct is an equitable defense to patent infringement that, if proved, bars enforcement of a patent." Therasense, Inc. v. Becton, Dickinson and Co., 649 F.3d 1276, 1285 (Fed. Cir. 2011) (en banc). "The concept of inequitable conduct in patent procurement derives from the equitable doctrine of unclean hands: that a person who obtains a patent by intentionally misleading the PTO can not enforce the patent." Demaco v. Corp. v. F. Von Langsdorff Licensing, Ltd., 851 F.2d 1387, 1394 (Fed. Cir. 1988).

"Inequitable conduct resides in failure to disclose material information, or submission of false information, with an intent to deceive." Lumenyte Int'l Corp. v. Cable Lite Corp., 92 F.3d 1206, *1 (Fed. Cir. 1996) (citation omitted). To prevail on a defense of inequitable conduct, the accused infringer must show by clear and convincing evidence "that the applicant affirmatively misrepresented or failed to disclose material information, or submitted false material information, with an intent to deceive the PTO." Eisai Co. v. Dr. Reddy's Lab'ys, Ltd., 472 F. Supp. 2d 493, 506 (S.D.N.Y. 2006), aff'd by, 533 F.3d 1353 (Fed. Cir. 2008); see also

Therasense, Inc., 649 F.3d at 1287. Both elements—intent and materiality—must be shown by clear and convincing evidence. Therasense, Inc., 649 F.3d at 1287.

To constitute clear and convincing evidence of intent to deceive, "the specific intent to deceive must be 'the single most reasonable inference able to be drawn from the evidence.'" Id. at 1290 (citing Star Sci. Inc. v. R.J. Reynolds Tobacco Co., 537 F.3d 1357, 1366 (Fed. Cir. 2008)). "Because direct evidence of deceptive intent is rare, a district court may infer intent from indirect and circumstantial evidence." Id.; see also Purdue Pharma L.P. v. Endo Pharm. Inc., 438 F.3d 1123, 1133-34 (Fed. Cir. 2006) (noting that intent to deceive may be inferred from clear and convincing evidence of the surrounding circumstances). "Intent is generally inferred from the facts and circumstances surrounding the applicant's overall conduct, especially where there is no good faith explanation for a nondisclosure." M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co., 439 F.3d 1335, 1341 (Fed. Cir. 2006). If "there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found." Therasense, Inc., 649 F.3d at 1290-91. "Intent to deceive, however, cannot be 'inferred solely from the fact that information was not disclosed; there must be a factual basis for a finding of deceptive intent.'" Purdue Pharma L.P., 438 F.3d at 1134 (quoting Hebert v. Lisle Corp., 99 F.3d 1109, 1116 (Fed. Cir. 1996)); see also Dayco Prods., Inc. v. Total Containment, Inc., 329 F.3d 1358, 1367 (Fed. Cir. 2003) (explaining that "[i]ntent to deceive cannot be inferred simply from the decision to withhold [information] where the reasons given for the withholding are plausible").

Additionally, a court must weigh any evidence of good faith when determining whether an intent to deceive has been shown. Purdue Pharma L.P., 438 F.3d at 1134. "If a court decides that evidence of the disputed conduct supports a threshold inference of materiality and deceptive intent, it must then weigh that evidence against all other circumstances to determine whether

conduct so culpable as to justify unenforceability has indeed occurred." <u>Eisai Co.</u>, 472 F. Supp. 2d at 506 (citing <u>Baxter Int'l, Inc. v. McGaw, Inc.</u>, 149 F.3d 1321, 1327 (Fed. Cir. 1998)); <u>see also Therasense Inc.</u>, 649 F.3d at 1287 (explaining that "the district court must weigh the equities to determine whether the applicant's conduct before the PTO warrants rendering the entire patent unenforceable"). "[A] patentee facing a high level of materiality and clear proof that it knew or should have known of that materiality, can expect to find it difficult to establish 'subjective good faith' sufficient to prevent the drawing of an inference of intent to mislead." <u>GFI, Inc. v. Franklin Corp.</u>, 265 F.3d 1268, 1275 (Fed. Cir. 2001). However, "materiality does not presume intent, which is a separate and essential component of inequitable conduct." <u>Purdue Pharma L.P.</u>, 438 F.3d at 1134 (quoting <u>Allen Eng'g Corp. v. Bartell Indus., Inc.</u>, 299 F.3d 1336, 1352 (Fed. Cir. 2002)).

To prove materiality, the accused infringer must show that the "withheld or misrepresented information would have blocked patentability." <u>Ohio Willow Wood Co. v. Alps South, LLC</u>, 735 F.3d 1333, 1345 (Fed. Cir. 2013). In other words, "it must be shown that the PTO would not have allowed the claim but for the nondisclosure or misrepresentation." <u>In re Rosuvastatin Calcium Pat. Litig.</u>, 703 F.3d 511, 519 (Fed. Cir. 2012) (citation omitted); <u>see also Therasense Inc.</u>, 649 F.3d at 1291 (explaining that "as a general matter, the materiality required to establish inequitable conduct is but-for materiality"). Although courts aim "to avoid impinging on the PTO's discretion by opining on matters unrelated to the substantive criteria of patentability . . . where the PTO's procedural rules are unambiguous, deciding what it would have done in a particular circumstance does not require [a court] to second-guess the agency." <u>In re Rembrandt Techs. LP Pat. Litig.</u>, 899 F.3d 1254, 1272 (Fed. Cir. 2018) (internal quotation marks and citation omitted).

"An applicant or patentee cannot meet the 'unintentional delay' standard in 37 C.F.R. § 1.137(a) if the entire delay is not unintentional." Manual of Patent Examining Procedures ("MPEP") § 711.03(C) (section C discussing unintentional delay).[25] Accordingly, an intentional delay in seeking revival of a patent application of "even a few weeks" will preclude the granting of a revival application under 37 C.F.R. § 1.137(b)(3). See New York Univ. v. Autodesk, Inc., 495 F. Supp. 2d 369, 374 n.4 (S.D.N.Y. 2007) ("[T]he plain meaning of the word 'entire' here is that revival may not be granted where a party intentionally delays seeking revival for even a few weeks.").

Under 37 C.F.R. § 11.18, an applicant presenting a paper to the PTO certifies that "[a]ll statements made therein of the party's own knowledge are true," and "[t]o the best of the party's knowledge, information and belief, formed after an inquiry reasonable under the circumstances," as well as that the "factual contentions have evidentiary support or . . . are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." 37 C.F.R. § 11.18(b)(1)-(2). The PTO imposes a "duty of candor and good faith" on applicants and those substantively involved in the preparation or prosecution of patents with the PTO. M. Eagles Tool Warehouse, Inc., 439 F.3d at 1339 (citing 37 C.F.R. § 1.56(a) (2004)); see also Molins PLC v. Textron, Inc., 48 F.3d 1172, 1178, 1178 n.6 (Fed. Cir. 1995) (noting that "applicants" who are "required to prosecute patent applications in the PTO with candor, good faith, and honesty" includes the inventor, "each attorney or agent who prepares or prosecutes an application." and "every other individual who is substantively involved in the preparation or prosecution of the application").

---

[25] "While the MPEP does not constitute binding law, it has received judicial notice as an official interpretation of patent law." Eisai Co., 472 F. Supp. 2d at 506 n.22.

"As patent prosecution is an *ex parte* process, and the PTO's investigative ability limited in time and resources, applicants seeking exclusive rights to an invention must fulfill a special obligation of candor and good faith to the PTO." Eisai Co., 472 F. Supp. 2d at 505; see also Dri Mark Prods., Inc. v. Wilpak Indus., Inc., No. 04-CV-696 (JBW), 2006 WL 2882565, at *4 (E.D.N.Y. Oct. 6, 2006) (explaining that patent law imposes duty of candor and good faith because "the patent prosecution process is *ex parte* and the patent examiner has limited resources, which prevents him or her from conducting an independent investigation"). This duty extends to a patent applicant's certification to revive an abandoned patent application, where the applicant must certify that the "entire delay" during the abandonment was unintentional. See 37 C.F.R. § 1.137(b)(4); see also Valjakka v. Netflix, Inc., 710 F. Supp. 3d 782, 793 (N.D. Cal. 2024) ("The revival petition must include a statement that the entire delay . . . was unintentional.") (internal quotation marks and citation omitted); Nite Glow Indus., Inc. v. Cent. Garden & Pet Co., No. 12-CV-4047, 2020 WL 255979, at *5 n.5 (D.N.J. Jan. 17, 2020) ("[37 C.F.R. § 1.137(b)] requires petitions to revive to contain . . . [a] statement that the entire delay in filing the necessary reply to the outstanding office action was unintentional.") (internal quotation marks omitted).

A breach of the duty of candor and good faith in connection with a revival application may constitute inequitable conduct. See Lumenyte Int'l Corp., 92 F.3d at *2-4; see also M. Eagles Tool Warehouse, Inc., 439 F.3d at 1339 ("A breach of this duty may constitute inequitable conduct, which can arise from a failure to disclose information material to patentability, coupled with an intent to deceive the PTO."); Eisai Co., 472 F. Supp. 2d at 506 (explaining that breach of duty of candor "constitutes inequitable conduct and renders all claims of even a valid patent unenforceable").

The standard for inequitable conduct is "stringent" because "[a] finding of inequitable conduct renders the entire patent unenforceable." E&E Co. v. London Luxury LLC, 571 F. Supp. 3d 64, 67 (S.D.N.Y. 2021) (internal citations omitted). Under such circumstances, the "patent may not be enforced even by 'innocent' co-inventors." Stark v. Advanced Magnetics, Inc., 119 F.3d 1551, 1556 (Fed. Cir. 1997). "Federal Circuit precedent requires that district courts exercise extreme caution before making a finding of inequitable conduct on a motion for summary judgment." Affymetrix, Inc. v. PE Corp., 306 F. Supp. 2d 363, 374 (S.D.N.Y. 2004); see also M. Eagles Tool Warehouse, Inc., 439 F.3d at 1340 ("Although it is not impermissible to grant summary judgment of inequitable conduct, [the Federal Circuit] urges caution in making an inequitable conduct determination at the summary judgment stage.") (internal quotation marks and citation omitted).

  2.  *Analysis*

The undisputed evidence shows that Weisner failed to respond to the September 30, 2009 Non-Final Action, leading to the abandonment of his '165 Application, until July 3, 2017, when he filed the Revival Petition. ECF No. 373-1 at ¶¶ 29, 30, 117. At his deposition, Mr. Weisner testified that the abandonment of the '165 Application was due solely to his drug use, which he claims led to him being "incapacitated," "nonfunctional," and "out of commission" for the entire period of abandonment. See ECF No. 344-1 at 3; ECF No. 350-1 at 3, 5. But Google has adduced evidence from which a trier of fact could rationally conclude that at various times during the abandonment period, Weisner was not incapacitated, nonfunctional, or out of commission, such that Weisner could have sought revival of the '165 Application prior to July 3, 2017. Summary judgment is therefore inappropriate on the inequitable conduct defense because, as explained below, there is a dispute of material fact as to whether Weisner, Nemanov, and/or

19

Dr. Friedman violated their duty of good faith and candor to the PTO in connection with the Revival Petition, by falsely representing that the *entire* period of delay, between December 31, 2009, and July 3, 2017, was unintentional.

First, there is a material dispute of fact as to whether Weisner and Nemanov intentionally abandoned the application, between September 2009 and April 2010, when they failed to respond to the Non-Final Action from the PTO. Weisner testified that he was doing "very, very bad" by "maybe late 2009" and was "nonfunctional" from 2010, if not earlier. ECF No. 372-2 at ¶ 12; ECF No. 350-1 at 4-5. Weisner also testified that he never saw Horowitz's e-mails informing him that the application would be abandoned if they did not respond by March 2010. ECF No. 372-2 at ¶ 9; ECF No. 350-1 at 13. Horowitz similarly testified that between September 30, 2009, and March 29, 2010, Weisner was "out of commission," "it wasn't possible to work with [Weisner]," and "[Weisner] couldn't function to work with me like he had been." ECF No. 372-2 at ¶ 11; ECF No. 344-6 at 6, 9. Nemanov also testified that Weisner was "quite a bit out of his mind" around 2009 to 2010 and "wasn't in a condition to do anything." ECF No. 373-1 at ¶ 36; ECF No. 344-4 at 5-6. Further, Dr. Westreich, who is a psychiatrist retained by Weisner, concluded that as early as "September 30[,] 2009 . . . Weisner was profoundly impaired and incapacitated by psychiatric illness and substance use disorders." ECF No. 372-2 at ¶ 13; ECF No. 351-8 at ¶ 21.

Google, however, points to conduct by Weisner between August 2009 to June 2010 that raises an issue of fact as to whether Weisner was so incapacitated that he could not have worked with an attorney to prepare a response to the Non-Final PTO Action. For example, Horowitz filed a response to the PTO on August 13, 2009 (ECF No. 344-6 at 3-4), six weeks before the Non-Final Action was issued and during a time when Weisner indicated that he was on high

doses of OxyContin and Xanax and may have been using non-prescribed drugs such as morphine, crack cocaine, and crystal meth (ECF No. 351-2 at 11-14; ECF No. 373-1 at ¶ 5). But Horowitz testified that he believed he would have spoken to Weisner before filing that August 13 response (ECF No. 344-6 at 3-4), indicating that six weeks prior to the Non-Final Action Weisner was still capable of responding to Horowitz's inquiries. As another example, on August 31, 2009, a month before the Non-Final Action, Weisner pled guilty to misdemeanor charges in the Superior Court of Connecticut. ECF No. 373-1 at ¶ 11; ECF No. 350-4 at 5-6. And on June 22, 2010, about two months after the notice of abandonment was issued, Weisner provided a sworn affidavit to the Brooklyn District Attorney's office in connection with a pending criminal case. ECF No. 373-1 at ¶ 45; ECF No. 344-11 at 3-5. All of this conduct, near in time to when a response to the Non-Final Action was due, undermines Weisner's claim that he was out of commission during this time.

Further, Nemanov's testimony raises an issue of fact as to whether Weisner, even if he was using drugs, nevertheless made the intentional decision to abandon the application because he could not pay Horowitz's legal fees. Nemanov testified that around the time of abandonment, between September 2009 to April 2010, he and Weisner discussed retaining Horowitz and that Weisner "insisted" on using Horowitz. ECF No. 373-1 at ¶ 36; ECF No. 344-4 at 4, 6. As an initial matter, that Weisner and Nemanov could have had a conversation about retaining an attorney undermines Nemanov's and Weisner's testimony that Weisner was so "out of commission" and "out of his mind" that he could not respond to Horowitz about the '165 Application. Nevertheless, according to Nemanov, Weisner "only wanted to use" Horowitz for the '165 Application, but Weisner "did not have the money to pay Horowitz," and Nemanov also "did not have the money to pay Horowitz." ECF No. 344-4 at 6-7. Weisner denies that the failure

21

to respond to the PTO was related to an inability to pay Horowitz (ECF No. 373-1 at ¶¶ 37-38; ECF No. 350-1 at 3), but Nemanov testified that neither he nor Weisner could pay Horowitz, and Nemanov also testified that Weisner "let [the patent] get abandoned over a $500 bill" (ECF No. 344-4 at 5-6). And although Horowitz testified that he made sure "not having the money in 2009 was not the basis for abandonment" during his investigation in 2017 (ECF No. 372-2 at ¶ 46) (alteration omitted), Horowitz does not explain what he did to determine that money was not the cause of Weisner's failure to respond to the Non-Final Action.

Whether the failure to respond to the Non-Final Action between September 2009 and April 2010 was due to Weisner's inability to pay Horowitz is significant because "a course of conduct resulting in delay that is purposefully chosen does not qualify as an unintentional delay." Field Hybrids, LLC v. Toyota Motor Corp., No. 03-CV-4121, 2005 WL 189710, at *7 (D. Minn. Jan. 27, 2005); see also MPEP § 711.03(C) ("A delay resulting from a deliberately chosen course of action on the part of the applicant is not an 'unintentional' delay within the meaning of 37 CFR 1.137."). If Weisner's failure to respond to the Non-Final Action was due to a deliberate decision to avoid paying Horowitz, then the failure to respond was intentional, and the applicants could not have certified in the Revival Petition that the entire period of delay was unintentional. See, e.g., In re Rembrandt Techs., 899 F.3d at 1272-73 (reasoning that decision not to pay maintenance fee, even if based on mistaken belief that patent could be revived later, is intentional abandonment of patent); Swinford v. 360Booth Inc., No. 21-CV-2993, 2025 WL 2101837, at *14 (M.D. Fla. July 28, 2025) (finding inequitable conduct where plaintiff intentionally failed to pay maintenance fees on the patent); MPEP § 711.03(C) (explaining that a delay "does not become an 'unintentional' delay" when "the applicant remains interested in

eventually obtaining a patent, but simply seeks to defer patent fees and patent prosecution expenses").

Second, even putting aside whether the failure to respond to the Non-Final Action between September 2009 and April 2010 was intentional, there is a dispute of material fact concerning whether Weisner, Nemanov, and Dr. Friedman falsely certified that the remaining period of delay (between April 2010 and May 2017) was unintentional. Beginning with Weisner, he testified that he was "nonfunctional" between 2008 or 2009 and before he went to rehab on December 2, 2014, and that "there was never a day when he was not on very heavy drugs." ECF No. 372-2 at ¶¶ 18-19; ECF No. 351-2 at 6, 14-17. Weisner also testified that he was "incapacitated" and "out of commission" due to his drug use, and this incapacitation was the sole basis for his assertion that the entire delay in responding to the Non-Final Action was unintentional. ECF No. 350-1 at 3, 5, 17.

Google points to conduct by Weisner from which a trier of fact could conclude that during periods of time after April 2010, Weisner would have been capable of filing a revival petition sooner than June 2017. For example, Google points to evidence that Weisner used a computer, talked to people on the phone, drove a car, signed documents, played and won online ranked chess games (including chess games against Nemanov), and attended social events. ECF No. 373-1 at ¶¶ 50-63. In June 2010, Weisner submitted a sworn affidavit to the Brooklyn District Attorney's office. Id. at ¶ 45; ECF No. 344-11 at 5. And Nemanov testified that he and Weisner met with another individual at the individual's apartment "in the 2012 to 2014 timeframe" to discuss the patent.[26] ECF No. 373-1 at ¶ 64; ECF No. 344-4 at 5-7.

---

[26] Google describes this individual as a "potential investor" (ECF No. 373-1 at ¶¶ 64-65), but neither Nemanov nor Weisner described him as such in their depositions. Further, according to Weisner, the meeting with the individual occurred in 2008 or 2009. ECF No. 373-2 at 10-11.

Although Nemanov testified that he "bore witness" to Weisner's incapacitation, he does not provide any factual details to explain how he would have known that Weisner was incapacitated due to drug use or that the incapacitation lasted for the *entire* period of time at issue. ECF No. 373-1 at ¶ 116; ECF No. 373-3 at 6-9. To be sure, Nemanov testified that Weisner increasingly became preoccupied with getting "a hold of the substance, whatever substance that he required," and, at times, friends thought that Weisner would eventually die from the drug use. ECF No. 373-3 at 8. But Nemanov's testimony suggests that this conduct occurred sometime between 2010 and 2012. Id. It is thus not clear from Nemanov's testimony that Weisner, even if incapacitated due to drug use between 2010 and 2012, was incapacitated for the entire period of time after 2012, including the 27-month period after February 2015 until June 2017.

To corroborate Weisner's testimony concerning his incapacitation, Weisner points to Horowitz, the attorney on the '165 Application. Horowitz testified that he conducted an investigation prior to preparing the Revival Petition and concluded that Weisner "had been incapacitated for the entire period of December 2009 (and possibly earlier than that)" to May of 2017. ECF No. 372-2 at ¶ 45 (internal quotation marks omitted); ECF No. 344-6 at 16, 18. But Horowitz's investigation was limited to speaking to a single person—Weisner. ECF No. 372-2 at ¶ 44; ECF No. 351-4 at 24. Horowitz did not obtain Weisner's medical records. See ECF No. 372-2 at ¶ 49; ECF No. 371-4 at 11; ECF No. 344-6 at 16-17. Nor did Horowitz speak to Weisner's physicians or individuals at the drug rehabilitation facility Weisner attended. ECF No. 351-4 at 24. Horowitz also did not speak to Weisner's friends and family. Id. Instead, Horowitz

---

Even if the meeting occurred then, it would be further evidence undermining Weisner's testimony that his drug use prevented him from responding to the Non-Final Action in 2009.

based his entire determination on the fact that "as somebody that had decades of experience as an attorney, he was able to distinguish if somebody was telling him something with no basis versus something with a basis." ECF No. 372-2 at ¶ 49 (internal quotation marks omitted).

Moreover, Weisner admits to being drug-free (except for marijuana use) after February 20, 2015, when he was discharged from the rehab facility. ECF No. 373-1 at ¶¶ 72-73; ECF No. 350-1 at 19. But Weisner did not submit a Revival Petition until June 2017, more than two years later. Between February 2015 and May 2017, Weisner "spent time in upstate New York where he hiked, meditated, and learned about Jewish mysticism, which required concentrating on ideas." ECF No. 373-1 ¶ 74. Although Weisner testified that he did not think about the patent until "the beginning of 2017" (ECF No. 372-2 at ¶ 27), he also testified that he may have been thinking about his patent in 2015 to 2016 (ECF No. 372-2 at ¶ 27; ECF No. 350-1 at 14).

Dr. Westreich, Weisner's retained psychiatrist, opined that "between at least September 30[,] 2009 and June 1, 2017 . . . Weisner was profoundly impaired and incapacitated," which would have "affected his perception, memory, and executive functions like problem-solving and decision making." ECF No. 372-2 at ¶¶ 13-14; ECF No. 351-8 at ¶ 21. But, here too, there are facts in the record from which a trier of fact could reasonably discredit Dr. Westreich's opinion. First, Dr. Westreich's opinion is based solely on a single conversation with Weisner. ECF No. 351-8 at ¶ 2. Dr. Westreich did not speak to anyone at Weisner's rehab facilities. Dr. Westreich did not speak to any of Weisner's medical providers. And Dr. Westreich did not speak to Weisner's friends and family, despite acknowledging that he commonly did engage in such conversations. ECF No. 372-3 at 3-4. Tellingly, Dr. Westreich testified that he usually assesses "collateral informants, like family members or friends," and discusses the patient with "clinicians who are contemporaneously treating the individual" to "get a complete assessment of the

individual." Id. at 3. But despite the lengthy period of time encompassed by Dr. Westreich's opinion (September 30, 2009, to June 1, 2017), Dr. Westreich relied on none of his usual contacts, choosing instead to rely solely on Weisner. Second, Dr. Westreich did not review Weisner's medical records for the entire period of abandonment. To be sure Dr. Westreich reviewed Weisner's medical records, but it was for December 2, 2014, to February 21, 2015. Id. at 6-7, 10, 12-13. Dr. Westreich testified that he did not review any medical records from 2016 or 2017. ECF No. 372-3 at 139. Thus, although he opined that Weisner would have been incapacitated from "at least" September 30, 2009, to June 1, 2017, that conclusion appears to be based solely on Weisner's own statements and medical records from a very limited period of time.

Presumably to explain Weisner's conduct after he left the rehab facility in February 2015, Dr. Westreich also opined that even after Weisner's rehabilitation, Weisner "remained impaired by persistent cognitive effects of his Opioid Use Disorder and Sedative/Hypnotic Use Disorder" which would have long-term effects on his memory. ECF No. 372-2 at ¶ 22. Here, too, there are facts in the record from which a trier of fact could discredit Dr. Westreich's opinion. As already discussed, Dr. Westreich did not review any medical records from after February 21, 2015, relying instead on Weisner, who unquestionably would have had a financial incentive to obtain an opinion that he was incapacitated. But even if one credits the conclusion that Weisner's memory was impaired by the drug use, Weisner admits that he discussed the '165 Application with a patent attorney while at a spa in the "beginning" of 2017. ECF No. 373-1 at ¶ 79; ECF No. 372-2 at ¶ 27; ECF No. 351-2 at 33-34. Yet despite this conversation, which plainly would have reminded Weisner of the existence of the patent in the beginning of 2017, Weisner did not file a Revival Petition until June 2017. ECF 373-1 at ¶ 96; ECF No. 372-2 at ¶ 31.

Additionally, Weisner admits that he stopped using hard drugs after he left the rehabilitation facility in February 2015. ECF No. 373-1 at ¶¶ 72-73. And Google points to evidence that Weisner was playing and winning online chess games in February 2015 and after. ECF No. 373-1 at ¶ 55; ECF No. 344-23 at 2-4. Also in 2016, Weisner obtained a car and drove it between upstate New York and New York City. ECF No. 350-1 at 3. Further, Google puts forth evidence that sometime prior to May 2017, Weisner was considering securing two investors. ECF No. 373-1 at ¶¶ 83-84. All of this conduct, coupled with Weisner's testimony that he stopped using drugs (except for marijuana) after February 2015, raises a question of fact as to whether Weisner's claim of incapacitation after February 2015 and through all of 2016 until May 2017 is credible. Simply put, there is evidence in the record from which a trier of fact could reasonably discredit Dr. Westreich's opinion that Weisner remained impaired for the more than two years after he stopped using drugs but before he filed the Revival Petition.

Turning to the conduct of Dr. Friedman, the attorney who certified that the entire delay was unintentional and filed the Revival Petition, there is no dispute that Dr. Friedman "did not personally conduct any investigation" into the period of delay by Weisner. ECF No. 372-2 at ¶ 38. Dr. Friedman instead relied on the investigation conducted by Horowitz. Id. at ¶¶ 40-41, 43. It is not apparent that Dr. Friedman could have delegated his responsibility to conduct his own investigation before attesting in the Revival Petition that the entire period of delay was unintentional. See Pavelic & LeFlore v. Marvel Ent. Grp., 493 U.S. 120, 125 (1989) ("The signing attorney cannot leave it to some trusted subordinate, or to one of his partners, to satisfy himself that the filed paper is factually and legally responsible; by signing he represents not merely the fact that it is so, but also the fact that he personally has applied his own judgment."); see also 37 C.F.R. § 11.18(b)(1) ("By presenting to the Office . . . (whether by signing, filing,

submitting, or later advocating) any paper, the party presenting such paper, whether a practitioner or non-practitioner, is certifying that . . . [a]ll statements made therein of the party's own knowledge are true, all statements made therein on information and belief are believed to be true[.]"). Indeed, under 37 C.F.R. § 11.18, the lawyer filing the paper with the PTO certifies that "[t]o the best of the party's knowledge, information and belief, formed after an inquiry reasonable under the circumstances," the "factual contentions have evidentiary support or . . . are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." 37 C.F.R. § 11.18(b)(2).

Even if Dr. Friedman could have delegated his responsibility to conduct an inquiry reasonable under the circumstances, Dr. Friedman could not even confirm that he had spoken to Horowitz to ensure that Horowitz's investigation was adequate and to ascertain the relevant factual circumstances supporting his certification that the entire delay was unintentional. Dr. Friedman testified that he could not remember talking to Horowitz about the investigation and Dr. Friedman did not "really recall anything" about the Revival Petition. ECF No. 373-1 at ¶ 123. Further, Dr. Friedman testified that every document his office files with the PTO has his "signature on it" for "insurance reasons," but that "depending on who does the work," he does not "check there carefully," and because Horowitz was a partner at the firm, he would not have "really check[ed] very much." ECF No. 344-7 at 3, 5-6. Dr. Friedman also was not aware "of the facts" supporting the statement that the entire period of delay was unintentional. Id. at 3-4.

Horowitz testified that he discussed his investigation with Dr. Friedman "enough for [Dr. Friedman] to know what [Horowitz] was doing." ECF No. 372-2 at ¶¶ 39, 42. But even if so, there are facts in the record from which a trier of fact could conclude that Horowitz did not conduct an adequate investigation upon which Dr. Friedman could have reasonably relied.

During his investigation, Horowitz "did not ask Weisner to produce documentation establishing his incapacity." Id. at ¶ 49. Horowitz's entire investigation consisted of speaking to Weisner. Id. at ¶ 44.

In seeking to revive a patent application, the *entire* period of delay must have been unintentional. See 37 C.F.R. § 1.137(b)(4); Clarification of the Practice for Requiring Additional Information in Petitions Filed in Patent Applications and Patents Based on Unintentional Delay, 85 Fed. Reg. 12222-01, at *12223 (Mar. 2, 2020) ("An applicant or patentee cannot meet the 'unintentional delay' standard in 37 CFR [1.137(a)] if the entire delay is not unintentional."); Aristocrat Techs. v. Int'l Game Tech., No. 06-CV-3717, 2011 WL 10934530, at *11 (N.D. Cal. May 6, 2011) (quoting Changes to Patent Practice and Procedure, 62 Fed. Reg. 53132-01, at *53163 (Oct. 10, 1997)) ("[A]n applicant who fails to file a petition under § 1.137 . . . (b) 'promptly' upon becoming notified, or otherwise becoming aware of abandonment of the application . . . will probably not even be able to make an appropriate statement that 'the entire delay in filing the required reply from the due date for the reply until the filing of the a grantable petition was unintentional.'") (alterations in original); New York Univ., 495 F. Supp. 2d at 374 n.4 ("[T]he plain meaning of the word 'entire' here is that revival may not be granted where a party intentionally delays seeking revival for even a few weeks."). Indeed, Dr. Friedman testified that a requirement of reviving a patent application was that the entire delay in filing the application was unintentional (ECF No. 344-7 at 3-4), and Horowitz testified that he understood that without the statement that the entire delay was unintentional, the PTO would not have revived the '165 Application (ECF No. 351-4 at 33).

Further, the PTO's procedural rules provide that an applicant seeking to revive an abandoned application must submit a petition that includes "[a] statement that the entire delay in

filing the required reply from the due date for the reply until the filing of a grantable petition . . .

was unintentional." See 37 C.F.R. § 1.137(b)(4) (listing the "[p]etition requirements" for an

abandoned patent application). The PTO issued additional guidance in 2020, clarifying that "[a]n

applicant or patentee cannot meet the 'unintentional delay' standard" in 37 C.F.R. § 1.137(a), "if

the entire delay is not unintentional." 85 Fed. Reg. 12222-01, at *12223. Where the PTO has

issued clear guidance, the Court need not guess as to whether the representation that the entire

period was unintentional was material to the PTO's decision to grant the Revival Petition. See In

re Rembrandt Techs., 899 F.3d at 1272-73 (relying on PTO regulations to conclude that

representation in revival application—that failure to pay maintenance fee was unintentional—

was material to PTO's decision to revive patent). And in granting revival of the '165

Application, the PTO noted that it was "relying on petitioner's duty of candor and good faith in

accepting the statement that the entire delay in filing the required reply from the due date for the

reply until the filing of a grantable petition pursuant to 37 CFR 1.137 was unintentional." ECF

No. 373-1 at ¶ 121 (internal quotation marks omitted); ECF No. 372-2 at ¶ 55. Simply put, the

relevant regulation and the PTO's own statement make clear that the representation concerning

the period of delay was material to the PTO's decision to grant the Revival Petition. See, e.g.,

General Electro Music Corp. v. Samick Music Corp., 19 F.3d 1405, 1411 (Fed. Cir. 1994)

(concluding that "false statement in a petition to make special" was material, for application of

inequitable conduct defense, because it led to expedited consideration of the application).

     Turning to the intent to deceive element of inequitable conduct, Weisner argues that

merely agreeing to the statement on the Revival Petition cannot constitute intentional deception.

ECF No. 373 at 19-21. In that vein, Weisner contends that "[t]here was no information withheld

because the form required by the PTO for the petition to revive did not ask for any information,

and no information was requested by the Patent Office." Id. at 24. This argument ignores Federal Circuit precedent.[27] In re Rembrandt Technologies, the Federal Circuit upheld a district court's finding of inequitable conduct where a patent owner allowed two patents to lapse by failing to pay the required maintenance fee and, in connection with an application to revive those patents, represented that the delay in payment of the maintenance fee was unintentional. 899 F.3d at 1260-61. That case, like here, required the applicant to agree to a statement on the PTO's standard form. See id. at 1261. In other words, the fact that the misrepresentation by the applicant in In re Rembrandt Technologies required the applicant to merely agree to a statement on the PTO's form, and did not instead provide a blank space for the applicant to provide a statement, did not preclude a finding of inequitable conduct. Likewise, here, a reasonable trier of fact could rely on the applicants' decision to agree with the statement that the entire delay was unintentional to conclude that the applicants made an affirmative misrepresentation. See also Swinford, 2025 WL 2101837, at *5, 14-15 (finding attorney intentionally misrepresented delay in maintenance fee when checking-the-box because "the Court finds [attorney] knew the meaning of 'delay' when he filed the petitions, but he assumed no one would ever probe the veracity of his certification"); 3D Med. Imaging Sys., LLC, 228 F. Supp. 3d at 1338 (finding intentional misrepresentation when patent-owner checked-the-box that delay in payment of maintenance fee was unintentional).

---

[27] Taken to its logical conclusion, Weisner's argument would also mean that despite the requirement in 37 C.F.R. § 1.137(b), that a revival application be accompanied by a statement that the entire delay was unintentional, that requirement would always be satisfied "as long as the patentee used the PTO's standard form," which includes the representation. 3D Med. Imaging Sys., LLC v. Visage Imaging, Inc., 228 F. Supp. 3d 1331, 1337-38 (N.D. Ga. 2017) (rejecting similar argument). The argument would render the requirement in § 1.137(b)(4) meaningless given the PTO's current revival form.

As to evidence of intent, Google points to the potential that Weisner forged Nemanov's signature on the power of attorney submitted to the PTO as circumstantial evidence of Weisner's intent to deceive. On July 3, 2017, Dr. Friedman re-filed a second power of attorney with a signature purporting to be Nemanov's signature. ECF No. 373-1 at ¶¶ 104, 106. But Nemanov could not identify that signature as his own during his deposition, testifying that he "really doubt[ed]" the signature was his because that was "not how I write at all." ECF No. 350-3 at 16. Nemanov testified that he "can't say absolutely for certain it's not [his] signature to be honest, but it could or it could not be." Id.; ECF No. 373-1 at ¶ 110. He further stated that he was "not certain that these signatures are fake," but that he was "almost certain." ECF No. 350-3 at 18. Further, a review of the signature for Nemanov on the power of attorney form does not look anything like the signature Nemanov provided during his deposition. Compare ECF No. 373-1 at ¶ 106 with id. at ¶ 111. Additionally, the date next to Weisner's signature on the power of attorney is in a handwriting that is nearly identical to the handwriting used for the date next to Nemanov's purported signature on the same form. Compare ECF No. 373-1 at ¶ 105 with id. at ¶ 106.

The possibility that the signature for Nemanov on the power of attorney is not Nemanov's signature is further supported by Nemanov's testimony and the documentary evidence. On June 6, 2017, Dr. Friedman filed the first power of attorney request to replace Horowitz as the prosecuting attorney. ECF No. 373-1 at ¶ 96. The PTO denied the power of attorney because it did not have Nemanov's signature. Id. at ¶¶ 97-98. According to Weisner, he had to "convince" Nemanov to revive the '165 Application. Id. at ¶ 99. But Nemanov testified that he "never discussed these patents with anybody" before they were revived and that he "only found them on Google patents," contradicting Weisner's testimony that he had discussed

reviving the patent with Nemanov. Id. at ¶ 115. A trier of fact could reasonably conclude that

Nemanov was not interested in pursuing the Revival Petition, explaining why his signature was

omitted from the first power of attorney, and Weisner forged his signature on the second power

of attorney in order to move forward without Nemanov, a coinventor. See, e.g., Applied

Materials, Inc. v. Multimetrixs, LLC, No. 06-CV-7372, 2008 WL 2892453, at *9 (N.D. Cal. July

22, 2008), aff'd sub nom. by, Applied Materials, Inc. v. Multimetrixs, LLC, 404 F. App'x 493

(Fed. Cir. 2010) (relying on evidence of forged signature of deceased investor to find intent).

Further, Weisner argues that there is no evidence that anyone made a deliberate decision

to misrepresent or omit information, but if credited, Nemanov's testimony suggests otherwise.

Nemanov testified that Weisner told him that they could revive the application and "[j]ust use

psychological problems as an excuse." ECF No. 344-4 at 7. According to Nemanov, Weisner

"said something" about "a rule change in 2014 which [ ] ma[d]e it permissible" to "claim

medical" as a basis for revival. ECF No. 350-3 at 4. Although Nemanov did not specify what

rule change Weisner had referenced, given the timing of the purported conversation (2017), the

timing of the rule change (2014), and the posture of the patent application (abandoned), the

likely rule change referenced by Weisner in his conversation with Nemanov was the one that

occurred on December 18, 2013.

The version of 37 C.F.R. § 1.137 in effect prior to December 18, 2013, required that an

application to revive an abandoned patent include a showing that the delay was unavoidable and

unintentional. See 37 C.F.R. § 1.137(a), (b) (effective May 16, 2007 to December 17, 2013); see

also Changes to Implement the Patent Law Treaty, 78 Fed. Reg. 62368-01 at *62382 (Oct. 21,

2013) (explaining that patent law "formerly provided for revival of unintentionally abandoned

application only in the patent fee provisions of 35 U.S.C. § 41(a)(7)" which "raised questions

concerning the [PTO's] authority to revive an unintentionally abandoned application (without a showing of unavoidable delay)"). To establish unavoidable delay, an applicant had to make "a showing accompanied by documentary evidence," whereas the unintentional delay standard only required a statement that the delay was unintentional. Aristocrat Techs. Australia PTY Ltd. v. Int'l Game Tech., 2011 WL 10934530, at *10 (N.D. Cal. May 6, 2011); see also Goss Int'l Americas, Inc. v. MAN Roland, Inc., No. 03-CV-513, 2006 WL 2251554, at *1 (D.N.H. July 31, 2006) ("While the regulation pertaining to *unavoidable* abandonment required a petitioner to make a showing of the causes of the delay, the regulation pertaining to *unintentional* abandonment required only a statement that the abandonment was unintentional, and did not require a showing of unintentionality.") (internal quotation marks, alterations, and citations omitted) (emphasis in original). The unavoidable delay standard was thus "more stringent" than the unintentional delay standard.[28] See, e.g., Glycobiosciences, Inc. v. Innocutis Holdings, LLC, 2015 WL 3609343, at *2 (D.D.C. June 10, 2015) (discussing the 2013 rule change). Congress clarified the standard when it enacted the Patent Law Treaties Implementation Act of 2012 ("PLTIA"), which made "it easier for patentees to reinstate expired patents" by replacing "unavoidable" with "unintentional delay."[29] Glycobiosciences, Inc., 2015 WL 3609343, at *2;

---

[28] "A petition to revive for unavoidable delay requires a showing to the satisfaction of the Director that the entire delay was unavoidable in spite of the exercise of due care and diligence expected of a reasonably prudent person under the circumstances." Aristocrat Techs. Australia PTY Ltd., 2011 WL 10934530, at *10 (citing 37 C.F.R. § 1.137(a)(3)).

[29] As the legislative history makes clear, the change to "unintentional" delay also applied to 37 C.F.R. § 1.137, which concerns abandoned patent applications like the '165 Application. See, e.g., 78 Fed. Reg. 62368-01 at 62368 ("The Office is also revising the rules of practice pertaining to the revival of abandoned applications (37 CFR 1.137) and acceptance of delayed maintenance fee payments (37 CFR 1.378) to provide for the revival of abandoned applications and acceptance of delayed maintenance fee payments solely on the basis of 'unintentional' delay. The PLTIA eliminates the provisions of the patent statutes relating to revival of abandoned

34

see also 35 U.S.C. § 27 (stating that the PTO may establish procedures to "revive an unintentionally abandoned application for patent . . . upon petition by the applicant for patent or patent owner") (effective Dec. 18, 2013). Consequently, after December 18, 2013, the PTO rules were clear that an applicant need only show that the delay was unintentional (and not unavoidable).

If Nemanov's testimony about the rule change and Weisner's statement to him that the change made it easier "to *claim* medical" is credited (ECF No. 446-4, Nemanov 4/11/25 Dep. at 72) (emphasis added), it is further circumstantial evidence of Weisner's intent to deceive the PTO. A trier of fact could rely on the testimony to reasonably conclude that Weisner did not believe he could have relied on his incapacitation claim under the prior standard because it required documentation for the entire period of abandonment.

Weisner also argues that Horowitz's good-faith belief that Weisner was incapacitated during the entire abandonment period is the antithesis of evidence of an intent to deceive. ECF No. 373 at 21, 25. But as already discussed, Horowitz's investigation consisted of speaking to one person: Weisner. And Weisner unquestionably had a financial incentive to revive the '165 Application. A trier of fact could reasonably conclude that Horowitz did not conduct a reasonable investigation, particularly given the lengthy period of abandonment and the period of more than two years before the Revival Petition was filed but after Weisner was out of rehab and during a time when, by his own admission, he was not using drugs (except for marijuana).

In short, because there is a genuine dispute of material fact as to whether Weisner or Dr. Friedman intentionally falsely certified on the Revival Application that the *entire* period of delay

---

applications or acceptance of delayed maintenance fee payments on the basis of a showing of 'unavoidable' delay.").

between abandonment and revival was unintentional, summary judgment is inappropriate for either party.

**B. <u>Prosecution Laches</u>**

*1. <u>Legal Standard</u>*

"Prosecution laches is an equitable defense to patent infringement" that "may render a patent unenforceable when it has issued only after an unreasonable and unexplained delay in prosecution that constitutes an egregious misuse of the statutory patent system under the totality of the circumstances." <u>ICOS Vision Sys. Corp. N.V. v. Scanner Techs. Corp.</u>, No. 10-CV-604 (PAC), 2012 WL 512641, at *7 (S.D.N.Y. Feb. 15, 2012) (internal citations omitted). Prosecution laches is "grounded in the need to strike an appropriate balance between the public's interest in encouraging invention with the public's competing interest in the free public enjoyment of the useful invention." <u>Reiffin v. Microsoft Corp.</u>, 270 F. Supp. 2d 1132, 1153 (N.D. Cal. 2003) (internal quotation marks omitted).

"Prosecution laches requires proving two elements: (1) the patentee's delay in prosecution must be unreasonable and inexcusable under the totality of circumstances and (2) the accused infringer must have suffered prejudice attributable to the delay." <u>GeigTech E. Bay LLC v. Lutron Elecs. Co.</u>, No. 18-CV-5290 (CM), 2023 WL 6614486, at *45 (S.D.N.Y. Sept. 20, 2023) (citing <u>Personalized Media Commc'ns, LLC v. Apple Inc.</u>, 57 F.4th 1346, 1354 (Fed. Cir. 2023) ("<u>Personalized Media Commc'ns, LLC I</u>")). A showing of prejudice under the second prong requires "evidence of intervening rights, *i.e.*, that either the accused infringer or others invested in, worked on, or used the claimed technology during the period of delay." <u>Shire Orphan Therapies LLC v. Fresenius Kabi USA, LLC</u>, No 15-CV-1102, 2018 WL 2684097, at *21 (D. Del. June 5, 2018) (citation omitted). "[T]here are no strict time limitations for

determining whether continued refiling of patent applications is a legitimate utilization of statutory provisions or an abuse of those provisions. The matter is to be decided as a matter of equity, subject to the discretion of [the] district court." Symbol Techs., Inc. v. Lemelson Med., Educ. & Rsch. Found., 422 F.3d 1378, 1385 (Fed. Cir. 2005), amended on reh'g in part sub nom. by, Symbol Techs., Inc. v. Lemelson Med., Educ. & Rsch. Found., LP, 429 F.3d 1051 (Fed. Cir. 2005). But the Federal Circuit has cautioned that the doctrine of prosecution laches "should be used sparingly lest statutory provisions be unjustifiably vitiated." Id.

As to the first element, "[r]easonableness is a fact-intensive inquiry and must include consideration of the circumstances of the [patentee] as patent prosecutor." ICOS Vision Sys. Corp., 2012 WL 512641, at *7 (internal quotation marks omitted, alteration in original)."The requirement of unreasonable and unexplained delay 'includes a finding of prejudice, as does any laches defense.'" ICOS Vision Sys. Corp., 2012 WL 512641, at *7 (quoting Cancer Rsch. Tech. Ltd. v. Barr Labs., Inc., 625 F.3d 724, 729 (Fed. Cir. 2010)).

The factors to consider in assessing the reasonableness of a delay in a patent prosecution include whether:

> (1) the prosecution history of plaintiff's patents was typical of patents in that field or patents generally; (2) any unexplained gaps exist in the prosecution history; (3) plaintiff took any unusual steps to speed or delay the application process; (4) the PTO or other reviewing body took any unusual steps to speed or delay the application process; (5) plaintiff took any steps to limit public awareness of his pending applications or the inventions he sought to patent over the course of the prosecution; (6) any changes in plaintiff[']s prosecution of the application coincide with or directly follow evolutions in the field that relate to the claimed invention; and (7) legitimate grounds can be identified for the abandonment of prior applications.

ICOS Vision Sys. Corp., 2012 WL 512641, at *7 n.10 (quoting Reiffin v. Microsoft Corp., 281 F. Supp. 2d 1149, 1155 (N.D. Cal. 2003)). Even "suspicious and suggestive" conduct may not be

sufficient to find unreasonable and unexplained delay. <u>Reiffin</u>, 281 F. Supp. 2d at 1153. "[T]he mere passage of time from a patent application filing to the issuance of the patent is insufficient in and of itself to constitute improper delay." <u>Koninklijke Philips Elecs. N.V. v. Cinram Int'l, Inc.</u>, No. 08-CV-515 (RS), 2012 WL 4074419, at *8 (S.D.N.Y. Aug. 23, 2012).

To establish prejudice, "an accused infringer must show evidence of intervening rights, <i>i.e.,</i> that either the accused infringer or others invested in, worked on, or used the claimed technology during the period of delay," and "[t]he Supreme Court cases underlying the [prosecution laches] doctrine all rely on a finding that the applicant's delay in prosecution adversely affected others working in the same field." <u>Cancer Rsch. Tech. Ltd.</u>, 625 F.3d at 729. "To show that a party was 'adversely affected,' it must show that the holder of intervening rights would have either done something differently or experienced a change in economic position as a result of the alleged delay in issuance of the patent-in-suit." <u>Shire Orphan Therapies LLC</u>, 2018 WL 2684097, at *23 (citation omitted).

Prosecution laches considers whether a patent owner unreasonably delayed in prosecuting their patent. <u>See</u> <u>Shire Orphan Therapies LLC</u>, 2018 WL 2684097, at *21-23. By contrast, the equitable defense of laches prevents a patent owner from recovering damages "for any patent infringement occurring prior to the filing of the lawsuit when a patent owner sits on his rights for an unreasonable period of time to the prejudice of an accused infringer." <u>Adelberg Lab'ys, Inc. v. Miles, Inc.</u>, 921 F.2d 1267, 1270 (Fed. Cir. 1990); <u>see also</u> <u>Sprint Commc'ns Co. L.P. v. Vonage Holdings Corp.</u>, 500 F. Supp. 2d 1290, 1335 (D. Kan. 2007) (explaining distinction between prosecution laches and laches). Laches thus considers a party's delay in filing suit after having actual or constructive knowledge of the potentially infringing activity. <u>Wanlass v. Gen. Elec. Co.</u>, 148 F.3d 1334, 1337-38 (Fed. Cir. 1998). Laches is a defense "to protect defendants

against unreasonable, prejudicial delay in commencing suit." <u>SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC</u>, 580 U.S. 328, 333 (2017) (internal quotation marks omitted). But in 2017, the Supreme Court ruled that laches could not be used as a defense to bar damages for patent infringement where the suit was filed within the statute of limitations. <u>Id.</u> at 346; <u>Medinol Ltd. v. Cordis Corp.</u>, 719 F. App'x 1016, 1017 (Fed. Cir. 2018) ("The Supreme Court . . . held that laches is no longer a defense to bar damages for patent infringement.").

In applying the defense of laches, the Federal Circuit has held that "[a] delay of more than six years raises a presumption that it is unreasonable, inexcusable, and prejudicial," which shifts the burden to the patent owner to produce evidence that the delay was reasonable or excusable, or that the defendant suffered no economic or evidentiary prejudice. <u>Wanlass</u>, 148 F.3d at 1337. But although laches is no longer a bar to damages for patent infringement after the Supreme Court's decision in <u>SCA Hygiene Products Aktiebolag</u>, the Federal Circuit has borrowed the six-year presumption from the defense of laches, and applied it where prosecution laches was raised as a defense in a case involving the PTO under 35 U.S.C. § 145.[30] <u>See</u> <u>Hyatt v. Hirshfeld</u>, 998 F.3d 1347, 1369-70 (Fed. Cir. 2021). ("[W]e now hold that, in the context of a § 145 action, the PTO must generally prove intervening rights to establish prejudice, but an unreasonable and unexplained prosecution delay of six years or more raises a presumption of prejudice, including intervening rights."); <u>see also</u> <u>Ex Parte Gilbert P. Hyatt</u>, 2024 WL 5265176, at *27 (P.T.A.B. Dec. 31, 2024) (applying presumption of prejudice in sustaining PTO's rejection of pending claims based on prosecution laches). Although an accused infringer may assert a defense of prosecution laches in a patent-infringement suit, <u>see, e.g.</u>, <u>Cancer Rsch. Tech.</u>

---

[30] 35 U.S.C. § 145 allows a patent applicant who is "dissatisfied with the decision of the Patent Trial and Appeal Board in an appeal under section 134(a)" to commence a civil action against the PTO in federal court.

Ltd., 625 F.3d at 729, the PTO may also reject a patent application based on prosecution laches, where it concludes that an applicant's delay in prosecution was unreasonable and unexplained, see In re Bogese, 303 F.3d 1362, 1367-69 (Fed. Cir. 2002).

Finally, the Federal Circuit has not determined whether prosecution laches must be shown by clear and convincing evidence or a preponderance of the evidence, and both standards have been used by courts in analyzing the affirmative defense. See, e.g., A & E Prods. Grp., L.P. v. Mainetti USA Inc., No. 01-CV-10820 (RPP), 2004 WL 345841, at *3 n.2 (S.D.N.Y. Feb. 25, 2004) (collecting cases); Personalized Media Commc'ns, LLC v. Apple, Inc., 552 F. Supp. 3d 664, 691 (E.D. Tex. 2021) ("Personalized Media Commc'ns, LLC II"), aff'd by, Personalized Media Commc'ns, LLC I (applying clear and convincing standard to prosecution laches); Natera, Inc. v. ArcherDX, Inc., 690 F. Supp. 3d 437, 445 (D. Del. 2023) ("When prosecution laches is raised as a complete defense to patent infringement, courts have applied the clear and convincing standard."); Hyatt, 998 F.3d at 1371-72 (applying preponderance of the evidence standard to prosecution laches). Here, regardless of which standard applies, Google has not demonstrated prejudice, an element of the defense of prosecution laches.

## 2. *Analysis*

Google argues that it was prejudiced by Weisner's delay in prosecuting the asserted patents because it began developing its Timeline in 2013 and publicly released Timeline in 2015. ECF No. 347 at 49. To support that contention, Google points to only Weisner's deposition testimony. But Weisner's testimony is unclear on this point. In his deposition, when asked if his understanding was "that the Google Timeline feature started developing in 2013 but was released in 2015," Weisner testified, "I think so." ECF No. 350-2 at 6. Although the parties agree that

Timeline was released in 2015, Google puts forth no other evidence that it began developing or investing in Timeline prior to 2015. ECF No. 373-1 ¶¶ 75, 76; ECF No. 344-25 at 2.

In its brief, Google argues that it invested in the claimed technology during the period of Weisner's delay and suffered economic prejudice. ECF No. 347 at 49-50. But Google's assertion of economic prejudice is unsupported by evidence in the record. There is no evidence in the record—whether in the form of witness testimony, documentary evidence, or affidavit—establishing that Google invested time, money, and other resources in the claimed technology and thus suffered economic prejudice from Weisner's delay. Instead, Google relies on Sonos, Inc. v. Google LLC, No. 20-CV-6754, 2023 WL 6542320 (N.D. Cal. Oct. 6, 2023) ("Sonos I"), a patent-infringement case where Google prevailed on the defense of prosecution laches. ECF No. 347 at 49-50; ECF No. 372 at 36, 41-42; ECF No. 386 at 32-33. In that case, it appears that the district court found prejudice for prosecution laches based on Google having begun "investing in the accused products by at least 2015, when it released its first products that practiced the invention," and Sonos "never offered sworn evidence that Google suffered no economic prejudice." Sonos I, 2023 WL 6542320, at *18. As the district court explained, Sonos' theory at trial was "that Google invested in building out a line of products that infringed Sonos's patents and that Google profited off this investment." Id.

On August 28, 2025, after briefing was complete on the summary judgment motions in this case, the Federal Circuit reversed the district court's grant of prosecution laches in Sonos I, concluding that the court had abused its discretion in determining that Google had been prejudiced by Sonos' delay. See Google LLC v. Sonos, Inc., No. 24-1097, 2025 WL 2473258, at *7 (Fed. Cir. Aug. 28, 2025) ("Sonos II"). In reaching that conclusion, the Federal Circuit explained that the evidence of prejudice advanced by Google before the trial court was that it had

begun "investing in its products by at least 2015." Id. at *6 (internal quotation marks and citation

omitted). But the Federal Circuit noted that Google had "presented no evidence—testimony or

otherwise—to support its assertion that its investment in those products actually began in

2015, or that it was caught unawares that Sonos may have already invented the adjudicated-

infringing functionality when making those investments." Id.

So too here. There is no evidence in the record concerning when Google began investing

in, or working on, its Timeline product. Additionally, there is no evidence concerning the nature

of Google's investment, such as financial outlay or use of personnel resources. "To show that a

party was 'adversely affected,' it must show that the holder of intervening rights would have

either done something differently or experienced a change in economic position as a result of the

alleged delay in issuance of the patent-in-suit." Shire Orphan Therapies LLC, 2018 WL

2684097, at *23 (citation omitted). And here there is no evidence that Google would have acted

differently if Weisner had not delayed in prosecuting his patent. There also is no evidence

demonstrating that Google was caught unaware of Weisner's invention when it began investing

in its accused product. The only evidence in the record is that Timeline was released by Google

in 2015. ECF No. 373-1 at ¶ 76; ECF No. 344-25 at 2.

The Court is not aware of a case where prejudice for prosecution laches was established

solely by reliance on the mere date the accused product was publicly released. Instead, in

considering whether an accused infringer has obtained intervening rights, and thus shown

prejudice for prosecution laches, courts have relied on witness testimony, documentary evidence,

and/or expert testimony concerning the investment or use of the accused product by the alleged

infringer. See, e.g., Personalized Media Commc'ns, LLC I, 552 F. Supp. 3d at 684-91

(discussing evidence that Apple "developed intervening rights" because it "worked on, invested

in, and used the claimed technology during the period of delay"); Chiron Corp. v. Genentech, Inc., 268 F. Supp. 2d 1139, 1145-47 (E.D. Cal. 2002) (considering evidence that had the patent issued earlier, defendant would have negotiated a lower royalty rate with plaintiff or would have designed around the patent); Cummins-Allison Corp. v. Glory Ltd., No. 02-CV-7008, 2003 WL 355470, at *43 (N.D. Ill. Feb. 12, 2003), report and recommendation adopted, 2003 WL 22125212 (N.D. Ill. Sept. 5, 2003) (in denying preliminary injunction, court reasoned that defendant had adequately alleged prejudice for prosecution laches based on evidence that defendant "committed substantial development, design, manufacturing, marketing and sales resources to these products, without having any knowledge or notification that there was a specific patent that [plaintiff] claimed covered those products"); Mojo Mobility, Inc. v. Samsung Elecs. Co., No. 22-CV-00398, 2024 WL 3354705, at *2 (E.D. Tex. June 11, 2024), report and recommendation adopted, 2024 WL 3350884 (E.D. Tex. July 9, 2024) (finding a dispute of material fact as to prejudice for prosecution laches where "Samsung points to evidence of development choices made for the Galaxy S6 and other accused products that demonstrate prejudice through evidence of investing in, working on, or using the accused technology").[31]

Google points to evidence that Weisner, through Horowitz, would have been aware in May 2017 that Google may have intervening rights, arguing that Weisner assumed the risk of triggering Google's intervening rights. ECF No. 347 at 50-55; ECF No. 350-8 at 2. Additionally, Google points to an e-mail from Weisner to Horowitz, providing a link to a feature in Google Maps, and argues that Weisner attempted to tailor his claims in his application to Google's

---

[31] Samsung's evidence in that case included declarations and other exhibits explaining that while plaintiff delayed in prosecuting its patent, Samsung released the technology at issue to various parties, began selling the technology in stores, and spent time and resources to develop and sell the technology. See Mojo Mobility, Inc. v. Samsung Elecs. Co., No. 22-CV-398 (E.D. Tex. 2022), ECF No. 133 at 20-21.

accused products. ECF No. 347 at 53. But Google cites to no case, and the Court is not aware of one, where prejudice for application of prosecution laches was found based solely on such evidence. Moreover, "it is not improper for an applicant to broaden his claims during prosecution in order to encompass a competitor's products, as long as the disclosure supports the broadened claims." <u>Liebel-Flarsheim Co. v. Medrad, Inc.</u>, 358 F.3d 898, 909 n.2 (Fed. Cir. 2004). This is because "[i]f the disclosure does not support the broadened claims, the applicant will not be accorded priority based on the original disclosure, and the claims may be invalidated." <u>Id.</u>

Finally, Google argues that Weisner's lengthy delay, of between eleven and fourteen years, in prosecuting his patent establishes a presumption that the delay was unreasonable, inexcusable, and prejudicial. ECF No. 372 at 29-31. As discussed, the six-year presumption where prosecution laches is asserted has been applied only where the action is brought against the PTO. <u>See, e.g.</u>, <u>Hyatt</u>, 998 F.3d at 1370 (applying presumption in action against PTO); <u>see also</u> <u>Ex Parte Gilbert P. Hyatt</u>, 2024 WL 5265176, at *27 (same). It is not apparent that the presumption applies in a case where prosecution laches (not laches) is raised as a defense to infringement in an action involving private parties, not the PTO. The Court has not found a case, and the parties have not cited one, where the presumption was applied in a case of prosecution laches as a defense to patent infringement. <u>See, e.g.</u>, <u>Personalized Media Commc'ns, LLC I</u>, 552 F. Supp. 3d at 685 ("[T]he Court does not find it appropriate to shift the burden on the issue of prejudice when prosecution laches is raised as a defense to infringement."); <u>Allergan Holdings Unlimited Co. v. MSN Lab'ys Priv. Ltd.</u>, No. 23-CV-794, 2024 WL 3444368, at *4 (D. Del. July 17, 2024) ("I agree with the <u>Personalized Media</u> court's rationale and conclusion that the presumption from <u>Hyatt</u> is limited to the context of a § 145 action."); <u>Wirtgen Am., Inc. v. Caterpillar, Inc.</u>, 746 F. Supp. 3d 218, 227 (D. Del. 2024) (declining to apply presumption in

44

case between private parties). Moreover, in Sonos II, a case that also involved a delay of more

than six years and an infringement action between private parties, Google argued for application

of the presumption of prejudice, which Sonos opposed. See No. 24-1097 (Fed Cir.), ECF No. 55

at 73, ECF No. 66 at 17. In concluding that Google needed to put forth evidence of prejudice to

establish prosecution laches, the Federal Circuit was silent on application of the presumption.

Sonos II, 2025 WL 2473258, at *6-7.

     In sum, I respectfully recommend that Weisner's motion for summary judgment be

granted as to the defense of prosecution laches, because there is no evidence in the record of

prejudice to Google, an essential element of the defense.

## II.    **The October 21, 2025 Bench Trial**[32]

     Prior to the bench trial, on October 13, 2025, Weisner moved to preclude certain

testimony by Robert L. Stoll (ECF No. 425), who was retained by Google to provide an expert

opinion concerning the PTO's general practices and procedures, as well as the PTO's practices

as they relate to the affirmative defense of inequitable conduct (see ECF No. 425-1 at ¶¶ 1, 19).

Mr. Stoll, who is registered to practice as a patent attorney before the PTO, served from October

2009 to December 2011 as Commissioner for Patents in the Patent Office. Id. at ¶¶ 3, 6; see also

ECF No. 448 ("Tr.") at 18-20 (recounting relevant work experience). Stoll also previously served

as a Patent Examiner in the PTO for approximately eight years, and in that role, he examined

patent applications and continuing applications. ECF No. 425-1 at ¶ 10. Stoll prepared an expert

report dated August 29, 2025. ECF No. 425-1 at 1.

---

[32] The page numbers referenced herein for citations to ECF are to the electronically
generated pagination in those documents, except for citations to deposition excerpts, for which
the original pagination is used.

Weisner moved to preclude any testimony from Stoll consistent with the opinions he expressed in Sections VI, VIII, and IX of his expert report.[33] ECF No. 425 at 1. Weisner argues that such testimony contains "improper legal conclusions, irrelevant speculation, and otherwise usurp[s] the province of the fact-finder." Id. Weisner did not raise any objection to testimony by Stoll consistent with his opinions in Sections IV and V. Id. Nor did Weisner object that Stoll, based on his training and experience, is not qualified to testify as an expert on the PTO's practices and procedures. Google submitted a response to Weisner's objections. ECF No. 438.

First, Stoll's extensive experience at the PTO is sufficient to render him an expert on the processes and procedures of the PTO, and Weisner does not contend otherwise. Stoll spent nearly three decades working at the PTO and is a former Commissioner for Patents. See ECF No. 425-1 at ¶¶ 2-18; Tr. at 19-20. Additionally, he has been deemed an expert in over 100 cases in federal and state courts nationwide, including cases in this District. See ECF No. 425-1 at Appendix A; see also Portus Singapore PTE LTD v. Kenyon & Kenyon LLP, 449 F. Supp. 3d 402, 415-16 (S.D.N.Y. 2020) (discussing Stoll's expert report).

Second, Weisner raises no objection to testimony by Stoll consistent with Sections IV and V of his expert report. In those sections, Stoll provides information concerning the procedures before the PTO relating to patent applications. ECF No. 425-1 at ¶¶ 35-80. He explains the parts of a patent's prosecution history, and describes and explains the steps in the patent-application process. Id. at ¶¶ 23-34. Such unobjected-to testimony is both helpful to the trier of fact and well within the realm of Stoll's expertise. See, e.g., Sundance, Inc. v. DeMonte Fabricating Ltd., 550 F.3d 1356, 1361 n.2 (Fed. Cir. 2008) (noting that expert, an experienced

---

[33] Weisner also moved to exclude any testimony by Stoll based on the opinion expressed in Section VII, which concerns the defense of prosecution laches. ECF No. 425 at 1.

patent attorney, would be able to testify as to patent office procedure generally); <u>Pharmacia Corp. v. Par Pharm., Inc.</u>, No. 01-CV-6011, 2004 WL 5614917, at *3 (D.N.J. Feb. 18, 2024) (permitting patent-law expert to testify regarding "relevant patent prosecution history, patent prosecution procedures and policies generally"); <u>Bausch & Lomb, Inc. v. Alcon Lab'ys, Inc.</u>, 79 F. Supp. 2d 252, 255 (W.D.N.Y. 2000) (allowing testimony from expert concerning the general procedures involved in the patent-application process); <u>G.D. Searle LLC v. Lupin Pharms., Inc.</u>, No. 13-CV-121, 2013 WL 12123216, at *2 (E.D. Va. Dec. 30, 2013) ("[C]ourts allow expert and patent attorney testimony on general relevant background information regarding procedures for prosecuting a patent and the specific facts of the patent prosecution history as to the patent at issue in the case.").

In Section VIII, Stoll discusses the facts regarding the prosecution of the patents in this suit. ECF No. 425-1 at ¶¶ 105-163. To the extent Stoll discusses dates relevant to the '165 Application—such as, when a response to the Non-Final Action was due (<u>see, e.g.</u>, <u>id.</u> at ¶¶ 105-06), when the patent became abandoned (<u>see, e.g.</u>, <u>id.</u> at ¶ 107), or when the Revival Petition was filed (<u>see, e.g.</u>, <u>id.</u> at ¶¶ 109-110)—such discussion is permissible. <u>See, e.g.</u>, <u>Abbott Biotechnology Ltd. v. Centocor Ortho Biotech, Inc.</u>, No. 09-CV-40089, 2014 WL 7330777, at *7 (D. Mass. Dec. 19, 2014) (explaining that an expert may testify about "the prosecution history in particular" of a patent). However, Stoll also recounts Weisner's activities and other facts in this section that do not relate to the prosecution history of the '165 Application. <u>See, e.g.</u>, ECF No. 425-1 at ¶¶ 120, 127-28, 144, 163. The Court has not relied on this testimony in reaching its recommended conclusions of law. <u>Top Brand LLC v. Cozy Comfort Co. LLC</u>, No. 21-CV-597, 2023 WL 11909902, at *1 (D. Ariz. Nov. 29, 2023) ("Any testimony by [patent-law expert]

which covers matters beyond patent prosecution activities generally, such as testimony involving the facts of this case, is inadmissible.").

In Section IX, Stoll opines that Weisner and Nemanov intentionally misrepresented that the entire delay in responding to the September 30, 2009 Non-Final Action was unintentional. ECF No. 425-1 at ¶¶ 166-219. Stoll further opines that Dr. Friedman also intentionally misrepresented that the entire delay was unintentional because he did not conduct an investigation, and he could not have delegated that responsibility to Horowitz. Id. at ¶¶ 220-32. Additionally, Stoll opines that Horowitz also misrepresented that the entire delay was unintentional because he was aware that Weisner delayed in reviving the patent application while trying to raise investment in the Revival Petition, and he also knew that Nemanov in 2010 had allowed the application to become abandoned. Id. at ¶¶ 233-47. The Court has not relied on these opinions. Stoll's opinions that the conduct by Weisner, Nemanov, Horowitz, and Dr. Friedman constituted an intentional misrepresentation is improper as it seeks to offer a legal conclusion concerning intent to deceive, an element of inequitable conduct. See e.g., AmTrust N. Am., Inc. v. KF&B, Inc., No. 17-CV-5340 (LJL), 2020 WL 5578675, at *5 (S.D.N.Y. Sept. 16, 2020) ("[A]s a general matter, experts may not offer opinions regarding state of mind, intent, or motive as part of their analysis."); Nisus Corp. v. Perma-Chink Sys., Inc., No. 03-CV-120, 2005 WL 6112992, at *5 (E.D. Tenn. May 27, 2005) (concluding that expert testimony which sought "to opine as to [individual's] intent to deceive and good faith" was impermissible because it "offer[s] legal conclusions regarding inequitable conduct"); see also Shire Viropharma Inc. v. CSL Behring LLC, No. 17-CV-414, 2021 WL 1227097, at *16 (D. Del. Mar. 31, 2021) (noting that court has "generally excluded patent law expert testimony relating to inequitable conduct largely because such testimony frequently amounts to the proffering of impermissible legal opinions").

Finally, Stoll opines about the materiality of the misrepresentation made by the applicants and their attorney, stating that the misrepresentation that the entire delay was unintentional was material to the PTO's decision to revive the '165 Application. ECF No. 425-1 at ¶ 165; see also id. at ¶¶ 172, 189, 191, 195, 201, 206, 209, 219, 226-27. On the question of whether the representation would have been material to the PTO, Stoll's opinion is permissible. See, e.g., Worldwide Home Prods., Inc. v. Bed, Bath & Beyond, Inc., 74 F. Supp. 3d 626, 633 (S.D.N.Y. 2015) ("[Expert's] testimony with regard to the propriety of the [p]laintiff's conduct before the patent office and the materiality of the omitted information to the PTO examiner's decision is properly admissible. . . . [Expert's] opinions are relevant to the adequacy of [p]laintiff's disclosures to the PTO examiner, which is a question of mixed law and fact."); Shire Viropharma Inc., 2021 WL 1227097, at *30-31 (permitting Stoll to opine as to whether particular report was "a material reference" from the PTO's perspective and collecting cases where courts permitted expert to testify about materiality prong of inequitable conduct inquiry).

Pursuant to the referral from Judge Hellerstein (see ECF No. 393), the Court scheduled a bench trial for October 21, 2025.[34] Despite being ordered to appear (see ECF No. 440), Weisner

---

[34] In his referral order, Judge Hellerstein referred the cross motions for summary judgment "and any bench trial that may be appropriate." ECF No. 392; see also ECF No. 393. On September 26, 2025, the Court entered an order setting a date of October 21 for the bench trial. ECF No. 409. On September 29, 2025, Weisner filed an emergency motion, requesting that Judge Hellerstein vacate the September 26 order. ECF No. 410. Google opposed the request. ECF No. 412. On October 1, 2025, Judge Hellerstein issued an order, stating that he had on August 26 referred the "summary judgment motions, including any related bench trial of the issues in the motions" to the undersigned. ECF No. 414. Having concluded that he had the statutory authority under 28 U.S.C. § 636(b) to issue the referral, Judge Hellerstein denied Weisner's emergency motion. Id. at 2-4. On October 15, 2025, Weisner filed a second emergency motion, seeking to vacate the proceeding scheduled for October 21. ECF No. 435. On October 17, 2025, Judge Hellerstein denied the motion, indicating that I should "proceed as scheduled on October 21-23, 2025." ECF No. 439 at 1. At the start of the proceeding on October 21, Weisner's counsel appeared to suggest that the referral from Judge Hellerstein was limited to a "report and recommendation on the summary judgment motions." Tr. at 4. But that assertion is

did not appear on October 21.[35] Nemanov also was not present, despite an October 8, 2025 court order directing him to appear on October 21. ECF No. 420; see also ECF No. 447-6 at 2 (indicating Nemanov's receipt of order). Google was prepared to proceed with the bench trial. Tr. at 5, 15.

## FINDINGS OF FACT

Based on the testimony presented at the bench trial and the exhibits received into evidence, I make the following recommendations as to findings of facts and conclusions of law regarding Google's defense of inequitable conduct, which is raised in Google's Sixth Affirmative Defense. ECF No. 304 at 25-48.

### A.  Robert L. Stoll

The prosecution of the '165 Application began on June 7, 2007 Tr. at 27. On July 29, 2008, the PTO rejected all the claims. Id. The applicants filed an amendment on October 29, 2008. Id. The PTO rejected all the claims on February 13, 2009. Id. On August 13, 2009, the applicants filed a request for a continued examination, which was a request "to keep the application going forward so you have more opportunities to amend, to change the claims, [or] to make remarks." Id. On September 30, 2009, there was another rejection of all claims in the

---

belied by the record. It is apparent that Judge Hellerstein referred the matter for a report and recommendation on the summary judgment motions and "any bench trial that may be appropriate." ECF No. 392; see also ECF No. 414. I have thus not overstepped Judge Hellerstein's referral by conducting the proceeding on October 21.

[35] On October 17, 2025, the Court held a conference with the parties; Weisner was present during the conference. See ECF No. 444 at 8. During that conference, the Court informed Weisner of his obligation to appear on October 21, and warned Weisner that failure to appear could result in sanctions. ECF No. 444 at 7-8. Following the October 17 conference, the Court issued an order stating that Weisner was "hereby ordered to appear on [October 21]" and warning Weisner "that failure to appear may result in a contempt sanction" and "other sanctions" such as "Google succeeding on its affirmative defenses through Plaintiff's default." ECF No. 440.

application. Id. Between June 7, 2007, and September 30, 2009, there was "active prosecution" of the '165 Application. Id. at 27-28.

The '165 Application became abandoned on December 30, 2009. Tr. at 30. The '165 Application remained abandoned between December 30, 2009, and May 2017. Id. at 30-32. "Sometimes very little" engagement is required by an inventor to prosecute an application, because "most" patent attorneys "handle the bulk of it themselves with very little involvement" from the inventor. Id. at 31.

The first petition for revival was filed on June 7, 2017, and was signed by Dr. Friedman. Id. at 32-33. The power of attorney submitted on June 7, 2017 needed Nemanov's signature because he was a coinventor. Id. at 34.

On July 3, 2017, a grantable revival petition was filed ("Revival Petition"). See JX-A at 0231-0243. On August 24, 2018, the '165 Application was allowed. Tr. at 34. The '165 Application was not allowed until the petition was filed with a signature for both inventors. Id.

The PTO relies on the duty of candor and good faith, as codified in 37 C.F.R. § 11.18. Tr. at 22. The PTO relies on the applicant's duty of candor because an applicant is obligated under 37 C.F.R. § 11.18 to inquire into the underlying facts and circumstances when a practitioner provides the statement to the office. Id. at 22-23. The PTO usually relies on the applicant's duty of candor and good faith and accepts the statement that the entire delay in filing the required reply from the due date for the reply until the filing of a grantable petition pursuant to 37 C.F.R. § 1.137 was unintentional. Id. The duty of candor and good faith is important because an applicant and his representative are the "source of information that's not accessible to the examiner," and that information "can help the examiner to lead to a valid issuance of a valid patent." Id. at 23. Weisner, Nemanov, and Dr. Friedman each owed the PTO a duty of candor

and good faith. Id. at 24. Horowitz did not owe such a duty because he was not involved in the petition to revive. Id.

In representing that the entire period of delay was unintentional, Stoll opined that "entire period" means "the entire period;" it includes "the entire delay" from "the due date for the reply until the filing of a grantable petition." Tr. at 23. According to Stoll, an applicant cannot meet the unintentional delay standard "if the entire delay is not unintentional."[36] Id. at 24. Likewise, Stoll opined that a delay resulting from a deliberately chosen course of action—such as the decision to defer the payment of fees or expenses—is not an unintentional delay within the meaning of 37 C.F.R. § 1.137. Id. at 25, 28-29. Stoll also opined that a decision not to pursue a patent application because you "think it's dead" would have been considered an intentional abandonment by the PTO.[37] Id. at 25-26, 30.

The PTO changed its rules to require "additional documentation" if the period of delay is more than two years from the date the application became abandoned. Tr. at 24. The PTO changed its rule to require documentation for periods of delay longer than two years because "significant issues" were "coming up about the entire period" when the delay was much longer than two years. Id.

_____

[36] To the extent Weisner objected to expert testimony concerning how the PTO interprets or understands the term "entire" in 37 C.F.R. § 1.137(b)(4), such expert testimony is permissible. See, e.g., Shire Viropharma Inc. v. CSL Behring LLC, 2021 WL 1227097, at *30-31 (D. Del. Mar. 31, 2021).

[37] Such testimony also is proper. See, e.g., Worldwide Home Prods., Inc. v. Bed, Bath & Beyond, Inc., 74 F. Supp. 3d 626, 633-34 (S.D.N.Y. 2015) (concluding that expert's testimony as to whether plaintiff's omitted information about prior art was material to the PTO was proper); Deere & Co. v. Kinze Mfg., Inc., No. 20-CV-389, 2024 WL 1235569, at *7-9 (S.D. Iowa Feb. 8, 2024) (reasoning that although Stoll may not testify to the conclusion as to whether party violated their duty of candor, Stoll may testify as to whether information would be material in context of prior art).

According to Stoll, inventor incapacity does not prevent prosecution of a patent application, because a prosecuting attorney with a power of attorney may make an application on the inventor's behalf. Tr. at 25. Stoll has never "heard" of illegal drug use constituting an example of unintentional delay. Id. at 26. In Stoll's experience, a delay of seven years is "very uncommon." Id. at 24.

Stoll opined that in his experience, both working at the PTO and as a patent attorney, he was not aware of any prosecuting attorney who had not personally investigated prior to making the statement of unintentional delay on the application. Tr. at 33-34.

### B.  Steven Horowitz's E-mails

On December 30, 2009, Horowitz sent an e-mail to Weisner and Nemanov asking to speak to them about their patent application, "a response to which is due tomorrow without extension fees." See Tr. at 55-56 (discussing Ex. JX-B).

On March 15, 2010, Horowitz sent an e-mail to Nemanov and Weisner. Tr. at 56-57 (discussing Ex. JX-C). The e-mail states, "I have previously emailed you at this exact email address several times with copies of the attached office action and have asked you to respond to my requests to advise me what action you want me to take and to discuss our options." Ex. JX-C. The e-mail continues, "As previously advised numerous times, the application will go abandoned on March 29, 2010 if we do not file a response by then. At this point we have $555 in extension fees to pay together with any response as previously advised by email on December 29, 2009." Id. (emphasis removed). Horowitz's e-mail indicated that it included as an attachment the September 30, 2009 Non-Final Action. Id.

On March 17, 2010, Horowitz sent an e-mail to Weisner and Nemanov asking for Weisner to "make some arrangement whereby I can speak to you on the telephone concerning

the patent application for example by providing a number and time for me to call or by telling me when you would like to call me." Tr. at 57 (discussing Ex. JX-D).

### C.  **Sholem Weisner**[38]

Weisner and Nemanov are the inventors for the '165 Application. Ex. JX-A at 0005-06; Tr. at 46, 55 (admitting Ex. JX-A (full patent application history)).

Around 2008, Weisner's father passed away and Weisner "had a lot of anxiety." ECF No. 446-2 ("Weisner 2/12/25 Dep.") at 50. Weisner was taking medication for panic attacks and anxiety. Id. Also in 2008, Weisner was in a bike accident. Id. Weisner broke his toe and might have fractured a disk in his back. Id. at 51. After the bike accident, Weisner "had terrible pain" and was prescribed OxyContin by a doctor. Id. He "very fast" went up in dosage of the OxyContin because it helped him with his anxiety and depression. Id. Weisner took "benzos and OxyContin" and it "took off [his] function." Id.

In "2008, 2009," Weisner took morphine, crack cocaine, and crystal meth." Weisner 2/12/25 Dep. at 55. When Weisner was taking all of these drugs, he was "totally nonfunctional." Id. at 56. Between 2008 and 2015, Weisner took drugs "every single day . . . every single quarter of the day." Id. at 57. From 2008 to 2015, Weisner was "constantly" on "very heavy drugs" for the entire time; he "never missed a quarter of the day." Id. at 57-58. When Weisner was on heavy drugs he could not think clearly. Id. at 59. Weisner never spoke to Dr. Friedman about his medical issues. Id. at 70.

---

[38] Because Weisner did not appear on October 21, Google called Weisner (as well as Nemanov and Dr. Friedman) by deposition testimony; the video of each witness's deposition was played for the Court. See, e.g., Tr. at 45 (noting "presentation by video"). Google subsequently submitted the excerpts of each witness's deposition testimony that was played for the Court. See ECF No. 446.

On August 31, 2009, Weisner entered a plea in New London, Connecticut, while present before a judge and while represented by counsel. Weisner 2/12/25 Dep. at 80. Weisner signed the plea document. Id. at 81; see also Ex. DX-AR (Weisner's public criminal records); Tr. at 50-51 (admitting Ex. DX-AR).

Weisner provided a sworn affidavit dated June 22, 2010, in a criminal case pending against Baruch Lebovits in Supreme Court, Kings County. See Ex. DX-AS; Tr. at 51 (admitting Ex. DX-AS). In that affidavit, which was sworn under penalty of perjury, Weisner recounts an encounter with Lebovits. See Ex. DX-AS.

Weisner attended rehab for his drug use at Passages in Malibu in 2014, and they helped him "get sober." Weisner 2/12/25 Dep. at 135. Weisner completed a physical health history form, dated December 2, 2014. Tr. at 58 (discussing JX-G). On that form, Weisner was asked if he had "difficulty going to sleep" and whether he ever found himself "not sleeping?" Ex. JX-G at 0004. In response to both questions, Weisner answered, "Yes when not using." Id. Weisner was also asked whether he ever slept "excessively," and Weisner answered "yes when 'high.'" Id.

Weisner left Passages on February 20, 2015. Weisner 2/12/25 Dep. at 147. Weisner has stayed sober since leaving Passages in February 2015, and he has not used drugs other than smoking marijuana. Id. at 147-48. Weisner smokes marijuana "all the time;" he "always smoke[s]." Id. at 197-98.

While at Passages, Weisner had access to a computer. Weisner 2/12/25 Dep. at 143-44. He used the computer to play chess. Id. at 144. While at Passages, Weisner played "50, 60 games" of chess every day. Id. at 144-45. After leaving Passages, Weisner went to upstate New York. Id. at 151-52. While living upstate, Weisner spent his time meditating, hiking, praying,

talking to Dr. Gross, and learning about Jewish mysticism. Id. at 152. Learning about Jewish mysticism involved "concentrating on ideas." Id.

In 2016, Weisner obtained a Lincoln MKZ in order to drive upstate because he was living upstate and wanted to be able to come back to the City when necessary. Id. at 37. Weisner drove the Lincoln MKZ from "the end of 2016" to "like 2019." Id. at 38.

Weisner first understood that his '165 Application had been abandoned "somewhere around" late 2016, during a conversation with Nemanov. ECF No. 446-2 ("Weisner 1/11/24 Dep.") at 219-20. During that conversation, Nemanov was telling Weisner "about different ideas" but Nemanov told Weisner that he would not do "anything anymore" with Weisner, because he had previously "started doing something" and it had gone "to hell." Id. at 220. When Weisner asked what had gone to hell, Nemanov responded, "the patent." Id. Weisner asked Nemanov what he meant, and Nemanov explained that they had not answered the PTO's Non-Final Action. Id.

Sometime in the winter of 2017, Weisner met Abe Rice, a patent attorney, while at a spa in Manhattan. Weisner 2/12/25 Dep. at 131-32; Weisner 1/11/24 Dep. at 209-10. Weisner told Rice that he "once made a patent," and Rice told Weisner "about revival" of his patent application. Weisner 2/12/25 Dep. at 131-32. Rice gave Weisner the idea that he might be able to revive the patent and then Weisner "started thinking . . . about doing it." Id. at 132. Rice told Weisner that he should "do something with it," but Weisner "didn't jump on an idea that second;" Weisner instead "started thinking about it." Id. at 131-32. Weisner did not "jump on it because it took time for [him] to process" and he was "still in the middle of healing" and "was not really doing anything." Id. at 132. A "few weeks afterwards," Weisner called Horowitz; he also called a "different lawyer first." Id. "Even before" Weisner went to Horowitz, Weisner

spoke with Nemanov. <u>Id.</u> at 351-52. Weisner told Nemanov that he was "better now," and he was "going to pursue" the patent. <u>Id.</u> at 352.

Nemanov's signature was omitted from the power of attorney because Nemanov "didn't have an interest in it." Weisner 2/12/25 Dep. at 351. Nemanov instead had "an interest in trading" and he told Weisner that "instead of spending money and reviving the patent," Weisner should give Nemanov "the money for the market." <u>Id.</u> at 351-52. Nemanov was never interested in the patent and Weisner "forced him to take percentages" because he wanted Nemanov to be "excited about something." <u>Id.</u> at 350. Weisner "had to convince [Nemanov]" and "convinced him the whole time." <u>Id.</u> at 350, 352. Weisner told Nemanov that he could not "do it without [him]," so Nemanov "did it." <u>Id.</u> at 352.

Weisner was incapacitated during the "entire time" of abandonment; he had "very, very, very minimum function." Weisner 1/11/24 Dep. at 214. Weisner understood that the PTO was relying on "that statement" in deciding whether to grant his revival petition, and he intended for the PTO to rely on the statement. <u>Id.</u> at 219. The entire delay in responding to the PTO was unintentional because Weisner was incapacitated. Weisner 2/12/25 Dep. at 40. Weisner's incapacitation was the only reason for the delay in responding to the PTO. <u>Id.</u> at 41.

Weisner "think[s]" he may have "read" that Google Timeline was developed in 2013 and released in 2015. ECF No. 446-2 ("Weisner 2/13/25 Dep.") at 460-61. On May 20, 2017, Horowitz sent Weisner an e-mail telling Weisner, "I want you to be aware of . . . intervening rights." Tr. at 52 (quoting Ex. DX-BI). Horowitz went on to explain that "[t]his means even if you end up with a patent since your patent was abandoned for a number of years and people thought you have (sic) up on it, if someone (like Google) saw that you apparently abandoned your patent and then after that started developing a product based on your published invention, a

court would be reluctant to force them to stop selling the product even after you get the patent since they relied on your having given up on it when they started developing it." Id. ("sic" in original).

On October 12, 2018, Weisner entered into an agreement with Martin and Malka Mittelman. Tr. at 54 (discussing Ex. DX-CE). In that agreement, Weisner agreed to sell the Mittelmans an "undiluted 3% interest" in the '165 Application. See Ex. DX-CE at 0003.

On October 26, 2018, Weisner sent an e-mail to Horowitz that included a URL and said, "Please look at this." Tr. at 53. The URL included in the e-mail was "https://geomarketing.com/what-google-maps-explore-feature-means-for-local-search-marketing." Ex. DX-CE at 0008.

Between 2005 and 2006, Weisner created the e-mail address sholemyosef@yahoo.com. Weisner 1/11/24 Dep. at 255-56. "Most times" Weisner does not read e-mails. Weisner 2/13/25 Dep. at 732. In 2018, Weisner was already considering an infringement claim against Google. Weisner 1/11/24 Dep. at 255. Although he was considering an infringement claim, Weisner did not preserve all records and did nothing to preserve records from that point forward. Id. at 277. Weiner does not preserve anything; he is not a "preserver." Weisner 2/13/25 Dep. at 732.

Weisner searched his e-mails for e-mails with "Nemanov" and "came up zilch." Weisner 1/11/24 Dep. at 260. He also searched his e-mail for "patent" and found "absolutely nothing." Weisner 2/12/25 Dep. at 188. Additionally, Weisner searched for "Google" in his e-mails and found nothing relevant. Id. He "think[s] [he] didn't" produce any e-mails from his Yahoo e-mail account. Weisner 1/11/24 Dep. at 260.

Weisner smoked marijuana on the day of one of his depositions. Weisner 2/12/25 Dep. at 198. Despite having smoked marijuana, Weisner was able to understand the questions asked, give truthful answers to those questions, and participate in the litigation. Id. at 202.

### D. Shmuel Nemanov

Around September 2009, Nemanov was "frustrated about the way [his] patent was being argued," because Horowitz did not "seem to understand the concepts." ECF No. 446-4 ("Nemanov 11/8/23 Dep.") at 60. Nemanov "was not able to go to a different lawyer," because "Weisner insisted, even though [Horowitz] was really expensive, [Weisner] insisted on staying with Horowitz." Id. at 60.

Weisner "insisted on . . . using exclusively Steven Horowitz." Nemanov 11/8/23 Dep. at 60-61. But "it was just understood" that Weisner "didn't have the money to pay" Horowitz, and Nemanov could not "do anything because [Weisner] insisted on Horowitz, and it was impossible to pay [Horowitz]." Id. at 67. Nemanov "did not have the money to pay Horowitz, and Weisner did not have the money to pay Horowitz, and Weisner would not go to another attorney," even "after the money got really tight." Id. at 71. It was always Weisner who paid Horowitz; Nemanov never paid Horowitz's legal fees. ECF No. 446-4 ("Nemanov 4/11/25 Dep.") at 80-81. Weisner stopped paying Horowitz in 2009. Id. at 107. Nemanov "blamed the abandonment" on Weisner, because Nemanov "could have gone to a different patent lawyer and very easily have finished it [himself]." Nemanov 11/8/23 Dep. at 60.

In 2010, Weisner told Nemanov that he "saw some kind of horrible injustice that he wanted to step in," concerning an individual named Lebovits and the production of a videotape in a case relating to abuse. Nemanov 4/11/25 Dep. at 117, 123-24, 153-54.

Between 2009 to 2017, Nemanov played "over the board chess" with Weisner "sometimes." Id. at 128.

Weisner first reached out to Nemanov "somewhere around 2017" about revival of the '165 Application. Id. at 130. Nemanov was prompted to revive his patent application in 2017 because Weisner told him "that it's possible." Nemanov 11/8/23 Dep. at 63. Nemanov was "overjoyed." Id. He told Weisner "okay, let's revive it." Id.

Nemanov arranged the meeting between Weisner and Lao to discuss the patents, but Nemanov "was not involved with that conversation, other than setting it up." Nemanov 4/11/25 Dep. at 86, 131. That conversation between Weisner and Lao occurred "in the 2012 to 2014 timeframe." Id. at 131.

Nemanov "wonder[ed]" whether the patents were "dead" and "Weisner generated a lie that the conditions have changed." Id. at 72. Weisner "said something" to Nemanov about "a rule change in 2014 which now made it permissible" to "claim medical" as a basis for revival and Nemanov "believe[s] that might have been a lie." Id.

Weisner "tried to get the patent revived without" Nemanov, but the PTO "stopped him," and said that Weisner needed Nemanov's signature on the power of attorney. Nemanov 4/11/25 Dep. at 179. In 2017, Nemanov was working with "some kind of algorithm related to markets" but that was not "preventing [him] from doing anything else." Id. at 180. Weisner "can't be saying" that Nemanov "wasn't interested in this patent." Id. at 190-91.

Nemanov's "abandonment" of the patent application "was unintentional," but the abandonment had "nothing to do with [his] medical condition"; Nemanov did not seek to revive his patent until 2017 "because [he] was misinformed," and "most probably intentionally" misinformed. Nemanov 4/11/25 Dep. at 71-72. Nemanov "was told that [the patent] was like

permanently dead;" Horowitz said that "they're done" and Nemanov "did not know that they

weren't quite done." Id. Nemanov "had the impression that [his] patent was dead" and he was

"convinced that they were not revivable." Id. at 74. Even after 2010, Nemanov could "have taken

initiative," but he "was not aware of that." Id. at 71.

Weisner told Nemanov that "he was incapacitated during those years" when the '165

Application was abandoned, and Nemanov "bore witness to that." Id. at 69. Weisner was

"regarded as a substance abuser" and Nemanov was "betting it was on the really severe side." Id.

at 101. "[P]eople felt [Weisner] really wasn't going to survive." Id. But Weisner was not "so

incapacitated that he couldn't even make it to a party." Id. at 100-01. Between 2007 and 2017,

Nemanov attended social events or parties where Weisner was present, but he did not remember

"exactly where." Id. at 100, 103.

"[O]ne of Weisner's attorneys characterized [Nemanov's] position as claiming mental

issues as [ ] a rationale for the abandonment." Id. at 69. But neither Nemanov nor his "legal

representative" has "ever claimed a medical condition as far as patents are concerned." Id. at 70.

Nemanov testified that "these patents are the product of fraudulent activity, because [he]

had nothing to do with them, and obviously [his] signature is on them." Id. at 66. "Even if

[Weisner] was" engaged in fraudulent activity around the patent abandonment, Nemanov

"wasn't engaged in any fraudulent activity" because he "was told that [he] could resume

prosecuting [his] patent." Id. at 69.

At his deposition, when shown the second power of attorney, Nemanov "really

doubt[ed]" whether it was his signature on the form. Nemanov 4/11/25 Dep. at 197. He doubted

it was his signature because "that's not how I write at all." Id. Nemanov "never" gave Horowitz

or Weisner permission to "sign anything on [his] behalf." Id. at 201.

Nemanov "didn't know" that Weisner and Horowitz had submitted "a whole bunch of new claims," following "Nemanov's claims," which Nemanov did not "partake" in and "only found out" about those new claims "later when they were canceled." Id. at 201. Nemanov never said "you can go and sign my name on claims," but he was "not certain that these signatures are fake," although he was "almost certain" they were fake. Id. at 201-02.

### E.  Dr. Mark Friedman

Horowitz joined Dr. Friedman's firm around August 2009. ECF No. 446-3 ("Friedman Dep.") at 15. Horowitz brought Weisner as a client from New York when Horowitz moved to Israel and joined Friedman's firm. Id. at 15, 25. Horowitz "handled the client exclusively all by himself" and there "was no involvement of any other professional from our firm," except for paralegals who would have "fil[ed] things and sen[t] reminders." Id. at 25. Dr. Friedman did not do any substantive work on the Weisner/Nemanov patent applications. Id. at 24. Dr. Friedman had no discussions with Weisner about his patent applications. Id. at 26.

Dr. Friedman could not recall when he first became involved in the Weisner/Nemanov patent applications, but the "file" was opened in his firm on October 21, 2009, and October 24, 2009, shortly after Horowitz moved to Israel. Id. at 14, 30, 32. Before May 2017, there were no entries in the firm's docketing system for the '165 Application, indicating to Dr. Friedman that "the office at that point" had not "handle[d] anything" and "it must have been handled by Horowitz directly himself." Id. at 16-17. Based on the lack of entries in the docketing system, Dr. Friedman's firm "probably" did not have any involvement in the '165 Application before May 2017, and Dr. Friedman himself "had no contact with it whatsoever at any time, even beyond 2017." Id. at 17. Dr. Friedman knew "very much nothing about" the '165 Application. Id. at 25. Dr. Friedman thought it was "very unusual" and he was "a little surprised" that

although the file for the patent application was opened within his firm in October 2009, there was no activity in the file until June 2017. Id. at 30, 32.

Dr. Friedman's electronic signature is on the Revival Petition, seeking to revive an abandoned patent under 37 C.F.R. § 1.137(a). Id. at 13-14, 19. It was the firm's practice to use Dr. Friedman's license and his signature on all applications filed with the PTO, because Dr. Friedman is the one licensed to practice before the PTO and also for "insurance reasons." Id. at 29-31. Horowitz is also licensed to practice in front of the PTO. Id. at 30. Dr. Friedman had "no recollection whatsoever" what he did before authorizing the use of his signature on the Revival Petition. Id. at 20. Dr. Friedman's normal practice would have been to "glance it over" and then "pass it on to the paralegals to file." Id. at 20.

The Revival Petition included a statement that said "[t]he entire delay in filing the required reply from the due date for the required reply until the filing of a grantable petition under 37 C.F.R. 1.137(a) was unintentional." Id. at 21. Although Dr. Friedman "personally made no investigation" before making the statement in the Revival Petition, "Horowitz most likely" did. Id. at 21. But Dr. Friedman could not recall whether he discussed with Horowitz the basis for the statement that the entire delay in filing the required reply was unintentional. Id. at 25-26.

Dr. Friedman was "not aware of the facts" that would have supported the statement that the entire delay in filing was unintentional, and he could not remember whether he was ever aware of the facts that supported the statement. Id. at 21-22. Dr. Friedman was not aware that the period of delay in filing the petition was more than seven years; he has "zero knowledge of the facts" surrounding the Revival Petition. Id. at 22, 27. Dr. Friedman never asked what led to abandonment of the '165 Application, and he has no information about Weisner's capacity during the period of time between September 30, 2009, and May 2017. Id. at 24.

63

Dr. Friedman assumed that the PTO relied on the statement that the entire period of delay was unintentional when it revived the '165 Application because "that's one of the requirements for reviving an unintentionally abandoned application." Id. at 23. Dr. Friedman intended for the PTO to rely on the statement that the entire period of delay was unintentional when the Revival Petition was submitted. Id. at 23.

## CONCLUSIONS OF LAW

As discussed, see supra Part I, Section A.1., to prevail on a defense of inequitable conduct, Google must show by "clear and convincing evidence that the applicant affirmatively misrepresented or failed to disclose material information, or submitted false material information, with an intent to deceive the PTO." Eisai Co., 472 F. Supp. 2d at 506.

### A.  **Missing Witness**

Typically, where a witness is "peculiarly within the power of the other party," a missing witness charge inviting the trier of fact to infer that the testimony of an uncalled witness might have been favorable is appropriate. See, e.g., United States v. Nichols, 912 F.2d 598, 601 (2d Cir. 1990) ("A missing witness charge permitting the jury to infer that the testimony of an unproduced witness would have favored one party is appropriate if production of the witness is peculiarly within the power of the other party.") (internal quotation marks, alterations, and citation omitted). "Such an inference is warranted also where a party to the action is, in effect, a missing witness." Chevron Corp. v. Donziger, 974 F. Supp. 2d 362, 700 (S.D.N.Y. 2014).

If an unproduced witness is equally available to both sides, a district court may provide a charge that permits an unfavorable inference against either party. Nichols, 912 F.2d at 601. A witness's availability "depends on all the facts and circumstances bearing upon the witness's relation to the parties." Id. at 602 (cleaned up). "An adverse inference is not warranted, for

example, where the controlling or related party makes the missing witness available to its

opponent, the party seeking the adverse inference equally could obtain the missing witness's

testimony, or the party seeking the adverse inference made no attempt to obtain the witness's

testimony." Chevron, 974 F. Supp. 2d at 701. A court may give a missing-witness charge "even

in the absence of a request from the parties." United States v. Ford, 771 F.2d 60, 63 (2d Cir.

1985).

Despite a court order (see ECF No. 440), Weisner, the plaintiff in this case, did not

appear on October 21. Nemanov, a coinventor, also did not appear despite a court order. ECF

No. 420. Additionally, prior to October 21, Google had indicated that it intended to call Weisner

and Nemanov as witnesses, in order to put on its case for the affirmative defense of inequitable

conduct. See ECF No. 447-4 at 3. Weisner unquestionably had knowledge of facts material to the

defense of inequitable conduct. Nemanov too had unique knowledge of facts material to the

defense. And given Weisner's role as plaintiff and Nemanov's position as the coinventor, there is

no basis to conclude that their testimony was equally available to Google. In fact, Google

anticipated the possibility that Nemanov might not appear and requested that the Court order his

attendance on October 21.[39] ECF No. 447-6 at 3. Weisner's and Nemanov's failures to appear, in

violation of court orders, whether considered independently or collectively, warrant an adverse

inference that had each testified, each of their testimonies would have been adverse to their case

and, in particular, would have been adverse to their contention that they did not commit

inequitable conduct in connection with the '165 Application. See Gray v. Great Am. Recreation

Ass'n, Inc., 970 F.2d 1081, 1082 (2d Cir. 1992) ("The non-appearance of a litigant at the trial or

---

[39] On October 7, 2025, Google sent an e-mail to Chambers, which copied Weisner's
counsel, requesting that the Court order Nemanov to attend on October 21, and seeking
permission to serve the subpoena via e-mail.

his failure to testify as to facts material to his case and as to which he has especially full knowledge creates an inference that he refrained from appearing or testifying because the truth, if made to appear, would not aid his contention.") (citation omitted). Although Google has not requested an adverse inference, the Court, as the finder of fact, may draw one sua sponte. Nevertheless, even without application of an adverse inference, the Court would have made the same factual findings discussed herein.

### B. **Weisner's E-Mail Preservation**

On April 17, 2025, Google moved for sanctions against Weisner, arguing that Weisner had spoliated evidence related to the abandonment of the '165 Application. ECF No. 277. Specifically, Google argued that it was entitled to an adverse inference because Weisner failed to preserve e-mails, financial documents, and medical records bearing on his contention that he was incapacitated during the period of abandonment, despite an obligation to preserve such evidence. Id. at 11-15. Weisner opposed the motion on April 22, 2025. ECF No. 284. In a written order, Judge Hellerstein denied Google's motion "as unnecessary" and explained that Google "will be entitled, at trial, to prove Plaintiff's failure to retain relevant documents and to urge the trier of fact to draw appropriate inferences from such failure." ECF No. 299.

On October 21, Google renewed its motion. Tr. at 61. Because Weisner did not appear, Google relied on his deposition testimony. During the proceeding, Google played the following deposition testimony from Weisner which is relevant to preservation.

In 2018, Weisner was already considering an infringement claim against Google. ECF No. 446-2 (Weisner 1/11/24 Dep.) at 255. Between 2005 and 2006, Weisner first started using the e-mail address sholemyosef@yahoo.com. Weisner 1/11/24 Dep. at 255-56. Weisner searched that e-mail address for "Shlomo Horowitz" and "Nemanov" and "it came up zilch." Id. at 260.

He also searched for "patent" in his e-mail and found "absolutely nothing." ECF No. 446-2 (Weisner 2/12/25 Dep.) at 188. Additionally, Weisner searched for "Google" in his e-mail and found nothing relevant. Id.

When he started considering an infringement claim against Google in 2018, Weisner did not preserve all records from that point forward and he did nothing to preserve his records. Weisner 1/11/24 Dep. at 277-78. There thus "could be" records that are missing because Weisner did not preserve them. Id. at 278. After he sued Google, "nobody told [Weisner]" that he "had to preserve e-mails." ECF No. 446-2 (Weisner 2/13/25 Dep.) at 732. Weiner does not preserve anything; he is not a "preserver." Id. "Most times" Weisner does not read e-mails "so why should [he] preserve them?" Id.

Based on Weisner's testimony, an adverse inference is appropriate. "A party has an obligation to preserve evidence when the party is on notice 'that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation.'" Alexander Interactive, Inc. v. Adorama, Inc., No. 12-CV-6608 (PKC) (JCF), 2014 WL 12776440, at *3 (S.D.N.Y. June 17, 2014) (quoting Fujitsu Ltd. v. Fed. Express Corp., 247 F.3d 423, 436 (2d Cir. 2001)). "If a party's failure to preserve evidence rises to the level of willfulness or gross negligence, the moving party is entitled to the rebuttable presumption that any missing evidence would be favorable to that party." Alexander Interactive, 2014 WL 12776440, at *4 (citing GenOn Mid–Atl., LLC v. Stone & Webster, Inc., 282 F.R.D. 346, 358 (S.D.N.Y. 2012), aff'd by, No. 11-CV-1299 (HB), 2012 WL 1849101 (S.D.N.Y. May 21, 2012)). "In order to protect the innocent litigant from the destruction of evidence by a spoliator who would otherwise assert an 'empty head, pure heart' defense, one who fails to preserve evidence will be sufficiently culpable even when acting with ordinary negligence." Mastr

Adjustable Rate Mortgages Tr. 2006-OA2 v. UBS Real Est. Sec. Inc., 295 F.R.D. 77, 84

(S.D.N.Y. 2013), aff'd by, No. 12-CV-7322 (HB), 2013 WL 6840282 (S.D.N.Y. Dec. 27, 2013)

(internal quotation marks, alterations, and citation omitted).

Weisner admits to having considered a patent-infringement claim against Google as early

as 2018. Weisner 1/11/24 Dep. at 277-78. Weisner admits that he took no steps to preserve his e-

mails. Weisner 2/13/25 Dep. at 732. And from the e-mail admitted into evidence on October 21,

Weisner would have received e-mails relevant to his patent infringement suit as early as October

2018. Tr. at 53. Yet, Weisner did not preserve those e-mails and admits to having taken no steps

to preserve any e-mails. This is sufficient to establish an adverse inference. See, e.g., SJS Distrib.

Sys., Inc. v. Sam's E., Inc., No. 11-CV-1229 (WFK) (RML), 2013 WL 5596010, at *4-5

(E.D.N.Y. Oct. 11, 2013) (granting sanctions where plaintiff failed to "take the most basic

document preservation steps" of relevant evidence, which was "particularly inexcusable"

because party was plaintiff in the action and "had full knowledge of the possibility of future

litigation"). Google is thus entitled to an inference that evidence in Weisner's e-mails would

have been favorable to it as it concerns Google's defense of inequitable conduct. However, even

without such an adverse inference, the Court would make the same factual findings and

conclusions of law.

## C.  **Materiality**

To prove materiality, the accused infringer must show that the "withheld or

misrepresented information would have blocked patentability." Ohio Willow Wood Co., 735

F.3d at 1345; Tofasco of Am., Inc. v. Atico Int'l U.S.A., Inc., No. 07-CV-4120, 2009 WL

10671988, at *6 (C.D. Cal. Dec. 28, 2009) ("Materiality is present when a reasonable examiner

would consider it important in deciding whether to allow the application at issue as a patent.")

(internal quotation marks and citation omitted). Put differently, "it must be shown that the PTO would not have allowed the claim but for the nondisclosure or misrepresentation." In re Rosuvastatin Calcium Pat. Litig., 703 F.3d at 519 (citation omitted).

Google has shown by clear and convincing evidence that the representation in the Revival Petition—that the entire period of delay was unintentional—was material to the PTO's decision to revive the abandoned '165 Application. In other words, the PTO would not have revived the abandoned '165 Application if Dr. Friedman had not certified in the Revival Petition that the entire period of delay, between December 30, 2009, and June 7, 2017, was unintentional.

First, the PTO's own regulations and guidance demonstrate that the representation was material to the decision to grant revival of the abandoned application. Under 37 C.F.R. § 1.137, a "grantable petition" to revive an abandoned patent application "*must* be accompanied by" a "statement that the entire delay in filing the required reply from the due date for the reply until the filing of a grantable petition . . . was unintentional." 37 C.F.R. § 1.137(b) (emphasis added); see also id. § 1.137(a). As the plain text of the regulation indicates, for the petition to be "grantable" it "must be accompanied" by the required statement that the "entire delay" was "unintentional." 37 C.F.R. § 1.137(b)(4); see also Valjakka, 710 F. Supp. 3d at 793 ("The revival petition must include a statement that the entire delay . . . was unintentional") (internal quotation marks and citation omitted); Nite Glow Indus., Inc., 2020 WL 255979, at *5 n.5 ("[37 C.F.R. § 1.137(b)] requires petitions to revive to contain . . . [a] statement that the entire delay in filing the necessary reply to the outstanding office action was unintentional.") (internal quotation marks omitted); see also New York Univ., 495 F. Supp. 2d at 374 n. 4 ("The plain meaning of the word 'entire' here is that revival may not be granted where a party intentionally delays seeking revival for even a few weeks.").

69

Further, the PTO has clarified that "[a]n applicant or patentee cannot meet the 'unintentional delay' standard in [37 CFR § 1.1.37(a)] if the entire delay is not unintentional." See 85 Fed. Reg. 12222-01 at 12223. The relevant regulation and PTO guidance thus make clear that the representation as to whether the entire delay in filing the required reply was unintentional was material to the PTO's decision to grant the Revival Petition. See In re Rembrandt Techs., 899 F.3d at 1272-73 (relying on PTO regulations to conclude that the representation in revival application—that failure to pay maintenance fee was unintentional—was material to PTO's decision to revive patent); Gen. Electro Music Corp., 19 F.3d at 1411 (concluding that "false statement in a petition to make special" was material because it led to expedited consideration of the application); Ulead Sys., Inc. v. Lex Comput. & Mgmt. Corp., 351 F.3d 1139, 1146 (Fed. Cir. 2003) (finding "no serious question [ ] as to materiality" because "the misrepresentation that [patent owner] qualified as a small entity was material to the PTO's acceptance of reduced maintenance fees, and thus, survival of the patent").

Second, the testimony of Dr. Friedman and Weisner also supports a finding of materiality. Dr. Friedman testified that a requirement of a revival application is a statement that the entire period of delay was unintentional, and he assumed that the PTO relied on the statement in the Revival Petition in granting revival of the '165 Application. ECF No. 446-3 at 23. Like Dr. Friedman, Weisner also understood that the PTO was relying on the statement that the entire delay was unintentional in deciding whether to grant his Revival Petition. ECF No. 446-2 (Weisner 1/11/24 Dep.) at 218-19.

Third, the testimony of Google's expert further supports a finding of materiality. Stoll, who spent nearly three decades working at the PTO and is a former Commissioner for Patents, testified that an applicant cannot meet the unintentional delay requirement in 37 C.F.R. § 1.137

"if the entire delay is not unintentional." Tr. at 24. In other words, because § 1.137 requires that "a *grantable* petition pursuant to this section *must* be accompanied by" a statement that the entire delay was unintentional, 37 C.F.R. § 1.137(b) (emphasis added), an application without such a statement is not a grantable petition, demonstrating the but-for materiality of the statement. Further supporting this conclusion is Stoll's testimony concerning the PTO's change in its practices. As Stoll testified, the PTO changed its rules to require "additional documentation" if the period of delay was more than two years from the date the application became abandoned, because the PTO was seeing "significant issues" about "the entire period" of abandonment when the delay was much longer than two years. Tr. at 24. The fact that the PTO changed its rules when it noticed "issues" with the representation concerning the entire period of delay further bolsters a finding of materiality.

Finally, the PTO itself indicated, in granting the Revival Petition, that it was "relying on petitioner's duty of candor and good faith in accepting the statement that the entire delay in filing the required reply from the due date for the reply until the filing of a grantable petition pursuant to 37 CFR 1.137 was unintentional." Ex. JX-A at 0263. And, Stoll testified that the PTO would have relied on an applicant's duty of candor and good faith in accepting the statement that the entire period of delay was unintentional. Tr. at 22. The fact that the PTO noted its acceptance of the statement in the Revival Petition and noted that it had relied on the duty of good faith and candor undermines any contention that the representation was not material to the PTO's revival decision simply because it did not require the applicant to provide additional information or only required agreement with a pre-printed statement.

In short, the plain text of the regulation, the PTO's subsequent guidance, the PTO's revival determination, and the testimony of Dr. Friedman, Weisner, and Stoll all support a

finding, by clear and convincing evidence, that the statement in the Revival Petition that the entire delay was unintentional was material to the PTO's decision to revive the abandoned '165 Application.

### D. <u>The Entire Period of Delay was not Unintentional</u>

37 C.F.R. § 1.137 requires a statement that the "entire delay" was unintentional. <u>See</u> 37 C.F.R. § 1.137(b)(4). The Merriam-Webster dictionary defines the word "entire" as "having no element or part left out: whole." <u>See</u> "entire," <u>Merriam-Webster.com Dictionary</u>, Merriam-Webster, https://www.merriam-webster.com/dictionary/entire (accessed Nov. 18, 2025). To comport with its plain meaning, "entire" in 37 C.F.R. § 1.137(b)(4) must mean that every day that elapsed from the due date for the required reply until the filing of a grantable petition was an unintentional delay. <u>See</u> <u>Wisconsin Cent. Ltd. v. United States</u>, 585 U.S. 274, 277 (2018) (explaining that the court's "job is to interpret the words consistent with their 'ordinary meaning,'" when examining a "statutory term"). And consistent with its ordinary meaning, Stoll testified that the PTO interprets "entire delay" in 37 C.F.R. § 1.137 to mean that the "entire period" of delay was unintentional. Tr. at 23-24.

Here, Google has presented clear and convincing evidence that various periods of delay between December 30, 2009, when the '165 Application became abandoned, and June 7, 2017, when the Revival Petition was filed, were intentional. Stated differently, Weisner, Nemanov, and Dr. Friedman could not have represented in the Revival Petition that the entire delay in filing the Revival Petition was unintentional.

Weisner testified that the entire delay in responding to the PTO's Non-Final Action was unintentional because he was incapacitated; there was no other reason for the delay in responding to the PTO. ECF No. 446-2 (Weisner 2/12/25 Dep.) at 40-41. This testimony is not credible.

First, Weisner claimed that he was incapacitated during the "entire time" because of his "heavy" drug use. Id. at 56-59; ECF No. 446-2 (Weisner 1/11/24 Dep.) at 214. But Weisner began using drugs in 2008, more than a year before the Non-Final Action in September 30, 2009. ECF No. 446-2 (Weisner 2/12/25 Dep.) at 55-57. Weisner presumably was involved in the prior responses submitted to the PTO in 2008, when the '165 Application was in "active prosecution." Tr. at 27-28. And while using drugs "every single day" as early as 2008 (Weisner 2/12/25 Dep. at 56-57), Weisner was able to assist in the prosecution of his patent application. If Weisner was not involved in assisting Horowitz with submissions to the PTO that preceded the Non-Final Action, then Horowitz could have responded to the Non-Final Action without Weisner's assistance. Indeed, Stoll testified that "sometimes very little" engagement by an inventor is required to prosecute an application and "most" patent attorneys "handle the bulk of it themselves." Tr. at 31. Regardless, if Horowitz required the assistance of an inventor and Weisner was unavailable, Horowitz could have turned to Nemanov, who was not incapacitated and was, at a minimum, aware of the application, given his testimony that he was "frustrated" with how Horowitz was handling the process and Horowitz's e-mails to Weisner and Nemanov alerting them that a response to the Non-Final Action was required. ECF No. 446-4 (Nemanov 11/8/23 Dep.) at 60; ECF No. 446-4 (Nemanov 4/11/25 Dep.) at 71-72 (testifying that the abandonment had "nothing to do with [his] medical condition"); Exs. JX-B, JX-C, JX-D.

There is more. Less than two months before the PTO's Non-Final Action, Weisner entered a plea before a judge in New London, Connecticut (ECF No. 446-2 (Weisner 2/12/25 Dep.) at 80-81), conduct that is incompatible with Weisner's testimony that he was "totally nonfunctional" and "constantly" on "very heavy drugs" every single day during this time. Id. at 55-58; see also DX-AR (criminal records). To be sure, Nemanov testified that people at times

felt that Weisner, who was regarded as a substance abuser, "wasn't going to survive." ECF No. 446-4 (Nemanov 4/11/25 Dep.) at 101. But Weisner's conduct in 2008 and 2009 suggests that Weisner's substance abuse did not get worse until after a response to the Non-Final Action was required.[40]

Viewed as a whole, Weisner's and Nemanov's testimony establishes that the '165 Application was abandoned because of Weisner's inability to pay Horowitz's legal fees, and not due to Weisner's total incapacitation. Nemanov testified that Weisner insisted on using only Horowitz for the patent application, but Weisner did not have the money to pay Horowitz. ECF No. 446-4 (Nemanov 11/8/23 Dep.) at 60-61, 67, 71. Nemanov also did not have the money to pay Horowitz. Id. at 71. Weisner stopped paying Horowitz in 2009. Id. at 107. Nemanov, however, testified that he "could have gone to a different patent lawyer and very easily have finished it [himself]," referring to the '165 Application. Id. at 60.

Stoll testified that the PTO would not have considered a delay from a deliberately chosen course of action, such as deferring payment of fees and expenses, an unintentional delay within the meaning of 37 C.F.R. § 1.137. Tr. at 25, 28-29; see also MPEP § 711.03(C) ("A delay resulting from a deliberately chosen course of action on the part of the applicant is not an unintentional delay."); Aristocrat Techs. v. Int'l Game Tech., No. 06-CV-3717, 2011 WL 10934530, at *10 (N.D. Cal. May 6, 2011) (pointing to examples that the PTO considers intentional delay which all represent "a conscious decision to abandon the application[] or . . . deliberately delay prosecuting to avoid or at least postpone any additional expenses"). As such,

---

[40] Even in 2010, around June 22, 2010, Weisner was able to provide a sworn affidavit in a criminal case then-pending in New York Supreme Court, Kings County. See EX. DX-AS. At least as to that time period, the sworn affidavit refutes Weisner's claim that he was totally nonfunctional and constantly on very heavy drugs.

the decision not to respond to the September 2009 Non-Final Action was intentional and the abandonment of the '165 Application that occurred on December 30, 2009, was intentional.

Second, even putting aside the December 2009 abandonment, there are other periods of intentional delay after December 2009. More specifically, the record does not support Weisner's testimony that he was incapacitated for the entire time after he left the rehabilitation facility in February 2015 until May 2017.

Weisner entered rehab for his drug use in 2014 and he left the facility on February 20, 2015. ECF No. 446-2 (Weisner 2/12/25 Dep.) at 135, 147. By his own admission, Weisner has refrained from using drugs, except for smoking marijuana daily, after leaving rehab in February 2015. Id. at 135, 146-148, 198, 202. Although Weisner testified that during this time he was still "in the middle of healing" (id. at 132), Weisner's conduct after February 2015 further establishes that Weisner was not incapacitated for the *entire* period after February 2015 through May 2017.

To that end, Weisner engaged in conduct in 2015 and 2016 that is inconsistent with his claim that he was incapacitated and had "very, very, very minimum function." ECF No. 446-4 (Weisner 1/11/24 Dep.) at 214. Nemanov testified that he played chess with Weisner (ECF No. 446-4 (Nemanov 4/11/25 Dep.) at 128-29) and saw Weisner at parties (id. at 100, 103). According to Weisner, he lived in upstate New York, where he mediated, hiked, and learned about Jewish mysticism. ECF No. 466-2 (Weisner 2/12/25 Dep.) at 149-52. Weisner was learning about Jewish mysticism, which he admitted required him to be able to "concentrat[e] on ideas," conduct which cannot be reconciled with his claim of "very minimum function." Id. In 2016, Weisner also got a car and drove it, yet more conduct that further belies a suggestion of incapacity. Id. at 37-38. Even accounting for "some time for healing" after Weisner left rehab in February 2015, the delay that occurred during all of 2016 is wholly unexplained. If Weisner is to

be believed that he was concentrating on ideas, meditating, and driving a car, then he plainly could not have been incapacitated.

Moreover, even though Weisner acknowledged that he learned in late 2016, through a conversation with Nemanov, that the '165 Application had been abandoned (ECF No. 446-2 (Weisner 1/11/24 Dep.) at 219-220), Weisner did not take action to revive the '165 Application until several months later, in June 2017. And in the winter of 2017, Weisner spoke with a patent attorney while at a Manhattan spa and learned about revival from the attorney, but Weisner acknowledged that he did not "jump on it." Id. at 209-210; ECF No. 446-2 (Weisner 2/12/25 Dep.) at 131-132; see also Aristocrat Techs., 2011 WL 10934530, at *11 (quoting Changes to Patent Practice and Procedure, 62 Fed. Reg. 53131 (Oct. 10, 1997)) (""[A]n applicant who fails to file a petition under § 1.137 . . . (b) '*promptly*' upon becoming notified, or otherwise becoming aware of abandonment of the application . . . will probably not even be able to make an appropriate statement that 'the entire delay in filing the required reply from the due date for the reply until the filing of the a grantable petition was unintentional.'") (ellipses in original, emphasis added). Further, even if Weisner in 2016 or early 2017 believed that his patent application was "dead," a decision not to pursue revival because you "think it's dead" is still an intentional abandonment, as Stoll testified. Tr. at 30.

In short, the record establishes that the '165 Application was abandoned in 2009 due to Weisner's inability to pay Horowitz and Nemanov's decision not to proceed without Weisner. Even if not, there is no evidence upon which Weisner or Dr. Friedman could have reasonably relied to make a good faith representation that Weisner was incapacitated for the *entire* period between February 2015 and May 2017.

E.  **Intent to Deceive**

Intent to deceive "cannot be 'inferred solely from the fact that information was not disclosed; there must be a factual basis for a finding of deceptive intent.'" Purdue Pharma L.P., 438 F.3d at 1134 (quoting Hebert, 99 F.3d at 1116); see also Dayco Prods., Inc., 329 F.3d at 1367 (explaining that "[i]ntent to deceive cannot be inferred simply from the decision to withhold [information] where the reasons given for the withholding are plausible"). "Intent is generally inferred from the facts and circumstances surrounding the applicant's overall conduct, especially where there is no good faith explanation for a nondisclosure." M. Eagles Tool Warehouse, Inc., 439 F.3d at 1341. "[M]ateriality does not presume intent, which is a separate and essential component of inequitable conduct." Purdue Pharma L.P., 438 F.3d at 1134 (quoting Allen Eng'g Corp., 299 F.3d at 1352).

As discussed, Weisner's conduct during a significant period after February 2015 belies his claim of incapacitation between sometime after February 2015 and certainly during all of 2016, through the first quarter of 2017. Additionally, the record establishes that the abandonment that occurred on December 30, 2009, with the failure to respond to the Non-Final Action, was intentional because it was due to an inability to pay Horowitz's fees. Given the lengthy period of time after February 2015 and Weisner's financial troubles in 2009, the representation in the Revival Petition that the entire period of delay was unintentional could not have been based on a good faith belief that Weisner was incapacitated. Instead, as explained below, the single most reasonable inference from the evidence is that the representation was made with an intent to deceive, by Dr. Friedman and Weisner, both of whom owed the PTO a duty of good faith and candor, as Stoll testified. See Tr. at 24.

Beginning with Dr. Friedman, although Dr. Friedman certified that the entire delay was unintentional because his signature was on the Revival Petition, he knew "very much nothing about" the '165 Application. ECF No. 446-3 at 25. Dr. Friedman did not discuss the application with Weisner, he did no substantive work on the application, and he "personally made no investigation" before his signature was added to the Revival Petition. Id. at 21, 24, 26. Dr. Friedman also never asked what led to abandonment of the '165 Application, and he had no information about Weisner's capacity during any portion of the period of abandonment. Id. at 24. Further, although Dr. Friedman testified that "Horowitz most likely" investigated whether the entire delay was unintentional, Dr. Friedman was not certain that Horowitz had conducted such an investigation. Id. 21, 25-26. But even if Horowitz had investigated and Dr. Friedman was aware of that, Stoll testified that he was not aware of a prosecuting attorney who had not personally investigated the circumstances prior to making a representation that the entire delay was unintentional. Tr. at 33-34.

Simply put, Dr. Friedman had no knowledge of the facts underlying his representation in the Revival Petition that the entire period of delay was unintentional (ECF No. 446-3 at 21-22, 27), yet he nevertheless represented that the entire period of delay was unintentional. Dr. Friedman thus "represented to the PTO" that he knew it to be true that the entire period of delay was unintentional, when "[i]n reality" he "lacked any knowledge of why" Weisner had abandoned the '165 Application. 3D Med. Imaging Sys., 228 F. Supp. at 1337-38 (finding an intent to deceive where individual represented in application that delay in payment of maintenance fee was unintentional but individual had "no personal knowledge" as to why entity had failed to timely pay maintenance fee and had conducted no investigation into failure to pay).

In short, Dr. Friedman's certification "was a misrepresentation because it represented that he knew something he did not." Id. at 1338.

As occurred in 3D Medical Imaging Systems, "[t]he single most reasonable inference to be drawn from" the evidence surrounding Dr. Friedman's representation is that Dr. Friedman "made the misrepresentation with the specific intent to deceive the PTO," because he had no knowledge of the facts supporting the representation. 228 F. Supp. 3d at 1339. And, Dr. Friedman testified that he intended for the PTO to rely on the representation in the Revival Petition in granting revival of the '165 Application. ECF No. 446-3 at 23.

The circumstances here are thus distinguishable from Network Signatures, Inc., where an intent to deceive was not shown. In Network Signatures, the Federal Circuit reversed the district court's grant of summary judgment on inequitable conduct, in a case where the patent owner had allowed the patent to lapse for nonpayment of a maintenance fee, because the patent owner had mistakenly believed that there was no commercial interest in the patent and but for that mistake of fact, the patent owner would have timely paid the maintenance fee. 731 F.3d 1239, 1240-41 (Fed. Cir. 2013). In Network Signatures, however, the individual making the representation that the late payment was unintentional had knowledge of the facts supporting that representation; he was aware of the reason for the failure to timely pay the maintenance fee. See id. at 1241. The individual thus had a good faith belief when making the representation that the representation was true, and there was no evidence of "irregularity" to undermine that good faith belief. Id. at 1243.

Consistent with Network Signatures, a good faith belief about a mistake of fact that underlies a representation to the PTO by itself does not suffice to show by clear and convincing

evidence an intent to deceive.[41] But Dr. Friedman could not have had a good faith belief that the representation in the Revival Petition was truthful, because he acknowledged that he knew nothing about facts surrounding the '165 Application, the Revival Petition, or the period of abandonment.

Turning to Weisner, the facts and circumstances surrounding Weisner's conduct also support a finding that he acted with an intent to deceive. According to Weisner, Nemanov was never interested in the patent and Weisner had to "convince" Nemanov to revive the patent application. ECF No. 446-2 (Weisner 2/12/25 Dep.) at 350-51. Weisner used Nemanov's purported lack of interest to explain why Nemanov's signature was not on the first power of attorney submitted to the PTO. Ex. JX-A at 0219. Weisner testified that Nemanov's signature was omitted from the power of attorney because Nemanov "didn't have an interest" in the patent. Weisner 2/12/25 Dep. at 350, 352. But Weisner's testimony is flatly contradicted by Nemanov.

---

[41] In In re Rembrandt Technologies, the Federal Circuit stated that an "alleged mistake of fact is no defense" when, in connection with a request to revive two patents, the patent owner misrepresented to the PTO that the delay in payment of the maintenance fee was unintentional. 899 F.3d at 1273. In re Rembrandt Technologies and Network Signatures are not inconsistent, however. In In re Rembrandt Technologies, in connection with the request to revive the patents in that case, Paradyne Networks, Inc. represented that its delay in payment of the fees was unintentional and the individual who made the representation (Horstemeyer) testified that "he felt he could truthfully say that the failure to pay fees had been unintentional because of Paradyne's misunderstanding about the conditions for revival." Id. at 1261. According to Horstemeyer, Paradyne "incorrectly believed it could . . . make belated payments of the maintenance fees to revive the patents if it so desired." Id. But unlike in Network Signatures, where there was no evidence to contradict the good faith belief that the representation to revive the patent was truthful when made, 731 F.3d at 1243, in In re Rembrandt Technologies, there was other evidence in the record that undermined Horstemeyer's testimony and indicated that the mistake of fact justification "was a post hoc rationalization." Id. at 1274-75. In other words, the district court in In re Rembrandt Technologies, in concluding that the evidence showed an intent to deceive, necessarily determined that the applicant did not have a good faith belief in the mistake of fact underlying the representation made to the PTO and thus the representation was made with an intent to deceive.

According to Nemanov, when Weisner reached out to him in 2017 to revive the patent application, Nemanov was "overjoyed" and told Weisner, "let's revive it." ECF No. 446-4 (Nemanov 11/8/23 Dep.) at 63. The only plausible inference from Nemanov's testimony and his missing signature on the first power of attorney is that Weisner had attempted to revive the '165 Application without Nemanov. Indeed, Nemanov suspected this, testifying that Weisner had "tried to get the patent revived without" him, but the PTO had "stopped him." ECF No. 446-4 (Nemanov 4/11/25 Dep.) at 179. Weisner, of course, would have been financially incentivized to move forward with the patent without Nemanov.

Further evidence of an intent to deceive can be gleaned from the fact that the signature purporting to be Nemanov's signature on the second power of attorney is a forgery. On July 3, 2017, Dr. Friedman refiled the power of attorney with a signature purporting to belong to Nemanov. Ex. JX-A at 0240. Nemanov was shown the signature during his deposition, and he could not identify the signature as his own. Nemanov 4/11/25 Dep. at 197. Instead, Nemanov testified that the signature was not how he writes and he "really doubt[ed]" it was his signature. Id. Nemanov also testified that he never gave Weisner or Horowitz permission to "sign anything on [his] behalf." Id. at 201. Additionally, during his deposition, Nemanov was asked to sign his name (Tr. 65 (discussing Ex. DX-CB)), and the signature, even to a lay observer, is not remotely similar to the signature on the second power of attorney submitted to the PTO. Compare Ex. DX-CB with Ex. JX-A at 0240; see also United States v. Marshall, No. 10-CR-14 (JCH), 2011 WL 2842497, at *6 (D. Conn. July 14, 2011) (quoting United States v. Alvarez–Farfan, 338 F.3d 1043, 1045 (9th Cir. 2003)) ("The law does not require 'a questioned document examiner to vouch for the similarity of handwriting,' but instead, allows the jury to determine for itself whether the same person's handwriting appears on two documents."); Hartford Fire Ins. Co. v.

81

ABC Paving Co., No. 11-CV-14110, 2013 WL 3213096, at *7 (E.D. Mich. June 26, 2013) (finding the "the trier of fact can determine the validity of the [s]ignature by comparing it to [party's] authenticated signature").

The inconsistencies between Nemanov's signature and the signature on the power of attorney are consistent with Nemanov's testimony and further support a finding of intent to deceive. Nemanov testified that "these patents are the product of fraudulent activity, because [he] had nothing to do with them, and obviously [his] signature is on them." Nemanov 4/11/25 Dep. at 66. Although Nemanov did not elaborate as to what he meant by "fraudulent activity," when viewed in light of the other evidence, the most plausible inference is that Weisner attempted to revive the '165 Application without Nemanov.

Finally, Nemanov testified that he thought his patent was dead until 2017, when Weisner contacted him about revival of the '165 Application. ECF No. 446-4 (Nemanov 11/8/23 Dep.) at 63; ECF No. 446-4 (Nemanov 4/11/25 Dep.) at 71, 74, 130. According to Nemanov, "Weisner generated a lie that the conditions have changed." Nemanov 4/11/25 Dep. at 72. Weisner "said something" to Nemanov about "a rule change in 2014 which [ ] ma[d]e it permissible" to "claim medical" as a basis for revival. Id. As already discussed, see supra pp. 33-35, the likely rule change referenced by Weisner would have made it easier for Weisner to claim incapacitation, because it permitted a statement that the entire period of delay was unintentional, rather than the submission of documentary evidence demonstrating that the delay was unavoidable. Nemanov's testimony about the rule change and Weisner's statement to him that the change made it easier "to *claim* medical" (ECF No. 446-4, Nemanov 4/11/25 Dep. at 72) (emphasis added), considered with Weisner's conduct between 2009 and 2017 and the lengthy period of abandonment, further demonstrates that the single most reasonable inference is that Weisner made a deliberate decision

to misrepresent that he was incapacitated for the *entire* period of delay in order to obtain revival of the '165 Application. As already discussed, Weisner engaged in conduct in 2009 that contradicts his assertion of incapacity around the time that a response to the Non-Final Action was due. And Nemanov's testimony points to financial troubles as the cause of the abandonment in December 2009. Moreover, after February 2015, and certainly during all of 2016, Weisner's assertion of incapacity is incredible. Viewed against this backdrop, Nemanov's testimony is particularly damning and undermines any finding that Weisner was operating under a subjective good faith belief that his drug use sufficed to represent that the *entire* period of delay was *unintentional*.

Relying on Sauder Mfg. Co. v. J Squared, Inc., No. 14-CV-962, 2017 WL 11541154, at *2 (N.D. Ohio July 19, 2017) in its summary judgment opposition, Weisner argued that simply using or agreeing with the standard language required by the PTO cannot constitute intentional deception. ECF No. 373 at 19-20. As an initial matter, Sauder Mfg. Co. is a lower court, out-of-district case. It is not binding on this Court. Catzin v. Thank You & Good Luck Corp., No. 15-CV-7109 (KBF), 2017 WL 11675149, at *2 (S.D.N.Y. Jan. 5, 2017) ("Of course, district court cases—even those from within this Circuit—are not binding authority on this Court."). Nor is the court's conclusion in Sauder Mfg. Co. persuasive. To the extent the court determined that "merely us[ing] the standard language required by the PTO to obtain relief from a missed procedural deadline" could never constitute intent to deceive, 2017 WL 11541154, at *2, such a conclusion is at odds with a Federal Circuit decision. For example, in In re Rembrandt Technologies, the Federal Circuit found the applicant's use of the PTO's standard language concerning unintentional delay did not preclude a finding of intent to deceive. 899 F.3d at 1261, 1272-74. It also ignores 3D Medical Imaging Systems, which like In re Rembrandt

83

Technologies, found an intent to deceive even where the certification was an agreement with the PTO's "pre-populated" statement concerning unintentional delay. See 3D Med. Imaging Sys., 228 F. Supp. 3d at 1335, 1338. Consequently, agreeing with the PTO's statement that the entire period of delay was unintentional is "indeed a misrepresentation," id. at 1338, that can support a finding of intent to deceive where other evidence indicates that the single most reasonable inference is an intent to deceive. In re Rembrandt Techs., 899 F.3d at 1273-74. Lastly, the court's reasoning in Sauder Mfg. Co. would make it so that even where there was direct evidence of an intent to deceive, merely agreeing to the PTO's standard language would not suffice. If that were the case, then the statement requirement by 37 C.F.R § 1.137(b) would effectively be nullified.[42]

### F. Equities

Having determined that Google met its burden of showing a misrepresentation of material information to the PTO with the specific intent to deceive the PTO, the Court must "weigh the equities to determine whether the applicant's conduct before the PTO warrants rendering the entire patent unenforceable." Therasense, Inc., 649 F.3d at 1287. As discussed, Google has proven Weisner's and Dr. Friedman's intent to deceive the PTO and that the misrepresentation concerning the period of delay was material to the PTO's decision to revive the abandoned patent. There is no evidence in the record that weighs against rendering the entire patent unenforceable. Therefore, having found by clear and convincing evidence that Weisner's conduct was material and that he intended to deceive the PTO, I recommend that the '165 patent be held unenforceable under the inequitable conduct doctrine.

---

[42] See also supra n. 27.

III.  **Google's Rule 41(b) Motion**[43]

On October 21, 2025, Google orally moved under Federal Rule of Civil Procedure 41(b) for dismissal of Weisner's suit, as a sanction for Weisner's non-appearance. Tr. at 5-6. Weisner opposed the motion in a written brief filed on October 27, 2025. ECF No. 443. Google filed a reply brief in further support of the motion on November 3, 2025. ECF No. 447. For the reasons set forth below, I respectfully recommend that Google's motion be granted and Weisner's suit be dismissed with prejudice.

A.  **Legal Standard**

Federal Rule of Civil Procedure 41 provides that "[i]f the plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it." Fed. R. Civ. P. 41(b). "Unless the dismissal order states otherwise, a dismissal under this subdivision (b) . . . operates as an adjudication on the merits." Id.; see also Lyell Theatre Corp. v. Loews Corp., 682 F.2d 37, 42-43 (2d Cir. 1982) ("[T]he sanction of dismissal operates as an adjudication upon the merits, but may be without prejudice if so specified by the court imposing it.") (internal quotation marks and citation omitted).

"District courts have discretion to effect dismissal pursuant to Rule 41(b)." Overy v. Cestona, Turnaround, & R. Roman Truck Leasing Inc., No. 22-CV-9382 (ER), 2025 WL 3137306, at *2 (S.D.N.Y. Nov. 10, 2025) (citations omitted). In exercising that discretion, courts consider the following factors:

> (1) the duration of the plaintiff's failure to comply with the court order; (2) whether the plaintiff was on notice that failure to comply would result in dismissal; (3) whether the defendants are likely to be prejudiced by further delay in the proceedings; (4) a balancing of the court's interest in managing its docket with the plaintiff's

---

[43] The page numbers referenced herein for citations to ECF are to the electronically generated pagination in those documents.

interest in receiving a fair chance to be heard; and (5) whether the
judge has adequately considered a sanction less drastic than
dismissal.

Lucas v. Miles, 84 F.3d 532, 535 (2d Cir. 1996) (citation omitted). "Generally, no one factor is

dispositive." Shannon v. Gen. Elec. Co., 186 F.3d 186, 194 (2d Cir. 1999) (citation omitted).

Because dismissal is a "drastic remedy," Peart v. City of New York, 992 F.2d 458, 461 (2d Cir.

1993) (citation omitted), it is an appropriate remedy "only in extreme circumstances," Spencer v.

Doe, 139 F.3d 107, 112 (2d Cir. 1998) (citation omitted), and only when the district court is

"sure of the impotence of lesser sanctions." Chira v. Lockheed Aircraft Corp., 634 F.2d 664, 665

(2d Cir. 1980).

## B. Discussion

As Weisner recognizes, dismissal under Rule 41(b) is "reserved only for the most

extreme circumstances—those involving willful neglect, contemptuous conduct, or prolonged

delay." ECF No. 443 at 1. He nevertheless contends that "[t]his case presents none of those

circumstances" because he has "complied with all court orders." Id. That Weisner's counsel

could argue in a filing to this Court that Weisner "complied with *all* court orders" and did not

engage in "contemptuous conduct" is bewildering, to say the least. Counsel's argument wholly

ignores the conference on October 17, where the Court orally directed Weisner to appear at the

proceeding on October 21, and it ignores the Court's written order that followed that conference,

which again directed Weisner to appear on October 21. Weisner's continued assertion that he did

not willfully violate a court order to appear on October 21 is a frivolous argument devoid of any

record support.

To begin, on October 15, 2025, Weisner submitted his second emergency motion to

Judge Hellerstein, in which Weisner stated that "he chooses not to continue with his case in any

proceeding . . . by the Magistrate Judge without Plaintiff's consent." ECF No. 435 at 4. The Court, having read that statement, scheduled a teleconference for October 17 and directed Weisner to personally appear for that teleconference. ECF No. 437. Referring to the statement by Weisner in the October 15 submission that he "chooses not to continue with his case" in any proceeding by the undersigned, the Court explained that it had "asked for the conference" because "a line on page four" of Weisner's filing "made me think there was the potential that Plaintiff Weisner would not appear on Tuesday." ECF No. 444 at 3-4. In light of that statement in Weisner's submission, the Court asked for "confirmation that Mr. Weisner will be here on Tuesday." Id. at 4. Weisner's counsel responded that "[Weisner] does not plan on attending." Id. at 6.

Following that representation, the Court stated that if Weisner "does not attend on Tuesday, I can hold him in contempt. I can sanction him. I can certainly move forward without him there." Id. at 7. The Court then addressed Weisner directly. Id. at 8 (confirming Weisner was on the call). The Court told Weisner, "I just want to make sure we're absolutely clear. I want to warn you that you risk being held in contempt and being sanctioned for failing to appear at this hearing on Tuesday, given that you're a key witness, given that you are the plaintiff in this case." Id. The Court continued, "[A]bsent some stay or decision from Judge Hellerstein, if you're not here on Tuesday, there could be repercussions, and I want to make sure that you're aware of that." Id. After Weisner asked whether he was "being forced to prosecute" his case, the Court told Weisner, "I'm ordering you to appear on Tuesday." Id. at 8. Google's counsel, now aware of the possibility that Weisner might not appear on October 21, announced that "Google reserves the right to seek dismissal with prejudice or an adverse inference and sanctions should the plaintiff not appear." Id. at 11.

After the conference, the Court issued a written order again explicitly directing Weisner to appear at the scheduled proceeding on October 21:

> During today's conference, Plaintiff indicated that he does not intend to appear for the proceeding scheduled for October 21, 2025. Plaintiff is hereby ordered to appear on Tuesday, October 21, 2025 at 9:00 a.m. in Courtroom 26-B. Plaintiff is warned that failure to appear may result in a contempt sanction. Plaintiff may also be subject to other sanctions for failing to appear, including bearing Google's costs for preparing for the proceeding, and/or Google succeeding on its affirmative defenses through Plaintiff's default.

ECF No. 440.

Weisner, referring to the October 21 proceeding, argues that "Plaintiff himself did not appear in person, and he was not ordered to personally appear in person." ECF No. 443 at 4; see also id. at 23 ("Plaintiff was not personally commanded to appear as he was for the October 17 teleconference, therefore he did not personally violate any order."). He thus contends that he has not violated a court order because the Court had ordered *only* counsel for the parties to appear at the bench trial. Id. at 4 n.1. Considering the record just recounted, this argument is plainly baseless and was not made in good faith by Weisner's counsel.

In making this argument, Weisner's counsel cites to the Court's October 16 order, which scheduled the teleconference and directed Weisner to attend, and selectively quotes from the Court's October 17 order, directing Weisner to appear on October 21. ECF No. 443 at 4 n.1. Counsel's argument is disingenuous, at best. Mr. Davis, Weisner's counsel, was present for the teleconference on October 17. ECF No. 444 at 1. No reasonable attorney, having just heard the exchange between the Court and Weisner, including the Court's oral order directing Weisner to appear on October 21, would have interpreted the written order that followed as requiring only counsel's appearance. But even putting aside the teleconference, no reasonable attorney would

have concluded upon reading the October 17 order that Weisner was not directed to appear. The

order stated: "During today's conference, Plaintiff indicated that he does not intend to appear for

the proceeding scheduled for October 21, 2025. Plaintiff is hereby ordered to appear on Tuesday,

October 21, 2025 at 9:00 a.m. in Courtroom 26-B." ECF No. 440. Those two sentences are

unambiguous: Weisner, the plaintiff in this case, was ordered to appear on October 21. The Court

*twice* ordered Weisner to appear on October 21: orally during the teleconference on October 17,

and that same day, in a written order. And during both warnings, the Court advised Weisner of

the potential consequences he could face if he failed to appear on October 21.

   At the start of the trial on October 21, after it was clear that Weisner was not in the

courtroom, the Court addressed Weisner's nonappearance with Weisner's counsel, stating:

> I understand your client objects to the proceeding moving forward
> . . . [b]ut there was a court order that I issued, after Judge
> Hellerstein denied your second emergency motion, indicating that
> Mr. Weisner had to be here today. And he's not here. And what I
> just don't understand is how he can completely disregard that order
> when you've made these arguments to Judge Hellerstein twice
> now.

Tr. at 10. In response to the Court's statements, Weisner's counsel did not express any surprise at

the Court's statement that Weisner had been ordered to appear. At no point during the

proceeding did counsel indicate that Weisner had never been ordered to appear. In other words,

the conduct of Weisner's counsel on October 21 further demonstrates that Weisner's present

excuse for his willful behavior is merely an ill-advised attempt to justify contemptuous conduct.

Weisner violated a court order when he failed to appear on October 21. His present contention

that he did not is patently baseless and made in bad faith.

   Unfortunately, that is not the only baseless argument in Weisner's opposition to Google's

motion. The crux of Weisner's argument is that he had a basis to violate the Court's October 17

order, because the Court had no authority to conduct a bench trial absent Weisner's consent. ECF No. 443 at 15-18. This argument ignores the law.

It is a cornerstone of our judicial system that a party cannot unilaterally decide whether it will follow a court order. See, e.g., McDonald v. Head Crim. Ct. Supervisor Officer, 850 F.2d 121, 124 (2d Cir. 1988) ("An order issued by a court must be obeyed, even if it is later shown to be erroneous."); N. L. R. B. v. J. P. Stevens & Co., 464 F.2d 1326, 1329 (2d Cir. 1972) ("Our system of justice cannot survive if litigants are seized with the notion that they can ignore the lawful orders of a court simply because they may disagree with them."); Komatsu v. City of New York, No. 18-CV-3698 (LGS), 2021 WL 4427015, at *2 (S.D.N.Y. Sept. 27, 2021) ("[A]ll litigants, including pro ses, have an obligation to comply with court orders.") (citation omitted); Loc. 30, Int'l Union of Operating Eng'rs, AFL-CIO v. Wood Grp. Power Operations LLC, No. 13-CV-2499 (JS) (GRB), 2017 WL 9939042, at *4 (E.D.N.Y. Dec. 22, 2017) ("It is axiomatic that counsel may not substitute its view of the law for that of this Court; compliance with court orders remains mandatory.") (citation omitted); Khan v. Yale Univ., No. 19-CV-1966, 2025 WL 328791, at *1 n.3 (D. Conn. Jan. 29, 2025) ("Our justice system does not countenance a party picking and choosing which orders must be followed based upon that party's own view of the law.") (citation omitted). As the Supreme Court made clear in Maness v. Meyers, 419 U.S. 449 (1975), a party must comply with a court order, even when the party disagrees with that order:

> We begin with the basic proposition that all orders and judgments of courts must be complied with promptly. If a person to whom a court directs an order believes that the order is incorrect the remedy is to appeal, but, absent a stay, he must comply promptly with the order pending appeal.

Id. at 458.

Weisner's contention that had he participated on October 21, he would have somehow waived his objection is frivolous. ECF No. 443 at 16-17. Under Federal Rule of Civil Procedure

46, "[w]hen the ruling or order is requested or made, a party need only state the action that it wants the court to take or objects to, along with the grounds for the request or objection." Fed. R. Civ. P. 46. And under Federal Rule of Evidence 103(b), "[o]nce the court rules definitively on the record—either before or at trial—a party need not renew an objection or offer of proof to preserve a claim of error for appeal." Fed. R. Evid. 103(b). Weisner has repeatedly objected to a bench trial before a magistrate judge. He made an ample record of his objection, raising the objection in two motions before Judge Hellerstein and a writ of mandamus to the Federal Circuit. ECF Nos. 410, 415. Weisner's objection is plainly preserved. See, e.g., Olin Corp. v. Certain Underwriters at Lloyd's London, 468 F.3d 120, 132 (2d Cir. 2006) (citing Fed. R. Civ. P. 46) ("Generally, specifically stating an objection to the court's ruling is sufficient to preserve that issue for appeal."); United States v. Iodice, 525 F.3d 179, 182 n.1 (2d Cir. 2008) (concluding that trial counsel "sufficiently preserved [an] objection for appellate review" where counsel "explicitly placed an objection on the record"); cf. CITGO Petroleum Corp. v. Ascot Underwriting Ltd., No. 24-0227, 2025 WL 3007930, at *16 (2d Cir. Oct. 28, 2025) (listing ways in which defendant-appellants could have preserved their objection for appeal, including by "submitting [a] letter, renewing the objection at a later time, or at least indicating on the record that the objection stood"). Indeed, the Court recognized as much at the conference on October 17, noting that Weisner had preserved his objection, and noting it again on October 21. See Tr. at 10; ECF No. 444 at 7 (noting that Weisner had preserved objection).

Having made an extensive record of his objection, Weisner's only recourse was compliance with the October 17 order directing him to appear. See Maness, 419 U.S. at 459 (explaining that "once the court has ruled, counsel and others involved in the action must abide by the ruling and comply with the court's orders"); McDonald, 850 F.2d at 124 ("If a person to

whom a court directs an order believes that order is incorrect the remedy is to appeal, but, absent

a stay, he must comply promptly with the order pending appeal.") (citation omitted); Keawsri v.

Ramen-Ya Inc., No. 17-CV-2406 (LJL), 2023 WL 7735345, at *1 (S.D.N.Y. Nov. 15, 2023)

(quoting United States v. United Mine Workers of Am., 330 U.S. 258, 293 (1947)) ("[I]t is black

letter law that 'an order issued by a court with jurisdiction over the subject matter and person

must be obeyed by the parties until it is reversed by orderly and proper proceedings.'"); Ginter

Logistics Serv. Co. v. ACH Freight Forwarding, Inc., No. 07-CV-8677 (LAP), 2010 WL

4455402, at *2 (S.D.N.Y. Oct. 21, 2010) ("A party is obliged by law to comply with an order of

the court unless and until it is stayed or reversed."). And, of course, after participating in the

bench trial on October 21, Weisner could have raised objections to any Report &

Recommendation and, on appeal, raised his objection to the undersigned's authority to conduct

such a proceeding. See Maness, 419 U.S. at 460 (reasoning that although "[r]emedies for judicial

error may be cumbersome" the "injury flowing from an error generally is not irreparable, and

orderly processes are imperative to the operation of the adversary system of justice").

　　The Court was proceeding pursuant to a referral that had not been invalidated or

withdrawn, and that referral instructed the Court to conduct a bench trial if necessary. ECF No.

392. As such, the Court's October 17 order directing Weisner to appear was valid. Even if

Weisner disagreed with that order, absent a stay of the order, Weisner was required to comply

with it. Maness, 419 U.S. at 458 ("If a person to whom a court directs an order believes that

order is incorrect the remedy is to appeal, but, absent a stay, he must comply promptly with the

order pending appeal."); Palacio v. City of New York, 489 F. Supp. 2d 335, 343 (S.D.N.Y. 2007)

("Even if plaintiff disagreed with [the Court]'s order[s], he had an obligation to comply with

them."); Shady Recs., Inc. v. Source Enters., Inc., 371 F. Supp. 2d 394, 397 (S.D.N.Y. 2005) ("A

party must comply with a court order, even one later determined to be unconstitutional.") (citation omitted). The law does not permit a litigant (or his attorney) to unilaterally decide that compliance with a court order is unnecessary because they simply disagree with it. See Poly-Am., L.P. v. API Indus. Inc., No. 21-CV-8195 (JSR) (BCM), 2022 WL 2176325, at *1 (S.D.N.Y. May 27, 2022) ("The Federal Rules of Civil Procedure do not permit a party to decide for itself when, based on 'changed circumstances,' it need not obey an Order of the Court."); Woo v. City of New York, No. 93-CV-07007 (AJP) (HB), 1997 WL 277368, at *5 (S.D.N.Y. May 27, 1997) ("A party who disagrees with a Court's ruling is not free to disregard or disobey it. Rather, the litigant must obey the order, while preserving the right to challenge it later on appeal.").

   *1.  Factor One*

   Turning to the first factor, Weisner contends that he has not caused any delay, in part, because his "objection to participating actually shortened the proceedings (which were originally scheduled for three days) and thereby saved both the Court and Google both significant time and expense." ECF No. 443 at 15-16. As Google rightfully points out (ECF No. 447 at 33), this argument is insulting to the Court and Google.

   As the Court had repeatedly explained during multiple teleconferences with the parties, it was operating under strict time constraints. At Judge Hellerstein's direction, the Court needed to issue a Report & Recommendation in time for the parties to raise any objections and for Judge Hellerstein to resolve those objections in time to allow the February 2, 2026 trial on the patent-infringement claims to proceed as scheduled. ECF No. 318. In September, the Court told the parties that it did not have a lot of availability in the coming weeks, and needed to issue a Report and Recommendation by the end of November. To schedule the proceeding in this case for

October 21 through October 23, the Court canceled various settlement conferences and other proceedings that had been scheduled months in advance for those days. It rescheduled those proceedings to accommodate the parties here. But even putting that aside, Weisner's violation of the October 17 order has undoubtedly caused more work for the Court, at a minimum, in the need to address Google's Rule 41 motion. In short, Weisner's contention that his violation of a court order somehow saved the Court time is mind-boggling, at best.

Weisner's conduct also caused Google to expend unnecessary time and resources. As Google explains (ECF No. 447 at 27), it was proceeding on the assumption that Weisner and Nemanov would appear on October 21. On October 10, 2025, while Weisner was attempting to vacate Judge Hellerstein's referral, Weisner nevertheless represented to Google that if the proceeding moved forward, "Plaintiff Weisner intends to call live himself, Mr. Nemanov, and Dr. Laurence M. Westreich." ECF No. 447-5 at 1. Relying on that representation, Google expended time and resources preparing to cross-examine those witnesses. Google also raised objections to Weisner's proposed exhibits, provided binders of exhibits to the Court as ordered, and filed other pretrial materials that would have been unnecessary if Weisner had not represented that he intended to participate on October 21. See, e.g., ECF Nos. 429, 434, 438. Moreover, Weisner's conduct deprived Google of an opportunity to prove its affirmative defense through the testimony of live witnesses.

In any case, the first factor "is of limited significance where a party deliberately disobeys court orders." Feurtado v. City of New York, 225 F.R.D. 474, 478 (S.D.N.Y. 2004) (citing Peart, 992 F.2d at 461). "In such an instance, the impetus for dismissal derives from the wilfulness [sic] of the party's actions rather than the time period that has elapsed as a result of those actions." Id. The Second Circuit has indicated that this factor "is not relevant where, as here, [a party] failed

to comply with two court orders and otherwise demonstrated a lack of respect for the court."

<u>Peart</u>, 992 F.2d at 461.

Weisner's blatant violation of the Court's October 17 order (which followed an oral order during a teleconference on the same day) was disrespectful.[44] And his counsel's argument in opposition to Google's Rule 41 motion, as discussed herein, continue to show a lack of respect for the Court. Weisner wholly ignores his own willful conduct and the record to fabricate a narrative where he "was not personally commanded to appear" and therefore "did not personally violate any order." ECF No. 443 at 23. This argument, and the others discussed, when considered along with Weisner's disregard for this Court weigh in favor of dismissal.

 2. *Factor Two*

The second factor also weighs in favor of dismissal, because the Court twice warned Weisner of the consequences of nonappearance. During the teleconference on October 17, after being told that Weisner refused to appear, the Court told Weisner: "I want to warn you that you risk being held in contempt and being sanctioned for failing to appear at this hearing on Tuesday." ECF No. 444 at 8. Then, in a written order issued after the teleconference, the Court again "warned that failure to appear may result in contempt sanction." ECF No. 440. The Court went on, "Plaintiff may also be subject to other sanctions for failing to appear, including bearing Google's costs for preparing for the proceeding, and/or Google succeeding on its affirmative defenses through Plaintiff's default."[45] <u>Id.</u> Additionally, Weisner was represented by counsel,

---

[44] Additionally, by failing to comply with the Court's orders to appear on October 21, Weisner necessarily disregarded Judge Hellerstein's orders denying his requests to stay the October 21 proceeding and directing that the proceeding move forward. <u>See</u> ECF Nos. 414, 439.

[45] The Court did not warn Weisner that nonappearance could specifically result in dismissal of his case. But the Court told Weisner that among the sanctions he could receive was the possibility that Google would succeed on its affirmative defense through Weisner's default.

who presumably would have also explained to Weisner the consequences of violating a court order. Moriarty v. United States, No. 05-CV-00222, 2006 WL 2165686, at *3 n.1 (D. Conn. July 28, 2006) (noting that "counsel has a professional duty to warn his client of the potentially adverse consequences of a particular course of conduct").

In arguing that the second factor "weighs decisively for Plaintiff," Weisner makes yet another argument that does not pass the smell test. Relying on Judge Hellerstein's October 17, 2025 order, Weisner argues that the order "made absolutely no mention that the proceedings of October 21-23, 2025, were going to be a 'bench trial'" and thus Weisner "read Judge Hellerstein's October 17 order as a possible indication that he was now limiting the October 21 proceedings to only an oral argument hearing on the summary-judgment motions." ECF No. 443 at 23 (emphasis removed). To fully understand the dubious and unconvincing nature of this argument, a review of Judge Hellerstein's orders is necessary.

This all began with a referral. On August 26, 2025, Judge Hellerstein entered a written order in connection with the cross motions for summary judgment. ECF No. 392. That order stated, "I hereby refer these motions, and any bench trial that may be appropriate, to U.S. Magistrate Judge Valerie Figueredo, for a report and recommendation, pursuant to 28 U.S.C.

---

ECF No. 440. That sanction—granting Google its inequitable conduct defense—is worse than dismissal because it invalidates Weisner's patent entirely. E&E Co., 571 F. Supp. 3d at 67 ("A finding of inequitable conduct renders the entire patent unenforceable; it also can spread from a single patent to render unenforceable other related patents and applications in the same technology family.") (internal quotation marks and citation omitted). By contrast, dismissal leaves Weisner's patent intact and merely ends his suit against Google. The Court thus warned Weisner of a consequence more severe than dismissal, and Weisner nevertheless refused to appear. And, tellingly, Weisner's counsel does not argue now that Weisner was not warned of the consequences of non-appearance. See ECF No. 443 at 23-24.

§ 636(b)(1)(B)-(C)." [46] Id. On September 26, 2025, the Court issued an order scheduling the

bench trial for October 21, 2025. ECF No. 409. Weisner sought to vacate the September 26 order

scheduling a bench trial in an emergency motion filed on September 29, 2025. ECF Nos. 410-

411. In that motion, Weisner asked Judge Hellerstein to vacate the September 26 order "setting a

bench trial on Google's Affirmative Defenses, or alternatively staying the bench trial." ECF No.

410 at 1. Having been told by Weisner that a bench trial had been scheduled, on October 1, 2025,

Judge Hellerstein denied Weisner's request to vacate the referral. ECF No. 414. It did not end

there, however.

After Weisner was unsuccessful in his writ of mandamus in the Federal Circuit, Weisner

filed a second emergency motion before Judge Hellerstein. ECF No. 435. Weisner argued to

Judge Hellerstein that the proceeding scheduled to begin on October 21 was a "proceeding to

find facts on the merits of the case" (in other words, a bench trial) and that 28 U.S.C. § 636 did

not permit a District Judge to delegate the resolution of factual disputes on the merits of the case,

even where a Report and Recommendation subject to de novo review follows. ECF No. 435 at 1,

3-4. On October 17, Judge Hellerstein again denied the request to vacate the proceeding

scheduled for October 21. ECF No. 439. As the order explained, "Plaintiff's motion is an attempt

to relitigate the same issue I addressed in my opinion and order on October 1, 2025." Id. at 1. He

subsequently concluded that "Magistrate Judge Figueredo shall proceed as scheduled on October

21-23, 2025." Id.

---

[46] Judge Hellerstein followed his written order with the template, check-the-box referral
order used in this District. See ECF No. 393. That order, too, referred the dispositive "cross
motions for summary judgment on the affirmative defenses" for a Report and Recommendation
and an "evidentiary hearing if appropriate." Id.

It would have been readily apparent to Judge Hellerstein that the proceeding on October 21, whether styled a bench trial or an evidentiary hearing, was a proceeding to resolve factual disputes on the cross motions for summary judgment via a Report and Recommendation. Indeed, his referral order stated that the motions were referred for "any bench trial that may be appropriate." ECF No. 392. There simply is no good faith basis to contend that Judge Hellerstein's October 17 order, denying Weisner's request to vacate the bench trial and directing that the undersigned proceed as scheduled, had somehow limited the scope of the proceeding to an oral argument, as Weisner now claims. ECF No. 443 at 23. But, even if Weisner and his counsel could have reasonably believed that the October 21 proceeding had been changed to an oral argument, it does not excuse Weisner's violation of the Court's October 17 order directing him to appear. Regardless of the nature of the proceeding, Weisner should have complied with the order, and if the proceeding was only an oral argument, then he could have delighted and listened. But to now claim that "Plaintiff's personal appearance was not required" if the proceeding on October 21 was a "hearing on the summary judgment motions" ignores this Court's ability to compel a litigant's appearance at a proceeding. ECF No. 443 at 24. The argument itself is disrespectful and contemptuous.

### 3. *Factors Three and Four*

The third factor requires an assessment of "whether defendants are 'likely to be prejudiced by further delay.'" U.S. ex rel. Drake v. Norden Sys., Inc., 375 F.3d 248, 256 (2d Cir. 2004) (quoting Martens v. Thomann, 273 F.3d 159, 180 (2d Cir. 2001)). Prejudice resulting from an unreasonable delay may be "presumed as a matter of law." Peart, 992 F.2d at 462 (citation omitted). However, "in cases where delay is more moderate or excusable, the need to show actual prejudice is proportionally greater." Lyell Theatre Corp., 682 F.2d at 43 (citation omitted).

Although Weisner did not appear on October 21, the Court nevertheless proceeded with the proceeding and is issuing a Report & Recommendation on Google's affirmative defenses. Weisner's conduct has not delayed resolution of the cross-motions for summary judgment.

But although there has been no delay, Google was prejudiced by Weisner's conduct. After months of discovery, Google was deprived of an opportunity to present its defense through live witness testimony, with the ability to cross-examine those witnesses in open court. Google prepared for such a proceeding, expending time and resources (see ECF No. 447 at 33-34), before being told, on the eve of the bench trial, that Weisner would not appear. Nemanov also did not appear, despite previously indicating that he would be present. ECF No. 447-6. Ultimately, however, Google's efforts were not for naught because the Court proceeded without Weisner and Nemanov and is issuing a Report and Recommendation addressing Google's affirmative defenses.

In cases where this factor has weighed in favor of dismissal, the conduct of the party being sanctioned delayed the case from moving forward for at least several months and the delay itself caused prejudice to the party seeking dismissal. See, e.g., Francis v. Morganthau, No. 97-CV-5348 (SAS), 1998 WL 226186, at *2 (S.D.N.Y. May 4, 1998) (collecting cases and explaining that in successful motions under Rule 41, the delay is significant); Komatsu, 2022 WL 1446545, at *5 (noting that this factor weighed in favor of dismissal where violations of orders continued for more than two years). Here, although Google has been prejudiced, there has been no delay.

Turning to the fourth factor, a court considers "the balance between district court calendar congestion and the plaintiff's right to an opportunity to be heard." Norden Sys., 375 F.3d at 257. The Second Circuit has cautioned that "a court must not let its zeal for a tidy

calendar overcome its duty to justice." <u>Davis v. United Fruit Co.</u>, 402 F.2d 328, 331 (2d Cir.

1968); <u>see also</u> <u>Lucas</u>, 84 F.3d at 535-36 ("There must be compelling evidence of an extreme

effect on court congestion before a litigant's right to be heard is subrogated to the convenience of

the court."). As already discussed, Weisner's conduct did not prevent the Court from issuing a

Report and Recommendation on the pending cross-motions for summary judgment. Accordingly,

this factor weighs against dismissal.

    *4.* *Factor Five*

    The final factor examines the efficacy of lesser sanctions. <u>Colon v. Mack</u>, 56 F.3d 5, 7

(2d Cir. 1995) ("[C]onsideration of lesser sanctions is one of the factors that should inform a trial

court's determination to dismiss under Rule 41(b).") (citations omitted). Weisner was warned,

orally and in writing, of the potential consequences he would face if he did not appear on

October 21. Weisner's deliberate decision to violate the Court's October 17 order and ignore the

Court's warnings demonstrates that lesser sanctions would be ineffective. Weisner acted

knowingly and willfully, demonstrating that lesser sanctions would have no effect. <u>See, e.g.</u>,

<u>Brow v. City of New York</u>, 391 F. App'x 935, 937 (2d Cir. 2010) (finding that "plaintiff's failure

to comply with the order warning him of the possibility of dismissal demonstrated that lesser

sanctions would be ineffective"); <u>Martin v. City of New York</u>, No. 09-CV-2280 (PKC) (JLC),

2010 WL 1948597, at *2 (S.D.N.Y. May 11, 2010) ("The fact that plaintiff was warned that

noncompliance would result in dismissal of her claims and chose not to comply illustrates that

lesser sanctions would be insufficient."); <u>Rodriguez v. Oak Room</u>, No. 12-CV-2921 (PKC), 2012

WL 5305551, at *2 (S.D.N.Y. Oct. 23, 2012) ("In light of plaintiff's non-compliance after being

warned that the sanction for non-compliance would be dismissal, the Court concludes that a

lesser sanction would not be efficacious.").

* * *

After weighing the relevant factors, dismissal with prejudice pursuant to Rule 41(b) is appropriate. Even though Weisner's conduct did not unduly delay resolution of the cross-motions, his conduct evinces flagrant bad faith. See Gonzalez v. Comm'r of Soc. Security, No. 09-CV-10179 (RJS), 2011 WL 2207574, at *3-4 (S.D.N.Y. June 2, 2011) (ordering dismissal as a sanction even where factors three and four did not weigh in favor of dismissal); Nolan v. Primagency, Inc., No. 07-CV-134 (RJS), 2008 WL 1758644, at *4-5 (S.D.N.Y. Apr. 16, 2008) (dismissing case even where prejudice factor did not weigh in favor of dismissal). Weisner willfully flouted a court order to appear for a proceeding. As the Sixth Circuit has recognized, a plaintiff's failure to "appear at the trial date" is the "epitome of a failure to prosecute," making a Rule 41(b) dismissal "particularly appropriate." Knoll v. Am. Tel. & Tel. Co., 176 F.3d 359, 364 (6th Cir. 1999). Granted, Weisner has repeatedly claimed that the undersigned had no authority to conduct a bench trial without his consent. But by October 21, Weisner had preserved his objection, and he had failed to vacate the referral. Even if that referral is later deemed invalid, the proper course would have been for Weisner to appear on October 21 and continue to raise any challenges to the proceeding in his objections to the Report & Recommendation and later, if necessary, on appeal. See McDonald, 850 F.2d at 124 ("An order issued by a court must be obeyed, even if it is later shown to be erroneous."); see also Khan, 2025 WL 328791, at *1 n.3, *6 (noting that although plaintiff had argued that the court's order was "unconstitutional," plaintiff was still "bound by it"). Instead, Weisner circumvented the normal process. And now, rather than acknowledging that deliberate conduct, Weisner responds to Google's motion with arguments that are baseless and only serve to further bolster a finding that his conduct on October 21 was contumacious. Under the totality of the circumstances, a sanction short of

dismissal is inappropriate and will only signal to Weisner (and others) that court orders can be ignored with impunity. See Kumaran v. ADM Investor Servs., Inc., No. 20-CV-3873 (GHW) (SDA), 2025 WL 2299259, *7 (S.D.N.Y. Aug. 8, 2025) (rejecting a lesser sanction because of concern "that any sanction short of dismissal will signal to [plaintiff] that she can ignore Court deadlines with relative impunity"); Windish v. 3M Co., No. 23-CV-1531, 2024 WL 1604012, at *8 (E.D. Pa. Apr. 12, 2024) (concluding that dismissal was necessary in part to "deter similar misconduct in the future") (citation omitted); see also Nat'l Hockey League v. Metro. Hockey Club, Inc., 427 U.S. 639, 643 (1976) (explaining that dismissal may be appropriate not only to penalize conduct "but to deter those who might be tempted to such conduct in the absence of such a deterrent").

**CONCLUSION**

For the reasons set forth above, I respectfully recommend that Weisner's motion for summary judgment be **GRANTED in part**, as to the affirmative defense of prosecution laches, and **DENIED in part**, as to the affirmative defense of inequitable conduct. I also respectfully recommend that Google's motion for summary judgment be **DENIED**. Following the bench trial conducted on October 21, 2025, I respectfully recommend a finding that Weisner's conduct in reviving the '165 patent constituted inequitable conduct. Lastly, I respectfully recommend that Google's Rule 41 motion be **GRANTED** and Weisner's suit be dismissed with prejudice.

DATED:       New York, New York
             November 21, 2025

                                        Respectfully submitted,

                                        _____
                                        VALERIE FIGUEREDO
                                        United States Magistrate Judge

**PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

**Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file any objections. See also Fed. R. Civ. P. 6(a), 6(b), 6(d). A party may respond to any objections within 14 days after being served. Any objections and responses shall be filed with the Clerk of the Court. Any request for an extension of time to file objections or responses must be directed to the Honorable Alvin K. Hellerstein. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; Fed. R. Civ. P. 6(a), 6(b), 6(d); Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).**