UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------------ X
SHOLEM WEISNER and SHMUEL NEMANOV,        :
                                          :
                     Plaintiff and        :
                   Involuntary Plaintiff, :
                                          :
        -against-                         :
                                          :
                                          :
                                          :
GOOGLE LLC.                               :
                                          :
                        Defendant.        :
------------------------------------------------------------------ X
```

**OPINION AND ORDER
DENYING MOTION TO
AMEND JUDGMENT**

20 Civ. 2862 (AKH)
23 Civ. 8186 (AKH)

ALVIN K. HELLERSTEIN, U.S.D.J.:

On February 12, 2026, I concluded a bench trial on the issue of Google LLC's ("Google") affirmative defense of inequitable conduct. The bench trial took place over four days and involved testimony from Sholem Weisner and Dr. Laurence Westreich, and by video recordings of depositions, from Steven Horowitz, Mark Friedman, and Shmuel Nemanov. At the conclusion of the trial, I read into the record my findings of fact and conclusions of law and directed that judgment be entered in favor of Google, finding that Google had proved its affirmative defense of inequitable conduct by clear and convincing evidence. The facts are as I stated into the record on February 12, 2026, and as developed at trial. Plaintiff Sholem Weisner moves under Federal Rules of Civil Procedure 52(b) and 59 to amend the judgment or make additional findings of fact and conclusions of law, or alternatively for a new trial. For the following reasons, the motions are denied.

## LEGAL STANDARD

District courts "have broad discretion in determining whether to grant a motion for reconsideration." *Open Soc'y Just. Initiative v. Cent. Intel. Agency*, No. 19 CIV. 1329 (PAE), 2021 WL 4150522, at *4 (S.D.N.Y. Sept. 13, 2021) (citing *Baker v. Dorfman*, 239 F.3d 415, 427

(2d Cir. 2000)). Such a motion "is not a motion in which a movant may reargue those issues already considered when a party does not like the way the original motion was resolved." *Evolution Fast Food Gen. P'ship v. HVFG, LLC*, No. 15 Civ. 6624 (DAB), 2018 WL 1779377, at \*2 (S.D.N.Y. Mar. 28, 2018) (citation omitted). Absent "an intervening change in controlling law [or] the availability of new evidence" a motion for reconsideration shall be granted only for "the need to correct a clear error or prevent manifest injustice." *Open Soc'y Just. Initiative*, 2021 WL 4150522, at \*4 (citing *In re Pishevar*, No. 19 Misc. 503 (JGK) (SDA), 2020 WL 1862586, at \*2 (S.D.N.Y. Apr. 14, 2020)).

Under Rule 52(b), a court "may amend its findings—or make additional findings—and may amend the judgment accordingly." Fed. R. Civ. P. 52(b). "A party moving pursuant to Rule 52(b) may seek to correct 'manifest errors of law or fact . . . or in some limited situations, to present newly discovered evidence.'" *Gonzalez v. United States*, No. 17-CV-3645 (GBD), 2021 WL 1606182, at \*1–2 (S.D.N.Y. Mar. 1, 2021), *aff'd*, 80 F.4th 183 (2d Cir. 2023) (citations omitted). Rule 52(b) motions are not opportunities to "relitigate old issues, to advance new theories, or to secure a rehearing on the merits." *Id.* Under Rule 59(e), "district courts may alter or amend judgment to correct a clear error of law or prevent manifest injustice." *Id.* (citing *4 Pillar Dynasty LLC v. New York & Co., Inc.*, 933 F.3d 202, 216 (2d Cir. 2019)).

For each rule, the movant must show that the Court overlooked "controlling decisions or factual matters" that had been previously put before it. *Great Am. Ins. Co. of New York v. USF Holland, Inc.*, No. 11-CV-6879 (KBF), 2013 WL 1832185, at \*1 (S.D.N.Y. May 1, 2013). "Such motions must be narrowly construed and strictly applied in order to discourage litigants from making repetitive arguments on issues that have been thoroughly considered by the court." *Range Road Music, Inc. v. Music Sales Corp.*, 90 F.Supp.2d 390, 391–92 (S.D.N.Y. 2000).

2

Under Rule 59(a), "[t]he court may, on motion, grant a new trial on all or some of the issues . . . after a nonjury trial" or "may . . . open the judgment . . . take additional testimony, amend findings of fact and conclusions of law or make new ones." Fed. R. Civ. P. 59(a)(1)(B); Fed. R. Civ. P. 59(a)(2). Under Rule 59(a)(1), "the court should only grant [the] motion when the [fact finder's] verdict is egregious." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998) (citations omitted). And under Rule 59(a)(2), "no error is ground for granting a new trial unless refusal to take such action appears to the court inconsistent with substantial justice." *LiButti v. United States*, 178 F.3d 114, 118 (2d Cir. 1999). "[A] trial court should be most reluctant to set aside that which it has previously decided unless convinced that it was based on a mistake of fact or clear error of law, or that refusal to revisit the earlier decision would work a manifest injustice." *Id.* "Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple.'" *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 141 (2d Cir. 1998) (citation omitted).

## DISCUSSION

Following a bench trial, I found by clear and convincing evidence that Weisner forged Nemanov's signature on the July 3, 2017 power of attorney, that Weisner intentionally abandoned the patent, that Weisner acted with deceptive intent, and that the misrepresentation to the Patent Office was intentional. *See* Trial Tr. at 411:15–425 (Bench Opinion). Weisner objects to each of these findings. These objections have no merit and are merely attempts to relitigate issues fully explored and decided at trial.

3

I.   **The findings of fact and conclusions of law were proper and will not be amended.**

    A.   **The finding that Weisner forged Nemanov's signature was not clearly erroneous.**

Weisner contends that my finding of forgery is clearly erroneous because: (1) Nemanov testified at deposition that he "signed on" to the revival and was "happy" about the revival petition; (2) the record contained several other Nemanov signatures, which Weisner contends do not match the signature he produced at his 2025 deposition; and (3) I drew an improper adverse inference from Nemanov's failure to appear at trial while in possession of an undisclosed ex parte email from Nemanov dated December 30, 2025.  I reject each contention.

    1.   **The forgery finding rests on sufficient evidence.**

Weisner argues that my finding of forgery was clearly erroneous based on his perception of the balance of the evidence.  This argument is an attempt to relitigate issues decided at trial and no clear error exists.  The record contained ample evidence to support the finding, including: (1) the signature block on Nemanov's copy of the July 3, 2017 power of attorney containing a large, unexplained white space in the center of the form, suggesting digital manipulation; (2) the signature itself bears a resemblance to Weisner's handwriting, not Nemanov's; (3) the document misspells Nemanov's name in the same way that Weisner testified that he believed Nemanov's name was spelled (Trial Tr. at 203–205 (Weisner Cross)); (4) the date line (June 29, 2017) appears to be written in Weisner's handwriting, not Nemanov's and Weisner's explanation that Horowitz entered the date was not credible given Horowitz was in Israel and was sent the document digitally (Trial Tr. at 95:19–96:6 (Weisner Direct); Trial Tr. at 200–202 (Weisner Cross)); and (5) Nemanov directly testified that he believed the signature was not his and was forged (ECF No. 514-1 at 29–30 (Apr. 11, 2025 Nemanov Dep. Tr. at 197–199)).

4

Further, my findings rest on numerous credibility determinations. Weisner's testimony on this issue was rife with inconsistencies, thus I found it not credible. "It is within the province of the district court as the trier of fact to decide whose testimony should be credited … [a]nd as trier of fact, the judge is entitled, just as a jury would be, to believe some parts and disbelieve other parts of the testimony of any given witness." *Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 95 (2d Cir. 2012). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 95 (citation omitted). Therefore, the finding of forgery is not clearly erroneous and stands.

### 2. Nemanov's email to the Court does not require amendment to the finding of forgery.

Weisner argues that the December 30, 2025 email from Nemanov to my chambers, wherein Nemanov stated that he feared for his life and complained of harassment by Google, requires amending the forgery finding. He argues that this email constituted a prohibited ex parte communication under Canon 3A(4) of the Code of Conduct for United States Judges; that I possessed personal knowledge of disputed evidentiary facts within the meaning of 28 U.S.C. § 455(b)(1); and that had he been made aware of the email, he could have investigated its contents and rebutted the adverse inference Google sought concerning Nemanov's absence. None of these arguments support amending the forgery finding.

First, Weisner is incorrect that I applied an adverse inference against him for Nemanov's failure to appear. During the proceedings, I discussed the possibility of an adverse inference and asked the parties to brief the issue. *See* Trial Tr. at 237:14–241:1. However, I ultimately did not draw an adverse inference against Weisner for the failure of Nemanov to appear. Even if I had made such a finding, the weight of the evidence is such that the forgery finding stands without the need for an adverse inference.

5

Second, Weisner argues that I violated Canon 3A(4) of the Code of Conduct for United States Judges because I did not immediately inform the parties of Nemanov's December 30, 2025 email. Canon 3A(4) requires that "[i]f a judge receives an unauthorized ex parte communication bearing on the substance of a matter, the judge should promptly notify the parties of the subject matter of the communication and allow the parties an opportunity to respond, if requested." Canon 3A(4). In the email, Nemanov stated that he feared for his safety and complained of harassment by Google. The email did not address the merits of the inequitable-conduct defense, did not address the forgery, and did not address Weisner's or Nemanov's state of mind during the abandonment period. When the question of an adverse inference for Nemanov's non-appearance was raised at trial, I disclosed the substance of the email to the parties on the record, and on Weisner's request, the email itself was provided. Trial Tr. 237:15–16.

The Canon's structure makes clear that the harm it guards against is a party's gain of a "procedural, substantive, or tactical advantage as a result of the ex parte communication." Canon 3A(4)(b). Here, no such advantage accrued. I disclosed the substance of the email at the point at which its content first became material and produced the email itself on Weisner's request. Weisner could have requested the email prior to the close of trial but chose to wait until post-trial motions to raise the issue. As a result, given the lack of an adverse inference drawn and Weisner's delay in seeking the email when first learning of it during trial, Weisner was not prejudiced. Weisner can only speculate that Google discouraged Nemanov from appearing at trial, but such speculation is insufficient to require an amended finding, given the countervailing evidence that both Google and Weisner attempted to have Nemanov appear at trial, including service of subpoenas on Nemanov by Google.

6

Further, Plaintiff's § 455(b)(1) argument is unavailing because the email did not give me knowledge of any disputed evidentiary fact bearing on the merits of the inequitable-conduct defense. The email described Nemanov's subjective fears and complaints in late 2025; it did not describe the events of 2009–2017 that were the subject of the trial. Section 455(b)(1) requires recusal where the judge has "personal knowledge of disputed evidentiary facts concerning the proceeding," 28 U.S.C. § 455(b)(1), and the disputed evidentiary facts concerning this proceeding were the facts of the abandonment, the revival, and the signature on the power of attorney. The email addressed none of those.

Therefore, the forgery finding is not affected by the timing of the disclosure of the December 30, 2025 email and stands on its independent evidentiary foundation.

### B.    The finding of intentional abandonment stands.

#### 1.  The application of *Rembrandt* was proper.

Weisner contends that I misapplied the law for the intentional abandonment standard, arguing that I improperly equated knowledge of abandonment with the intent to abandon. I disagree. My finding was that Weisner intended to abandon the patent and that finding was based on clear and convincing evidence.

Plaintiff argues that under MPEP § 711.03(c)(II)(C) and *In re Rembrandt Technologies LP Patent Litigation*, only a "deliberately chosen course of action" supports a finding of intentional delay and that the touchstone is the applicant's intent behind the abandonment. *In re Rembrandt Technologies LP Patent Litigation*, 899 F.3d 1254, 1273 (Fed. Cir. 2018); *Freshub, Inc. v. Amazon.com, Inc.*, 93 F.4th 1244, 1252–53 (Fed. Cir. 2024). Plaintiff's statement of the law overreaches in its application. In *Rembrandt*, the Federal Circuit held that a delay is not unintentional within the meaning of § 1.137 where the applicant has "consciously allowed [the application] to expire." *Rembrandt*, 899 F.3d at 1273. The standard thus has two components: (i)

7

the applicant must have known that the application would lapse absent action, and (ii) the applicant must have nonetheless chosen not to act. Both components are present here, and both are supported by clear and convincing evidence. I found that Weisner was aware that the patent application would go abandoned if he did not act and that he chose to not act on it despite that knowledge. *See also Lumenyte Int'l Corp. v. Cable Lite Corp.*, 92 F.3d 1206, at *1 (Fed. Cir. 1996) (holding that abandonment due to lack of interest in pursuing after abandonment was intentional).

On the knowledge component, Weisner was actively involved in prosecuting the application through August 2009. He worked on responses, communicated with Horowitz, and understood the basic mechanics of patent prosecution. He received notice of the September 30, 2009 office action at his email address, which he continued to use for online activity through and past the abandonment period. Ex. JX-C; Trial Tr. 146:17–147:6. He knew that the application required a timely response and that failure to respond would cause it to lapse.

On the deliberate-choice element, the record establishes that Weisner, knowing what was required, chose not to act and let the patent go abandoned. Nemanov testified that the application went abandoned because Weisner could not afford continued legal fees. Apr. 11, 2025 Nemanov Dep. Tr. 106:25–107:11. That is itself a deliberate choice within the meaning of *Rembrandt*. The Federal Circuit has recognized that abandonment by an applicant who declines to invest further resources is intentional even where the applicant retains some hope that the patent might one day be revived. *Rembrandt*, 899 F.3d at 1272–73.

This is further supported by what Weisner did during the abandonment period, which demonstrated an ability to pursue the patent and a choice not to. He participated in the 2009 nolo contendere plea proceeding and executed the detailed Lebovitz affidavit. Ex. DX-AS. After leaving Passages in February 2015, he engaged in cognitively demanding activities including

8

chess, hiking, meditating, and studying Jewish philosophy. Trial Tr. 78–82. He met with Lao to discuss the patent. Apr. 11, 2025 Nemanov Dep. Tr. 86:16–18, 131:03–132:13. None of this is consistent with a person who lacked the capacity to make a deliberate choice.

The Federal Circuit's "consciously allowed" formulation contemplates precisely the conduct present here: an applicant who, fully aware of the consequences of inaction, chooses not to act for reasons sufficient to him at the time. *Rembrandt*, 899 F.3d at 1273. To require more would convert the unintentional-delay standard into a test of subjective verbalization that no inequitable-conduct defendant could ever satisfy and would, in effect, immunize knowing abandonment so long as the applicant kept his reasons private.

Therefore, the finding of intentional abandonment is supported by clear and convincing evidence and is not clearly erroneous.

### 2. The conclusions were not against the weight of the evidence.

Weisner further contends that my findings of fact and their application to my conclusions of law were against the weight of the evidence. These arguments are attempts to relitigate issues decided at trial and go to the weight of the credibility determinations I made at trial. Regardless, there is clear and convincing evidence of my conclusion.

First, in regard to the initial 2009-2010 abandonment until Weisner successfully exited rehab in February 2015, there was clear and convincing evidence of intentional abandonment. Weisner argues that my findings ignore the evidence he presented, including his own testimony and that of his expert Dr. Westreich. Weisner testified that he did not recall working on the patent after August 2009, that he was incapacitated beginning around that time, and that he was not aware of the September 30, 2009 rejection from the Patent Office. Dr. Westreich similarly testified that Weisner was incapacitated beginning around August 2009.

9

However, I found Weisner's testimony not credible because of the weight of countervailing evidence.

Contrary to Weisner's testimony, the evidence showed that Weisner actively used his email address where Horowitz provided notice of the potential for abandonment of the patent for online accounts (Ex. JX-C; Trial Tr. at 146:17–147:6 (Weisner Cross)) and Nemanov testified that the reason the patent was abandoned was for the inability to pay the legal fees to continue to pursue it. ECF No. 514-1 at 21 (Apr. 11, 2025 Nemanov Dep. Tr. at 106:25–107:11); Trial Tr. at 412:23–414:7 (Bench Opinion). Further, I found it not credible that Weisner testified that he was actively involved in the prosecution of the patent as recently as August 2009, but that just a few weeks later Weisner was so incapacitated that he could not continue to engage with the patent. Finally, there was evidence that Weisner was capable of pursuing the patent application at this time, including his ability to play online chess (Trial Tr. at 146:17–147:6 (Weisner Cross)), his participation in the Lebovitz case wherein he provided a detailed statement and affidavit (Ex. DX-AS), entering a nolo contendere plea[1], and his meeting with an individual named Lao regarding pursuit of the patent (ECF No. 514-1 at 16–17, 25 (Apr. 11, 2025 Nemanov Dep. Tr. at 86:16–18, 131:03–132:13)). Therefore, based on my balancing of the evidence and assessment of the credibility, I concluded that Weisner knew of the potential for the abandonment of the patent and deliberately chose not to pursue it further, despite his ability to do so.

Weisner also argues that I disregarded the testimony of Dr. Westreich. This is incorrect. I properly weighed Dr. Westreich's testimony against the totality of the record evidence.

---

[1] Plaintiff argues that the Connecticut casino incidents took place in 2005 and 2007, not during the abandonment period, and that I mistakenly referred to his "return to the casino" in 2009. The correction is not material. Weisner's own testimony establishes that he entered a nolo contendere plea in August 2009, after the patent was rejected and during the abandonment period (Trial Tr. at 113:6–114:19, 124:2–125:5 (Weisner Cross)), and that the plea proceeding required sworn representations of capacity. The plea itself, within the abandonment period, is the relevant fact.

10

I credited Dr. Westreich's diagnoses, which were grounded in his clinical training, his application of the DSM-5-TR, and the Passages admission records dated December 2, 2014 (Ex. 5). Trial Tr. at 261:18–20, 262:13–14, 264:6–266:11. I also credited Dr. Westreich's general testimony that severe substance-use disorders can cause executive dysfunction, memory impairment, and difficulty with step-wise tasks. Trial Tr. 309:25–310:2. However, Dr. Westreich's opinions were based on a one-hour call in which Weisner self-reported his periods of incapacitation. Trial Tr. at 296:19–21, 297:21–24 (Westreich Cross). Dr. Westreich did not examine Weisner in person. Trial Tr. 296:19–21. He did not interview collateral informants, such as family members, friends, treating clinicians outside the Passages period, who could have spoken to Weisner's day-to-day functioning during 2010–2017. Trial Tr. 297:21–24. Further, the medical records on which Dr. Westreich relied were temporally limited. The Passages records covered only the period from December 2, 2014 through Weisner's discharge in February 2015. Trial Tr. (record discussion of Ex. 5). And the pharmacy records and the Passages records together do not provide clinical observation of Weisner's functioning during the 2010–2014 pre-rehabilitation period or during the post-rehabilitation period from March 2015 through June 2017.

Given the limitations on Dr. Westreich's basis for his testimony, I weighed it appropriately against the other testimony and evidence in the record. *See McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co.*, 938 F.2d 1544, 1550 (2d Cir. 1991). This balancing acknowledged the limited ability for Dr. Westreich to fully attest to whether Weisner was fully incapacitated during the entire period, given the limited information and the inconsistent statements from Weisner himself. Therefore, in light of the full record, I found that Dr. Westreich's testimony established that Weisner had substance-use disorders and associated psychological diagnoses during the

11

relevant period, but it did not establish that Weisner was so cognitively impaired as to be incapable of the deliberate choice to abandon his patent.

Second, there was sufficient evidence to support my finding that Weisner had capacity to pursue his patent after he successfully exited rehab in February 2015, making his delay in revival until June 2017 an intentional delay. Weisner points to his testimony that he was not thinking about the patent and remained incapacitated until June 2017. I found this testimony to not be credible. After leaving rehab, Weisner reported playing chess, hiking, meditating, and studying Jewish philosophy, activities which require a higher level of thinking. Weisner also testified inconsistently regarding when he claims to have first learned that the patent was abandoned. Initially, Weisner testified that he learned of the abandonment from Nemanov sometime in 2016. However, he later testified that the first conversation he had about the patent was with Abe Rice in March 2017. *See* Trial Tr. at 174:11–176:9 (Weisner Cross). Based on this record, I found his testimony that he was incapacitated during this period not credible. I concluded that Weisner was aware that he had intentionally abandoned his patent, decided to talk to Rice about it when he happened to meet him in a bathhouse, and thereafter devised the scheme to claim unintentional abandonment. I found that Weisner's renewed interest in the patent was triggered by the release of Google's Timeline feature, finding Weisner's testimony that he was not thinking of Google not credible in light of the suspect timing of the revival and the May 2017 email from Horowitz mentioning Google. Ex. DX-BI.0001.

Therefore, Weisner's attempts to relitigate and reweigh trial evidence in his favor fail and the finding of intentional abandonment stands.

### C.   The conclusion that Weisner acted with deceptive intent stands.

Weisner makes two arguments to challenge the deceptive-intent finding. First, he contends that *Freshub, Inc. v. Amazon.com, Inc.*, 93 F.4th 1244 (Fed. Cir. 2024), required that I

find that the prosecuting attorneys, Horowitz and Friedman, subjectively believed the abandonment had been intentional, and that the absence of such a finding is dispositive. Second, he argues that the inference of deceptive intent was not the single most reasonable inference on the record. Both arguments fail.

### 1. *Freshub* does not require a finding of deceptive intent on the part of prosecuting counsel where the inventors themselves are found to have acted with deceptive intent.

Weisner contends that the finding of deceptive intent misapplied *Freshub* because I did not separately find that Horowitz and Friedman subjectively believed the abandonment was intentional. In so arguing, Weisner misconstrues the Federal Circuit's holding in *Freshub, Inc. v. Amazon.com, Inc.*, 93 F.4th 1244, 1254 (Fed. Cir. 2024), contending that it requires a specific finding of deceptive intent of counsel. This is not true.

The Federal Circuit's discussion of counsel's belief in *Freshub* was driven by the specific posture of that case: the accused infringer there had "focuse[d] entirely on the intent of [patent owner's] counsel, which it then attribute[d] to [patent owner], rather than on any intent on [patent owner's] part separate from that of its counsel." *Id.* The Federal Circuit accordingly assessed whether the record compelled a finding of deceptive intent on counsel's part because that was the only theory the defendant had advanced. *Id. Freshub* did not, however, adopt a per se rule requiring a deceptive-intent finding as to counsel whenever counsel signs the petition.

In fact, *Freshub* articulated the legal standard as "[t]o prevail on the defense of inequitable conduct, the accused infringer must prove that the *applicant* misrepresented or omitted material information with the specific intent to deceive the PTO." *Id.* (quoting *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1287 (Fed. Cir. 2011)) (emphasis added). The Federal Circuit's broader inequitable-conduct precedent forecloses Plaintiff's reading. The duty of candor

13

extends to "the inventor, on each attorney or agent who prepares or prosecutes an application and on every other individual who is substantively involved in the preparation or prosecution of the application." *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 n.6 (Fed. Cir. 1995) (citing 37 C.F.R. § 1.56). Inequitable conduct may therefore be established where any one of these individuals submits a material misrepresentation with specific intent to deceive. *See Stark v. Advanced Magnetics, Inc.*, 119 F.3d 1551, 1556 (Fed. Cir. 1997) ("One bad apple spoils the entire barrel. Misdeeds of co-inventors, or even a patent attorney, can affect the property rights of an otherwise innocent individual."). Plaintiff's contrary rule has no support in the case law and would invert the duty of candor.

Therefore, the correct legal standard requires a finding of the applicant's deceptive intent, which I applied in finding deceptive intent in Weisner and Nemanov's submissions.

### 2. Specific intent to deceive is the single most reasonable inference on this record.

Weisner also contends that my finding of an intent to deceive was incorrect based on his weighing of the evidence. The Federal Circuit requires that specific intent to deceive be "the single most reasonable inference able to be drawn from the evidence." *Therasense*, 649 F.3d at 1290. Based on the evidence articulated in the record on February 12, 2026 and as explained above, the single most reasonable inference from the record is that Weisner intended to deceive the PTO. No competing inference is reasonable on this record.

First, the certification of unintentionality to the Patent Office was unambiguous. The petition required certification that the entire delay from March 30, 2010 through the filing of the petition on June 1, 2017 was unintentional. JX-A at FH-000297–98. The form itself is explicit that this is a prerequisite to a grantable petition. *Id.* As I found at trial, certifying that the entire

14

delay was unintentional when the applicant knew that some portion of the delay was not unintentional was an "unmistakably false statement." Trial Tr. 423:16–24.

Second, the record forecloses any reasonable inference that Weisner and Nemanov subjectively believed the entire seven-year delay was unintentional. The findings on intentional abandonment establish that Weisner knew the application would lapse if he did not respond to the September 30, 2009 office action, that he had the cognitive capacity to act, and that Nemanov testified the application was abandoned because of an inability to pay legal fees. Those findings independently establish that the applicants knew the delay was not entirely unintentional.

Third, the timing and sequence of the revival establish that the certification was made with knowledge of its falsity. Google's Maps Timeline feature was launched in 2015. Trial Tr. 420:1–18. Weisner sought revival in 2017 and a May 2017 email from Horowitz specifically referenced Google. Ex. DX-BI.0001. I found that Weisner's renewed interest in the patent was triggered by the prospect of asserting it against Google. The proximity in time between the launch of the accused product, Weisner's renewed interest, and the false certification is itself probative of specific intent to deceive. *Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 543 F.3d 657, 664 (Fed. Cir. 2008), is not to the contrary. While *Aristocrat* observed that an applicant typically has no incentive to abandon and then mislead the PTO about abandonment, that observation assumes that there is no intervening event creating value in revival. Here, that intervening event was Google's launch of an accused product, which supplied precisely the incentive *Aristocrat* posited would ordinarily be absent.

Fourth, the forgery of Nemanov's signature on the July 3, 2017 power of attorney is itself evidence of consciousness of the falsity of the certification. A reasonable applicant who genuinely believed the entire delay had been unintentional would have no need to forge a co-

15

inventor's signature to secure the revival. The forgery is consistent only with an applicant who knew the certification could not withstand the scrutiny of an honestly cooperating co-inventor.

Weisner argues that the competing inference is the single most reasonable: that Weisner, owing to substance-use disorders, lacked the recollection or cognitive ability to know whether the delay had been unintentional, and that his certification therefore reflected an honest mistake rather than deception. That inference is not reasonable on this record for the reasons set forth above regarding Dr. Westreich's testimony and Weisner's contemporaneous activity. I found Weisner's testimony on his alleged incapacity not credible and the unrebutted contemporaneous evidence establishes that Weisner had the capacity to know what he was certifying.

Therefore, specific intent to deceive the PTO is the single most reasonable inference on this record and is supported by clear and convincing evidence.

### D.    The finding of materiality stands.

Weisner argues that my finding that the misrepresentation to the Patent Office was material was not supported by clear and convincing evidence. I disagree.

In submitting the Revival Petition, Weisner and Nemanov certified that the entire delay in seeking revival of the patent was unintentional. This certification of unintentionality was necessary for the Patent Office to grant the petition and the Patent Office would not have granted the petition but for the statement. The petition form itself makes clear this requirement. JX-A at FH-000297–98. Therefore, the requirement of such certification makes a misrepresentation of that certification material in and of itself. *See, e.g., 3D Medical Imaging Systems, LLC v. Visage Imaging, Inc.*, 228 F. Supp. 3d 1331, 1339 (N.D. Ga. 2017) ("Here, materiality is straightforward. The PTO regulations expressly require a petition for acceptance of late maintenance fees to include '[a] statement that the delay in payment of the maintenance fee was unintentional.' 37 C.F.R. § 1.378(b)(3). Had [patent applicant] not certified that he knew the delay was unintentional, he

16

would not have met the petition's requirements and the PTO would not have reinstated the '655 patent. That satisfies the 'but for' materiality requirement.").

Weisner argues that had the Patent Office known all the facts in the record, it may have still granted the petition and found that the entire delay was unintentional. This argument misapplies that standard. I have found that the entire delay was not unintentional and that Weisner knew that the entire period of delay was not unintentional and therefore could not truthfully certify as such. That makes the certification a material misstatement. How the Patent Office may or may not have weighed the evidence differently, under different standards, does not bear on whether the statement was material.

Further, this analysis does not require reliance on the testimony of Robert Stoll, as I made clear when I announced my decision, and therefore any argument Weisner makes against his testimony is meritless. Trial Tr. at 423:16–24.

### E. The equities weigh decisively in favor of holding the patents-in-suit unenforceable.

Weisner argues that I failed to weigh the equities before invalidating the patents, pointing to my statement at the close of the findings that I had not "balanced equities." After I delivered my findings, Plaintiff's counsel asked whether I had balanced the equities. I clarified that the equities were subsumed within the findings of materiality and deceptive intent, specifically that where a patentee has forged a co-inventor's signature and deceived the PTO about the entirety of a seven-year abandonment period, the equities do not meaningfully favor enforceability. Subsequently, I made an explicit balancing of equities in the record and found that the equities weigh in favor of invalidating the patents-in-suit because patent examiners do not have the time to investigate every applicant's personal story, because the good faith of the applicant is the bedrock

17

on which the agency's work depends, and because upholding the patents would reward a knowing deception that, if normalized, would collapse the revival process. *See* Trial Tr. at 428:1–23.

While this balancing was sufficient when the decision was announced, I expound on it here. *Therasense* instructs that "[a]s an equitable doctrine, inequitable conduct hinges on basic fairness." *Therasense*, 649 F.3d at 1292. The Federal Circuit has identified several considerations relevant to the equitable balance: the severity of the misconduct, whether the misconduct produced an unfair benefit, in the sense of a patent that would not have issued absent the misconduct, the relationship between the misconduct and the patents asserted, and the public interest in the candor requirement on which the patent system depends. *Id.* I address each in turn.

**Severity of the misconduct.** The misconduct in this case is at the most serious end of the inequitable-conduct spectrum. It comprises two distinct acts of dishonesty: (i) a forged signature on a power of attorney filed with the PTO, and (ii) a knowing material misrepresentation that the entire seven-year delay in prosecuting the '165 Application was unintentional when the applicants knew that significant portions of the delay reflected deliberate non-pursuit of the application. These acts of dishonesty are direct attacks on the candor that the patent system requires and represent serious misconduct. *See Refac Int'l, Ltd. v. Lotus Dev. Corp.*, 81 F.3d 1576, 1583 (Fed. Cir. 1996) (false statements in PTO submissions warrant inequitable-conduct finding).

**Unfair benefit and but-for materiality.** *Therasense* emphasizes that inequitable conduct should apply where "the patentee's misconduct resulted in the unfair benefit of receiving an unwarranted claim." *Therasense*, 649 F.3d at 1292. Such is the case here. The PTO regulations expressly require, as a prerequisite to revival, certification that the entire delay was unintentional. 37 C.F.R. § 1.137(a). Without that certification, the petition would not have been grantable and without the grantable petition, the '165 Application would have remained abandoned, and all the

18

patents-in-suit, which issued from continuations of that application, would not exist. The benefit Weisner received from the misrepresentation is the existence of the patents-in-suit themselves, which is the unfair benefit described in *Therasense*.

*Therasense*'s rule that inequitable conduct should not apply where "the patent would have issued anyway," does not apply. *Therasense*, 649 F.3d at 1292. Had Weisner truthfully certified that he had deliberately allowed the application to lapse for years, the petition would have been denied, the application would have remained abandoned, and the patents-in-suit would not have issued. *See 3D Med. Imaging Sys.*, 228 F. Supp. 3d at 1339 (but-for materiality satisfied where false unintentionality certification was prerequisite to revival).

**Relationship between misconduct and patents asserted.** The patents-in-suit are direct descendants of the '165 Application. The unenforceability sanction is therefore proportionate as it reaches only those patents whose existence is traceable to the tainted revival. It does not extend to unrelated patents in the family of any other applicant or to other work product of the prosecuting attorneys.

**Public interest in PTO candor.** The PTO operates on a system of self-certification that is workable because applicants are presumed to be candid. Patent examiners cannot and do not conduct independent factual investigations of every applicant's representations regarding the cause of every delay. The unintentional-delay certification under § 1.137(a) additionally asks the applicant to attest to the subjective fact of the applicant's own state of mind, which an examiner could not easily verify. Thus, the duty of candor in this certification is paramount to the integrity of the revival process, and the public interest in the integrity of that regime weighs heavily in favor of enforcing the candor requirement here.

19

**Plaintiff's countervailing equities.** Plaintiff invokes the public interest in the validity of duly-issued patents and the harshness of unenforceability as a remedy. However, the public interest in valid patents is not served by enforcement of a patent family whose existence depends on a forged signature and a knowing misrepresentation. While unenforceability is a severe remedy, *Therasense* expressly contemplates it as the appropriate remedy for misconduct of this character. *See Therasense*, 649 F.3d at 1288.

Weighing these considerations, the equities favor unenforceability. The misconduct was severe, knowing, and directly material to the existence of the asserted patents, the benefit to Plaintiff was the patents themselves, which would not exist absent the misconduct, the remedy is proportionate to the harm, and the public interest in the candor on which the PTO depends is squarely implicated. Therefore, the patents-in-suit are unenforceable.

**F.  Reliance on the proceedings before Magistrate Judge Figueredo was proper.**

Plaintiff contends that the entire proceeding is tainted because I improperly relied on findings made by Magistrate Judge Figueredo from the record developed at the October 21, 2025 proceeding before her. I disagree.

First, I have found before and do not relitigate here that the referral to Magistrate Judge Figueredo was proper. ECF No. 489. The proceeding before Judge Figueredo was a pretrial hearing to develop the evidentiary record on Google's affirmative defenses, properly referred under § 636(b)(1)(B). However, out of fairness to Weisner, I granted him the opportunity to present evidence and fully litigate the case before me in the subsequent bench trial.

Second, I reviewed Judge Figueredo's findings de novo, and Weisner was not prejudiced by their inclusion. I used her 103-page Report and Recommendation to inform my own review of the record and conducted a de novo review of her report, which was further

20

supplemented by the proceedings before me.  At the bench trial before me Weisner had the full opportunity to present all evidence and witnesses he wished to put forward, including testifying at length.  Google had the same opportunity to present its case.  This testimony and evidence were the bedrock for my findings, while the record from Judge Figueredo provided a baseline set of undisputed facts.  As a result, Weisner was not prejudiced by the proceedings before Judge Figueredo.

Weisner's invocation of the "blind consent" provision of Rule 73(b) does not change the analysis.  Even assuming Google's direct communication of consent to Judge Figueredo was procedurally imperfect, and even assuming Plaintiff preserved an objection, the remedy Plaintiff seeks, vacating the judgment, is disproportionate to any procedural irregularity.  Weisner received the proceedings before me which he requested.  Any error of statutory authority was cured by those proceedings.

## II.    Weisner's request for a new trial is denied.

Weisner's alternative request for a new trial under Rule 59(a)(1)(B) repackages the same six categories of argument addressed above.  Therefore, for the foregoing reasons, none of those arguments establishes a manifest error of law or mistake of fact that would justify a new trial.  *See Newton v. City of New York*, 171 F. Supp. 3d 156, 164 (S.D.N.Y. 2016) ("[A] court considering a Rule 59 motion for a new trial must bear in mind that the court should only grant such a motion when the [fact finder's] verdict is egregious.").  Weisner had his day in court.  He was heard at length.  The evidence was clear and convincing.  A retrial would produce the same result on the same record.

21

## CONCLUSION

Plaintiff's Motion to Amend or Make Additional Findings under Rule 52(b) and 59, to Alter or Amend the Judgment under Rule 52(b) and 59, and Alternatively for a New Trial under Rule 59 is DENIED.

SO ORDERED.

Dated:     May 14, 2026
          New York, New York

                                       ALVIN K. HELLERSTEIN
                                       United States District Judge